IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

BOARD OF EDUCATION OF SHELBY )
COUNTY, TENNESSEE, et al., )
)
   Plaintiffs, )
)
v. )     No. 11-2101
)
MEMPHIS CITY BOARD OF )
EDUCATION, et al., )
)
   Defendants. )

---

### ORDER

---

Plaintiff Board of Education of Shelby County, Tennessee ("Shelby County Board of Education") filed a complaint for a declaratory judgment on February 11, 2011. (ECF No. 1.) It filed an amended complaint on March 3, 2011. (ECF No. 22.) Defendant City of Memphis filed an answer and counterclaims on March 17, 2011. (ECF No. 49.) Defendant Memphis City Council filed an answer, counterclaim, and cross-claim on March 17, 2011. (ECF No. 50.) Defendant Memphis City Board of Education (the "Memphis City Board of Education" or the "Board of Education of the Memphis City Schools") filed an answer, counterclaim, and cross-claim on March 18, 2011. (ECF No. 52.) Defendant Board of County Commissioners of Shelby County, Tennessee ("Shelby County Commission") filed an answer and

counterclaim on March 22, 2011. (ECF No. 62.) Defendants Tennessee Department of Education and Patrick Smith, in his then official capacity as Acting Commissioner of the Tennessee Department of Education, filed an answer on March 23, 2011. (ECF No. 64.) On April 2, 2011, intervening plaintiffs Snowden Carruthers, Michael Wissman, David Reaves, Joseph Clayton, and David Pickler ("Intervening Plaintiffs") filed a verified intervening complaint. (ECF No. 103.)

The Tennessee Department of Education and Kevin Huffman, in his Official Capacity as Commissioner of the Tennessee Department of Education, answered the Memphis City Council's cross-claim and the Memphis City Board of Education's cross-claim on April 12, 2011. (ECF No. 113; ECF No. 114.) The Shelby County Board of Education answered the counterclaims filed by the City of Memphis, the Memphis City Council, the Memphis City Board of Education, and the Shelby County Commission on April 12, 2011. (ECF No. 115; ECF No. 116; ECF No. 117; ECF No. 118.) The City of Memphis answered the Memphis City Board of Education's cross-claim on April 12, 2011. (ECF No. 119.) The Memphis City Council answered the Memphis City Board of Education's cross-claim and filed a counterclaim on April 12, 2011. (ECF No. 121.) Intervening defendants Memphis Education Association, Keith O. Williams, and Karl Thomas Emens

filed an answer and counterclaim on May 11, 2011. (ECF No. 176.)

The Court held a hearing on May 12, 2011, and May 13, 2011, at which it received proof in the form of testimony and exhibits and heard oral arguments. (See ECF No. 177; ECF No. 178.) The parties agreed that the Court would decide this matter based on the testimony, the written record, and the affidavits before it after the submission of final briefs on June 30, 2011. (ECF No. 182.) Based on that record, the Court makes the following findings of fact and conclusions of law and orders the following declaratory relief.

## I.   Background

The parties do not dispute the material facts in this case. The public school system in Memphis (the "Memphis City Schools") is the largest school system in Tennessee and the twenty-third largest public school system in the United States. (See District Budget 20, ECF No. 200-2; ECF No. 199-7.) It has approximately 105,000 students and 209 schools. (See District Budget 20, ECF No. 200-2; ECF No. 199-7.) The student demographics are 85.7% African-American, 7.0% Caucasian, 5.9% Hispanic, and 1.4% other races and nationalities. (See District Budget 20, ECF No. 200-2; ECF No. 199-7.) Memphis City Schools anticipates enrolling 108,461 students during the 2011-2012 school year. (See District Budget 388, ECF No. 201-1.)

According to its financial report for the fiscal year ending June 30, 2010, Memphis City Schools owns land valued at $34,699,701, buildings and improvements valued at $802,832,197, and machinery and equipment valued at $54,694,705. (See Report 93, ECF No. 201-2.) Memphis City Schools has 16,081 full-time and part-time staff, including more than 7,000 teachers. (See District Budget 20, ECF No. 200-2; District Budget 392, ECF No. 201-1.)

Although the City of Memphis is located in Shelby County, the Shelby County Board of Education operates the Shelby County Schools, a separate school system that includes all public schools in Shelby County outside Memphis. (See, e.g., ECF No. 204-9.) Shelby County Schools has more than 48,000 students and is the fourth largest school system in Tennessee. (See id.; see also ECF No. 204-4; ECF No. 204-5; Budget 4, ECF No. 205-2.) The student demographics are approximately 55.2% Caucasian, 36.1% African-American, 4.0% Hispanic, 0.4% Native American, and 4.3% Asian/Pacific Islander. (See Report 16, ECF No. 205-3.) Shelby County Schools has 51 schools and more than 5,200 employees. (See ECF No. 204-3; ECF No. 204-5; ECF No. 204-8.) In 2010, it had total net assets valued at more than $320 million. (See Audited Financial Statements 10, ECF No. 204-7.)

In 1869, the State of Tennessee granted the Memphis City Board of Education a charter to operate a public school system

in Memphis.  (See Resolution 1, ECF No. 22-1; Answer ¶ 16, ECF No. 52; Ex. A, at 1, ECF No. 132-2; Act, ECF No. 153-5.)  On December 20, 2010, the Memphis City Board of Education voted to surrender its charter to operate the Memphis City Schools and to transfer administration of the Memphis City Schools to the Shelby County Board of Education.  (See Resolution 1-3, ECF No. 22-1; Br. 2-3, ECF No. 234; Preliminary Injunction Hr'g Ex. 13, at 4-5.)  The Board's resolution states in part:

> **THEREFORE BE IT RESOLVED THAT**, the Board of Commissioners of the Board of Education of Memphis City Schools surrenders its charter as authorized by 1961 Tennessee Private Acts Chapter 375.
>
> **BE IT FURTHER RESOLVED THAT**, the Memphis City Schools Board of Commissioners hereby request that the Shelby County Commissioners of Elections conduct a referendum that transfers the administration of Memphis City Schools to the Shelby County Board of Education as required by Tennessee Code Annotated Section 49-2-502 to take place at the same time as any future election is conducted by the Shelby County Election Commission or as provided by state law, whichever occurs sooner.

(Resolution 1-2, ECF No. 22-1; Preliminary Injunction Hr'g Ex. 13, at 4-5.)

Chapter 375 of the 1961 Private Acts of the State of Tennessee (the "1961 Private Act") amends the Memphis City Board of Education's charter "so as to authorize the Board of Education of the Memphis City Schools to dissolve the charter of the Memphis City Schools and to surrender the same to the Secretary of State, at such time as the said Board of Education

shall determine by resolution that such action is desirable, all of which shall be subject to the approval, by resolution, of the Board of Commissioners of the City of Memphis." 1961 Tenn. Priv. Acts Chapter 375. The Act provides that all laws in conflict with it are repealed and that it shall become effective after approval by a vote of not less than two-thirds of the Memphis City Council (formerly, the Board of Commissioners of the City of Memphis). Id. At the end of the Act, Joe C. Carr, the Tennessee Secretary of State, certified that it "was properly ratified and approved and is therefore operative and in effect in accordance with its provisions." Id.

When the Memphis City Board of Education adopted its December 20, 2010 resolution, Tennessee Code Annotated § 49-2-502(a) provided in its entirety that:

> The school board, school commissioners, school trustees or other duly constituted administrative officials of any special school district are authorized and empowered to transfer the administration of the schools in the special school district to the county board of education of the county in which the special school district is located. Before a transfer is effectuated, however, a referendum shall first be conducted on the subject, and the school system of the special school district shall not be transferred to the county unless a majority of the voters who cast votes in the referendum vote in favor of the transfer. The referendum shall be held by the county election commission when requested by the school board of the special school district, and the expenses of the election shall be paid from the funds of the special school district.

Tenn. Code Ann. § 49-2-502 (2009).

On January 19, 2011, the Shelby County Election Commission scheduled a referendum for City of Memphis voters that was held on March 8, 2011.  (See Ex. F, at 1, ECF No. 132-7.)  The referendum posed the question, "Shall the Administration of the Memphis City School System, a Special School District, be Transferred to the Shelby County Board of Education?"  (Br. 3, ECF No. 242.)

On January 27, 2011, the Shelby County Board of Education discussed the combination of its schools with Memphis City Schools.  (See Minutes 12-16, ECF No. 240-2.)  The Board adopted a resolution stating in part, "**NOW THEREFORE, BE IT RESOLVED** THAT THE SHELBY COUNTY BOARD OF EDUCATION UNANIMOUSLY OPPOSES [sic] THE TRANSFER OF THE MEMPHIS CITY SCHOOL SYSTEM TO THE SHELBY COUNTY BOARD OF EDUCATION."  (Id. at 17.)

On February 7, 2011, Dr. Kriner Cash ("Cash"), the superintendent of Memphis City Schools, and John S. Aitken ("Aitken"), the superintendent of the Shelby County Schools, sent a joint letter to Patrick Smith ("Smith"), the then Acting Commissioner of the Tennessee Department of Education.  (Letter, ECF No. 22-4; Preliminary Injunction Hr'g Ex. 3.)  The letter said it would take months to assimilate the information necessary to submit a plan for Smith to consider in deciding whether combining the two systems would impair, interrupt, or

diminish teachers' rights and privileges, as he was required to do by Tennessee Code Annotated § 49-5-203. (<u>See</u> Preliminary Injunction Hr'g Ex. 3, at 1.)  The letter also said that Cash and Aitken would be unable to comply with Smith's request for a plan for the protection of teachers' rights by February 15, 2011, and for an overall transition plan by March 1, 2011. (<u>See</u> <u>id.</u> at 4.)

Tennessee Code Annotated § 49-5-203(d) provides that:

> Prior to the change in any governmental structure or organization becoming effective, the commissioner of education shall determine that the rights and privileges [of teachers] protected by this section are not impaired, interrupted or diminished.  In addition to the remedies available to a teacher aggrieved by a change in the governmental structure, organization or administration of a school system or institution, the commissioner is authorized to withhold state funds in the enforcement of this section.

Tenn. Code Ann. § 49-5-203(d).

On February 10, 2011, the Memphis City Council passed a resolution approving the surrender of the Memphis City Schools' charter and dissolving the Memphis "special school district." (<u>See</u> Resolution 2-3, ECF No. 22-3; Preliminary Injunction Hr'g Ex. 13.)  The resolution states in part:

> **NOW, THEREFORE BE IT RESOLVED**, by the Memphis City Council that the Resolution of the Board of Education of the Memphis City Schools to surrender its Charter and dissolve the Memphis special school district is hereby accepted and approved, effective immediately, and a transition thereafter to be implemented in accordance with the plan of dissolution hereinafter set forth.

> **BE IT FURTHER RESOLVED**, that the Comptroller of the City is directed certify [sic] this Resolution and plan of dissolution and the Mayor is directed to cause to be filed with the Tennessee Secretary of State a certified copy of this Resolution and plan of dissolution on February 11, 2011.

(Preliminary Injunction Hr'g Ex. 13, at 2-3.)

The Tennessee General Assembly adopted and, no later than noon on February 11, 2011, the Governor of Tennessee signed and dated Chapter 1 of the 2011 Public Acts of the State of Tennessee ("Public Chapter 1").  (See Aff. ¶ 2, ECF No. 153-3.) The signed and dated bill was delivered to the Senate Engrossing Clerk's office at approximately 1:00 p.m. on February 11, 2011, and subsequently taken to the Tennessee Secretary of State's office for entry.  (See id. ¶ 3.)

Public Chapter 1 amended Tennessee Code Annotated § 49-2-502 to require that:

> Notwithstanding the provisions of subsection (a) or any other law to the contrary, *if* the proposed transfer of the administration of the schools in the special school district to the county board of education would result in an increase in student enrollment within the county school system of one hundred percent (100%) or more, *and if* a majority of the voters who cast votes in the referendum vote in favor of the transfer; *then* a comprehensive transition plan shall be developed, *and* the transfer shall take effect at the beginning of the third, full school year immediately following certification of the election results.

Tenn. Code Ann. § 49-2-502(b)(1).

9

Public Chapter 1 provides that the comprehensive transition plan is to be developed by a transition planning commission:

> (2) The comprehensive transition plan shall be developed by a transition planning commission. The transition plan shall consider and provide for each of the matters set forth in § 49-2-1201(i) and § 49-2-1204. Prior to its implementation, the transition plan shall be submitted to the department of education for review and comments. The transition planning commission shall consist of twenty-one (21) members, as follows:
>
>> (A) The county mayor, the chair of the county board of education and the chair of the board of education of the special school district shall serve as ex officio members of the commission;
>>
>> (B) The county mayor, the chair of the county board of education and the chair of the board of education of the special school district shall each appoint five (5) competent citizens to serve as members of the transition planning commission; and
>>
>> (C) The governor, the speaker of the senate and the speaker of the house of representatives shall jointly appoint three (3) competent citizens to also serve as members of the transition commission.

Tenn. Code Ann. § 49-2-502(b)(2).

Public Chapter 1 also eliminates restrictions on municipal school districts and special school districts:

> (3) From and after the effective date of the transfer of the administration of the schools in the special school district to the county board of education, the restrictions imposed on the creation of municipal school districts, in § 6-58-112(b), and special school districts, in § 49-2-501(b)(3), shall no longer apply in such county.

Tenn. Code Ann. § 49-2-502(b)(3).

Public Chapter 1 provides that it will take effect on becoming law and will apply to any proposed § 49-2-502 transfer pending on or after that date.  See 2011 Tenn. Pub. Acts Chapter 1.

At 1:21 p.m. on February 11, 2011, a certified copy of the Memphis City Council's resolution approving the surrender of the Memphis City Schools' charter was delivered to the Tennessee Secretary of State.  (See Answer ¶ 24, ECF No. 50; see also Preliminary Injunction Hr'g Ex. 13, at 1 (displaying a time stamp showing that the Secretary of State received the Memphis City Council's resolution at 1:21 p.m. on February 11, 2011).)

On February 28, 2011, the Shelby County Commission adopted an ordinance and a resolution.  (See Ordinance, ECF No. 129-2; Resolution, ECF No. 129-3; Preliminary Injunction Hr'g Ex. 4; Preliminary Injunction Hr'g Ex. 7.)  The ordinance increased the number of members serving on the Shelby County Board of Education from seven to twenty-five during any transition period established by a school board redistricting plan adopted by the Shelby County Commission if voters approved the transfer of administration of the Memphis City Schools to the Shelby County Board of Education.  (See Preliminary Injunction Hr'g Ex. 4, at 2.)  The ordinance allowed the seven current members of the Shelby County Board of Education to retain their positions but expanded the number of positions to provide proportional

11

representation to Memphis residents. (See id.) Memphis residents are not represented on the Shelby County Board of Education although they represent approximately 74% of Shelby County's population. (See id. at 1-2.)

The resolution divided Shelby County into twenty-five districts, each to be represented by one member on the Shelby County Board of Education. (See Preliminary Injunction Hr'g Ex. 7, at 2-3.) The resolution also provided that, if the Shelby County Commission could not implement its plan to create twenty-five districts, it adopted an alternative redistricting plan dividing Shelby County into seven districts with the seven seats to be filled by an election held in August 2012. (See id.) Mark H. Luttrell, Jr., the Mayor of Shelby County, refused to sign the Shelby County Commission's ordinance and resolution. (See Letter 1, ECF No. 57-9; Preliminary Injunction Hr'g Ex. 7, at 5-6.) His refusal did not affect its validity.

Approximately 67% of those voting answered the referendum question in the affirmative, approving the transfer of administration of the Memphis City Schools to the Shelby County Board of Education. See Shelby County Election Commission, available at http://www.shelbyvote.com/archives/39/030811% 20Official%20GEMS%20ELECTION%20SUMMARY%20REPORT.pdf. The Shelby County Election Commission certified the result on March 17, 2011. See id.

Since voting to surrender the Memphis City Schools' charter, the Memphis City Board of Education has continued to make decisions affecting the operation of the Memphis City Schools. (See, e.g., ECF No. 198-7.) It has held regular work sessions and board meetings to conduct business for the Memphis City Schools. (See, e.g., ECF No. 195-7; ECF No. 197-3; ECF No. 197-4; ECF No. 198-7.) It has considered approving a budget for the operation of the Memphis City Schools during the 2011-2012 school year. (See ECF No. 197-4.)

Tennessee Code Annotated § 49-2-502(b)(2) provides, by reference, that certain matters must be considered in a comprehensive transition plan before the administration of schools in a covered special school district may be transferred to a county board of education. See Tenn. Code Ann. § 49-2-502(b)(2). Those matters include the administrative organization of the proposed consolidated school system, a method to ensure no diminution in the level of educational service occurs, appropriate means to transfer assets and liabilities, and plans to preserve teachers' rights. See id.; see also Tenn. Code Ann. §§ 49-2-1201(i), 49-2-1204. Matters to be considered also include long-term planning, curricular decisions, the hiring of teachers and staff, the provision of student transportation, and plans to ensure compliance with

federal and state requirements once the school systems are combined.

## II.  Claims Asserted and Relief Requested

### A.  Shelby County Board of Education

The Shelby County Board of Education asserts nine claims. (ECF No. 22.)  First, it alleges that the Memphis City Board of Education, the Memphis City Council, and the City of Memphis have violated the rights of schoolchildren in Memphis to due process and equal protection under the Fourteenth Amendment to the United States Constitution.  (See id. at 15-16.)  Second, it alleges that the 1961 Private Act, as applied by the Memphis City Board of Education, the Memphis City Council, and the City of Memphis, violates the rights of schoolchildren in Memphis under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  (See id. at 16.)  Third, it alleges that the 1961 Private Act is unconstitutional under Article XI, Section 9 of the Tennessee Constitution.  (See id. at 17.)  Fourth, it requests a declaration of its rights and responsibilities as to teachers and non-licensed staff formerly employed by the Memphis City Board of Education.  (See id. at 18-19.)  Fifth, it requests a declaration of the proper legal procedure required for the Memphis City Board of Education to cease operations.  (See id. at 19-20.)  Sixth, it alleges that a December 20, 2010 resolution passed by the Memphis City Board

14

of Education and later approved by the Memphis City Council makes it impossible for the Shelby County Board of Education to place teachers, transfer administration from schools located in Memphis, and resolve property and funding disputes in the proper, legal, and timely manner required by Tennessee law. (See id. at 20-21.) Seventh, it alleges that the Memphis City Board of Education has impaired the Shelby County Board of Education's ability to fulfill its responsibilities under federal and state law to students in Memphis with disabilities. (See id. at 21-22.) Eighth, it alleges that the dissolution of the Memphis City Board of Education makes it impossible for the Shelby County Board of Education to comply with Tennessee law requiring school systems to provide a secure and safe environment to schoolchildren in Memphis. (See id. at 22-23.) Ninth, it requests a declaration of the rights, duties, and legal relations between the Shelby County Board of Education and the Shelby County Commission as to the Shelby County Commission's attempted expansion and reconstitution of the Shelby County Board of Education. (See id. at 23-25.)

As a remedy, the Shelby County Board of Education requests a declaratory judgment declaring the parties' rights, duties, and legal relations as to the matters set forth in the amended complaint. (See id. at 26.) It requests that the declaration include, if legally appropriate, an order (1) declaring when the

15

transfer of the administration of the public schools in Memphis to the Shelby County Board of Education has been or will be effectuated; (2) declaring the parties' rights, duties, and legal relations as to the expansion and reconstitution of the Shelby County Board of Education; or (3) declaring that the Memphis City Board of Education's effort to abandon its charter pursuant to the 1961 Private Act is null and void, relieving the Shelby County Board of Education of responsibilities for the Memphis City Schools.  (See id.)  The Shelby County Board of Education also requests an award of damages, attorney's fees, and costs under 42 U.S.C. §§ 1983 and 1988.  (See id. at 16-17, 26.)

### B.   City of Memphis

The City of Memphis asserts two counterclaims against the Shelby County Board of Education.  (See ECF No. 49.)  First, the City of Memphis alleges that the Shelby County Board of Education is legally obligated under Tennessee state law to provide for the maintenance, support, and administration of the public schools in Memphis.  (See id. at 17-19.)  Second, the City of Memphis alleges that Public Chapter 1 violates Article II, Section 17 of the Tennessee Constitution, Article XI, Section 8 of the Tennessee Constitution, and the Equal Protection Clause of the Fourteenth Amendment because it

disproportionately affects a minority population.  (See id. at 19-23.)

As a remedy, the City of Memphis requests a declaratory judgment as to the obligations of the Shelby County Board of Education under the Tennessee Constitution to provide for the maintenance, support, and administration of the public schools in Memphis, and a permanent injunction ordering the Shelby County Board of Education to fulfill its legal obligations immediately.  (See id. at 23.)  The City of Memphis also requests a declaration that Public Chapter 1 is unconstitutional under the United States and Tennessee Constitutions; an award of attorney's fees, costs, and expenses of the litigation; and any other relief the Court deems appropriate.  (See id.)

C.   Memphis City Council

The Memphis City Council asserts a counterclaim against the Shelby County Board of Education and a cross-claim against the Tennessee Department of Education.  (ECF No. 50.)  The Memphis City Council alleges that the Shelby County Board of Education has refused to perform its duty to manage and control all schools within its jurisdiction and to educate all eligible children in Shelby County.  (See id. at 17.)  The Memphis City Council also alleges that the Tennessee Department of Education has failed to require the Shelby County Board of Education to perform its duty and has failed to make a determination that the

17

rights and privileges of teachers who work at Memphis City Schools have not and will not be impaired, interrupted, or diminished by the Shelby County Board of Education's assuming its duty. (See id.)

As a remedy, the Memphis City Council requests: (1) a declaration that the lawful existence of the Memphis City Board of Education has been terminated; (2) a declaration that the Shelby County Board of Education has a duty to manage and control all schools within its jurisdiction and to provide a free public education to all eligible children who reside in Shelby County, including children in the City of Memphis; (3) an injunction ordering the Shelby County Board of Education to assume full control and management of all schools in Shelby County, including schools in Memphis; and (4) an injunction ordering the Tennessee Department of Education to determine expeditiously that the rights and privileges of teachers who work at Memphis City Schools have not and will not be impaired, interrupted, or diminished. (See id. at 17-19.) The Memphis City Council also requests any other relief to which it may be entitled. (See id. at 19.)

The Memphis City Council asserts a counterclaim against the Memphis City Board of Education. (ECF No. 121.) The City Council alleges that the Memphis City Board of Education no longer lawfully exists and has acted in concert with the Shelby

County Board of Education to defer presenting information to the Tennessee Department of Education with the intent to delay the Shelby County Board of Education's assumption of its duty to manage and control all schools within Shelby County. (See id. at 7-8.) The Memphis City Council seeks an injunction against the Memphis City Board of Education prohibiting it from taking any action to contract, sue, or otherwise continue business operations except to preserve assets and perform educational functions pending further orders of this Court. (See id. at 8.) The Memphis City Council requests a declaration that any and all actions taken by the Memphis City Board of Education or contracts that the Memphis City Board of Education has entered into, other than those necessary to preserve or transfer assets and perform educational activities, are ultra vires and void. (See id. at 9.) The Memphis City Council also requests a declaration that the lawful existence of the Memphis City Board of Education has terminated. (See id.)

### D. Memphis City Board of Education

The Memphis City Board of Education has filed a counterclaim against the Shelby County Board of Education and cross-claims against the City of Memphis, the Memphis City Council, and the State of Tennessee. (ECF No. 52.) The Memphis City Board of Education requests the Court to determine the applicability of Public Chapter 1 to the circumstances set forth

19

in the Shelby County Board of Education's amended complaint and the Memphis City Board of Education's counter-complaint and cross-complaint. (See id. at 17-18.) The Memphis City Board of Education alleges that sub-subsection (b)(3) of Public Chapter 1 ("section (b)(3)" or "(b)(3)") is unconstitutional under the Tennessee Constitution. (See id. at 18-20.) It also alleges that the City of Memphis exceeded its authority by purporting to oversee Memphis City Schools during a "winding up" period after the Memphis City Board of Education had surrendered its charter and by purporting to negotiate with the Shelby County Board of Education about property owned by Memphis City Schools. (See id. at 20-22.) The Memphis City Board of Education also seeks a determination that the Memphis City Schools have a right to continue receiving local funding as required by Tennessee law so long as the Memphis City Schools continues to exist and operate as a school district. (See id. at 22-23.)

As a remedy, the Memphis City Board of Education requests a declaratory judgment (1) declaring the parties' rights, duties, and legal relations, including when the transfer of the administration of the Memphis City Schools to the Shelby County Board of Education has been or will be effected; (2) declaring that section (b)(3) of Public Chapter 1 violates the Tennessee Constitution; (3) declaring that, if the Memphis City Board of Education's and the City of Memphis' actions were effective

under the 1961 Private Act, the City of Memphis' attempt to control and "wind up" the affairs of the Memphis City Schools is ultra vires and of no effect; and (4) declaring that the Memphis City Board of Education shall continue to exist for all purposes until it transfers administration of the Memphis City Schools to the Shelby County Board of Education, including the City Schools' right to local funding. (See id. at 23-24.) The Memphis City Board of Education also seeks any other relief to which it is entitled. (See id. at 24.)

### E.   Shelby County Commission

The Shelby County Commission has filed a counterclaim against the Shelby County Board of Education. (ECF No. 62.) In its first count, the Shelby County Commission seeks a declaratory judgment that its ordinance and resolution redistricting seats on the Shelby County Board of Education are lawful and that it has authority to fill eighteen vacancies on the redistricted Board of Education. (See id. at 26-28.) In its second count, the Shelby County Commission seeks a declaratory judgment that its alternative redistricting plan creating a seven-member Shelby County Board of Education is lawful and that the Shelby County Commission has the authority to fill seven vacancies. (See id. at 28-29.) In its third count, the Shelby County Commission seeks a declaratory judgment that Public Chapter 1 does not apply to the surrender of the

21

Memphis City Schools' charter or transfer of authority for operating Memphis City Schools to the Shelby County Board of Education. (See id. at 30.) In its fourth count, the Shelby County Commission seeks a declaratory judgment that Public Chapter 1 violates Article XI, Section 8 of the Tennessee Constitution. (See id. at 30-32.) In its fifth count, the Shelby County Commission alleges that Public Chapter 1 is impermissibly vague and violates the Fourteenth Amendment to the United States Constitution. (See id. at 32-33.) In its sixth count, the Shelby County Commission alleges that Public Chapter 1 violates Article II, Section 17 of the Tennessee Constitution. (See id. at 33-34.) In its seventh count, the Shelby County Commission alleges that Public Chapter 1 violates Article II, Section 24 of the Tennessee Constitution. (See id. at 34.) In its eighth count, the Shelby County Commission alleges that Public Chapter 1 violates Article I, Section 20 of the Tennessee Constitution and Tennessee Code Annotated § 1-3-101. (See id. at 34-35.)

As a remedy, the Shelby County Commission seeks a declaratory judgment declaring its rights, duties, and obligations, including that it is legally obligated to reapportion and redistrict positions on the Shelby County Board of Education to give immediate representation to Memphis residents, to add eighteen positions to the Shelby County Board

22

of Education, to appoint eighteen new members to the Shelby County Board of Education, and to adopt the ordinance and resolution that redistrict the Shelby County Board of Education. (See id. at 35-36.) Alternatively, the Shelby County Commission seeks a declaration that it was authorized to adopt a redistricting resolution on February 28, 2011, that redistricted all of Shelby County to create a new seven-member Shelby County Board of Education and has authority to appoint members to serve until the next general election. (See id. at 36.) The Shelby County Commission also seeks a declaration that Public Chapter 1 does not apply to the transfer of the Memphis City Schools to the Shelby County Board of Education and that Public Chapter 1 is unconstitutional. (See id. at 36-37.) The County Commission also seeks an award of attorney's fees and costs under 42 U.S.C. § 1988 and any other relief to which it is entitled. (See id. at 37.)

### F.   Intervening Plaintiffs

The Intervening Plaintiffs allege that the Shelby County Commission has violated their due process rights under the Fourteenth Amendment to the United States Constitution by interfering with their right to hold office as elected officials. (ECF No. 103.) They allege that the Shelby County Commission has violated Tennessee law. (See id. at 5-6.) They further allege that they are entitled to an injunction

prohibiting the Shelby County Commission from receiving applications for a newly-constituted Shelby County Board of Education and appointing any new members to the Shelby County Board of Education. (See id. at 6-7.)

As a remedy, the Intervening Plaintiffs request an injunction prohibiting the Shelby County Commission from receiving applications for a newly-constituted Shelby County Board of Education, selecting new members, or appointing new members. (See id. at 7.) They also request a declaration that they have the right to continue holding office for the duration of their terms, compensatory damages of not more than $20,000 per intervening plaintiff, attorney's fees under 42 U.S.C. § 1988, and any other relief the Court deems just and proper. (See id. at 7-8.)

### G.   Memphis Education Association, Keith O. Williams, and Karl Thomas Emens

The Memphis Education Association, Keith O. Williams, and Karl Thomas Emens request a judgment declaring that, on a change in the governmental structure of the Memphis City Schools, the rights and privileges of teachers employed by Memphis City Schools shall be protected from impairment, interruption, or diminution, and shall continue as obligations of the Shelby County Board of Education. (ECF No. 176.) They also request

24

any other relief the Court deems just and proper.  (See id. at
16.)

    **III. Jurisdiction**

    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "[i]n
a case of actual controversy within its jurisdiction . . . any
court of the United States, upon the filing of an appropriate
pleading, may declare the rights and other legal relations of
any interested party seeking such declaration, whether or not
further relief is or could be sought."  28 U.S.C. § 2201(a).
"The Declaratory Judgment Act does not create an independent
basis for federal subject matter jurisdiction."  Heydon v.
MediaOne of Se. Mich., Inc., 327 F.3d 466, 470 (6th Cir. 2003)
(citations omitted).  "The Act only provides courts with
discretion to fashion a remedy."  Id. (citation omitted).  "A
federal court accordingly 'must have jurisdiction already under
some other federal statute' before a plaintiff can 'invok[e] the
Act.'"  Davis v. United States, 499 F.3d 590, 594 (6th Cir.
2007) (quoting Toledo v. Jackson, 485 F.3d 836, 839 (6th Cir.
2007)).

    "A district court has subject matter jurisdiction over any
civil action 'arising under the Constitution, laws, or treaties
of the United States.'"  Id. (quoting 28 U.S.C. § 1331).  "A
claim arises under federal law when the plaintiff's statement of
his own cause of action shows that it is based upon federal laws

25

or the federal Constitution." Id. (quoting Cobb v. Contract
Transp., Inc., 452 F.3d 543, 548 (6th Cir. 2006)). The Sixth
Circuit has explained that a complaint arises under federal law
in four circumstances:

> A complaint arises under federal law if it: (1) states
> a federal cause of action; (2) includes state-law
> claims that necessarily depend on a substantial and
> disputed federal issue; (3) raises state-law claims
> that are completely preempted by federal law; or (4)
> artfully pleads state-law claims that amount to
> federal-law claims in disguise.

Ohio ex rel. Skaggs v. Brunner, 629 F.3d 527, 530 (6th Cir.
2010) (citing Mikulski v. Centerior Energy Corp., 501 F.3d 555,
560 (6th Cir. 2007) (en banc)).

Here, the parties agree that the Court has subject-matter
jurisdiction. (See, e.g., Hr'g Tr. 291-96, May 12, 2011.) The
Shelby County Board of Education alleges that the Memphis City
Board of Education, the Memphis City Council, and the City of
Memphis have violated the rights of schoolchildren in the City
of Memphis to due process and equal protection under the
Fourteenth Amendment by surrendering the Memphis City Schools'
charter and forcing the Shelby County Board of Education to
assume responsibility for educating schoolchildren in the City
of Memphis, an impossibility without a transition plan. (See
Am. Compl. ¶¶ 41-46, ECF No. 22.) According to the Shelby
County Board of Education, those defendants have made it
impossible for the Shelby County Board of Education to fulfill

its obligations under federal and state law to provide a free public education to schoolchildren in the City of Memphis without intervention by the Court. (See id. ¶ 44.) The Shelby County Board of Education also alleges that the 1961 Private Act, as applied by the Memphis City Board of Education, the Memphis City Council, and the City of Memphis, violates the rights of schoolchildren in the City of Memphis to due process and equal protection under the Fourteenth Amendment to the United States Constitution by abridging the children's right to a free and appropriate public education. (See id. ¶¶ 47-51.)

Because the Shelby County Board of Education asserts a right to relief under 42 U.S.C. § 1983 for these alleged constitutional violations (see id. ¶¶ 46, 51), the Court has federal question jurisdiction over the Board's claims against the Memphis City Board of Education, the Memphis City Council, and the City of Memphis under 28 U.S.C. § 1331. See Morrison v. Bd. of Educ. of Boyd Cnty., 521 F.3d 602, 607 (6th Cir. 2008) ("The district court had federal-question jurisdiction over this 42 U.S.C. § 1983 action." (citing 28 U.S.C. § 1331)); Pointer v. Wilkinson, 502 F.3d 369, 372 (6th Cir. 2007) ("The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 to hear Pointer's action brought under 42 U.S.C. § 1983."); Thomas v. Eby, 481 F.3d 434, 437 (6th Cir. 2007) ("The district court had federal-question jurisdiction over Thomas's § 1983 claim."

(citing 28 U.S.C. § 1331)); <u>Morrison v. Colley</u>, 467 F.3d 503, 505-06 (6th Cir. 2006) ("Because Morrison alleged the violation of rights recognized by the First and Fourteenth Amendments to the U.S. Constitution, the district court had federal-question jurisdiction under 28 U.S.C. § 1331.").

The Shelby County Board of Education's complaint also arises under federal law because it "includes state-law claims that necessarily depend on a substantial and disputed federal issue." <u>Ohio ex rel. Skaggs</u>, 629 F.3d at 530 (citing <u>Mikulski</u>, 501 F.3d at 560). "[A] federal court has subject-matter jurisdiction where: '(1) the state-law claim . . . necessarily raise[s] a disputed federal issue; (2) the federal interest in the issue [is] substantial; and (3) the exercise of jurisdiction [does] not disturb any congressionally approved balance of federal and state judicial responsibilities.'" <u>United States v. City of Loveland</u>, 621 F.3d 465, 472 (6th Cir. 2010) (quoting <u>Mikulski</u>, 501 F.3d at 568) (alterations in original); <u>see also</u> <u>Ohio ex rel. Skaggs</u>, 629 F.3d at 531 (stating that federal courts have jurisdiction under the substantial federal question doctrine "when a state-law claim turns on a disputed and substantial federal issue, and exercising jurisdiction would not upset the traditional scope of the state courts' jurisdiction" (citing <u>Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308, 313, 318 (2005))); <u>Mikulski</u>, 501 F.3d at 560

28

(stating that the substantial federal question doctrine is an exception to the well-pleaded complaint rule and "applies 'where the vindication of a right under state law necessarily turn[s] on some construction of federal law'" (quoting Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 9 (1983))).

The Shelby County Board of Education's state-law claim against the Shelby County Commission for expanding, reconstituting, and redistricting the Shelby County Board of Education necessarily raises a federal issue. (See Am. Compl. ¶¶ 87-98.) As the Sixth Circuit has found, the United States Constitution prevents the inclusion of Memphis voters in the electorate for the Shelby County Board of Education where the Shelby County Board of Education administers only a separate and distinct school system outside Memphis. See Bd. of Cnty. Comm'rs of Shelby Cnty. v. Burson, 121 F.3d 244, 246-51 (6th Cir. 1997). To decide whether the attempted expansion, reconstitution, and redistricting of the Shelby County Board of Education is lawful, the Court must first determine whether the current composition and districting of the Shelby County Board of Education violates the United States Constitution.

If the Shelby County Board of Education is already responsible for educating schoolchildren in Memphis, the Court must determine whether the current composition and districting

of the Shelby County Board of Education violate the one-person, one-vote principle in order to decide whether the Shelby County Commission's actions are lawful.   That principle is a federal issue.   See Dunn v. Blumstein, 405 U.S. 330, 336 (1972) ("There is no need to repeat now the labors undertaken in earlier cases to analyze this right to vote and to explain in detail the judicial role in reviewing state statutes that selectively distribute the franchise.   In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.") (citations omitted); Duncan v. Coffee Cnty., 69 F.3d 88, 92 (6th Cir. 1995) ("[T]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." (quoting Gray v. Sanders, 372 U.S. 368, 381 (1963))).

If the Shelby County Board of Education is not responsible for educating schoolchildren in Memphis, the inclusion of Memphis voters in the electorate for the Shelby County Board of Education is unconstitutional and the Shelby County Commission's actions to expand representation are unlawful.   See Burson, 121 F.3d at 246-51.   Regardless, the Court must decide whether the Shelby County Commission's expansion of the Shelby County Board

of Education to provide representation for Memphis residents violates the one-person, one-vote principle in order to decide the Shelby County Board of Education's state-law claim against the Shelby County Commission.

The Shelby County Board of Education's state-law claim necessarily raises one-person, one-vote issues under the United States Constitution. The parties dispute whether Memphis residents are entitled to representation on the Shelby County Board of Education. (Compare Shelby County Board of Education Br. 40, ECF No. 242 (arguing that the Shelby County Commission's redistricting and expanding the Shelby County Board of Education "is unconstitutional and should be enjoined"), with Shelby County Commission Br. 27-28, ECF No. 240 ("Here, not only is the representation for the citizens of Memphis on the Shelby County Board not proportionate – it is nonexistent. In the face of direct and uncontroverted proof that the Shelby County School Board will be making decisions which affect all of the citizens of Shelby County immediately, this Court should provide representation for those citizens on the County School Board as soon as possible.").) The Shelby County Board of Education's state-law claim necessarily raises a disputed federal issue and satisfies the first requirement of the substantial federal question doctrine. See City of Loveland, 621 F.3d at 472 (finding first element satisfied where it was impossible to

31

resolve defendant's request to terminate an agreement and plaintiff's request for declaratory relief without analyzing and interpreting a federal Clean Water Act consent decree).

"The second factor regards the substantiality of the federal interest." Id. In making that determination, courts "consider whether: (1) the case includes a federal agency; (2) the federal question is important; (3) the decision on the federal question will resolve the case; and (4) the decision will affect other cases." Id. (citing Mikulski, 501 F.3d at 570).

Here, there is a substantial federal interest. Although they have been dismissed from the case (ECF No. 184), the United States Department of Justice and the United States Department of Education were named as defendants in the amended complaint. (See Am. Compl. 1-2.) The federal question is important. It will affect all Memphis residents eligible to vote by determining whether they are being disenfranchised and represented by an unrepresentative board of education. It will also affect all Memphis schoolchildren by determining who is responsible for educating them, a decision that will, in turn, affect their parents and the teachers and staff employed by Memphis City Schools.

A decision on the federal question will resolve the claim. The Shelby County Commission cannot provide representation to

Memphis residents on the Shelby County Board of Education if the Shelby County Board of Education is not responsible for educating schoolchildren in Memphis.  See Burson, 121 F.3d at 249-51 (affirming district court's determination that the Constitution prevents the State of Tennessee from including Memphis voters in the electorate for the Shelby County Board of Education where Memphis voters resided outside the Shelby County Schools district).  A determination of whether the Shelby County Board of Education must include representation for Memphis residents will determine the rights, duties, and legal relations between the Shelby County Board of Education and the Shelby County Commission as to the expansion and reconstitution of the Shelby County Board of Education, one of the subjects of the Shelby County Board of Education's declaratory judgment requests.  (See Am. Compl. 26.)

The decision on the federal question will have a broad impact.  In another pending case before the District Court for the Western District of Tennessee, four Memphis voters allege that their right to vote has been violated because they are not allowed to vote for members of the Shelby County Board of Education.  See Jones v. Board of County Commissioners of Shelby County, No. 11-2241 (W.D. Tenn. filed March 30, 2011).  Deciding the federal question in this case will determine whether the Intervening Plaintiffs represent unrepresentative districts and

33

have a right to continue serving in office until the completion of their terms and whether the Shelby County Commission may redistrict seats on the Shelby County Board of Education.

Under these circumstances, the federal interest is substantial, and the second requirement of the substantial federal question doctrine is satisfied. See City of Loveland, 621 F.3d at 472 (finding second element satisfied where federal agencies negotiated a consent decree, the consent decree affected thousands of ratepayers in the Cincinnati metropolitan area, the resolution of defendant's obligations under the consent decree would resolve the case, and the decision on the federal question had a broad impact because, depending on the litigation's outcome, other entities might seek to circumvent consent agreements entered into between the federal government and cities to enforce the Clean Water Act).

Under the third requirement of the substantial federal question doctrine, courts "inquire into the risk of upsetting the intended balance by opening the federal courts to an undesirable quantity of litigation." Id. (quoting Mikulski, 501 F.3d at 573). The facts presented by this case are exceptional and unlikely to be repeated frequently. Exercising jurisdiction under the federal question doctrine would not open federal courts to a significant quantity of litigation. Federal courts are already charged with enforcing the one-person, one-vote

principle.   See, e.g., Burson, 121 F.3d at 247-51; see also 28
U.S.C. § 1343(a)(4) (granting district courts original
jurisdiction over civil actions "[t]o recover damages or to
secure equitable or other relief under any Act of Congress
providing for the protection of civil rights, including the
right to vote") (emphasis added); Reynolds v. Sims, 377 U.S.
533, 554 (1964) ("Undeniably the Constitution of the United
States protects the right of all qualified citizens to vote, in
state as well as in federal elections.   A consistent line of
decisions by this Court in cases involving attempts to deny or
restrict the right of suffrage has made this indelibly clear.
It has been repeatedly recognized that all qualified voters have
a constitutionally protected right to vote and to have their
votes counted.") (internal citations omitted); Panior v.
Iberville Parish Sch. Bd., 498 F.2d 1232, 1235 (5th Cir. 1974)
("[F]ederal courts have consistently held elected state boards
of education and local school boards bound by the 'one person,
one vote' standard.") (citations omitted).

     The Court's exercise of jurisdiction would not disturb any
congressionally approved balance of federal and state judicial
responsibilities.   See City of Loveland, 621 F.3d at 472
("Because federal courts are already charged with enforcing the
Clean Water Act, and federal consent decrees, by definition,
stem from a matter already within the court's jurisdiction, the

district court's exercise of jurisdiction over this matter would not open the floodgates of litigation that might overwhelm the federal courts."). Congress has chosen to give federal courts jurisdiction under 28 U.S.C. § 1343(a)(4). See 28 U.S.C. § 1343(a)(4). Therefore, the third requirement of the substantial federal question doctrine is satisfied. See City of Loveland, 621 F.3d at 472-73.

The three requirements of the substantial federal question doctrine are satisfied. See id. at 472. Because the Shelby County Board of Education's state-law claim against the Shelby County Commission necessarily depends on a substantial and disputed federal issue, it arises under federal law. See Ohio ex rel. Skaggs, 629 F.3d at 530 (citing Mikulski, 501 F.3d at 560). Therefore, the Court has jurisdiction over the state-law claim under 28 U.S.C. § 1331. See 28 U.S.C. § 1331; Davis, 499 F.3d at 594.

There is an additional basis for subject matter jurisdiction. "Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." Franchise Tax Bd. of State of Cal., 463 U.S. at 19; see also Bell & Beckwith v. United States, 766 F.2d 910, 914 (6th Cir. 1985) ("In interpleader actions as in declaratory

36

judgment actions, federal question jurisdiction exists if such jurisdiction would have existed in a coercive action by the defendant."). "Federal question jurisdiction 'exists in a declaratory judgment action if the plaintiff has alleged facts in a well-pleaded complaint which demonstrate that the defendant could file a coercive action arising under federal law.'" Stuart Weitzman, LLC v. Microcomputer Res., Inc., 542 F.3d 859, 862 (11th Cir. 2008) (quoting Household Bank v. JFS Grp., 320 F.3d 1249, 1251 (11th Cir. 2003)); see Bell & Beckwith, 766 F.2d at 913 ("[T]he Supreme Court recently noted that federal courts have regularly taken original jurisdiction over declaratory judgment suits where the declaratory judgment defendant could bring a coercive action that would necessarily present a federal question." (citing Franchise Tax Bd. of State of Cal., 463 U.S. at 5-7) (emphasis added)); Glover v. Nationwide Mut. Fire Ins. Co., 676 F. Supp. 2d 602, 618 (W.D. Mich. 2009) ("To determine whether a declaratory judgment complaint raises a claim within the court's federal-question jurisdiction, the court must consider whether the facts alleged in the plaintiff's well-pleaded complaint show that the defendant could file a coercive action arising under federal law." (citing AmSouth Bank v. Dale, 386 F.3d 763, 775 (6th Cir. 2004))).

The facts alleged by the Shelby County Board of Education demonstrate that the declaratory judgment defendants could file

a coercive action arising under federal law.  A complaint that "states a federal cause of action" or "includes state-law claims that necessarily depend on a substantial and disputed federal issue" arises under federal law.  Ohio ex rel. Skaggs, 629 F.3d at 530 (citing Mikulski, 501 F.3d at 560).  Based on the facts alleged in the Shelby County Board of Education's well-pleaded complaint, the declaratory judgment defendants could assert a federal cause of action against the Shelby County Board of Education for violating the Fourteenth Amendment.  See, e.g., Albrecht v. Treon, 617 F.3d 890, 894 (6th Cir. 2010) (stating that property rights protected by the Due Process Clause of the Fourteenth Amendment "are principally created by state law"); Laney v. Farley, 501 F.3d 577, 581 (6th Cir. 2007) ("Like Ohio, Tennessee has created a free education system and requires attendance in school.  Thus Tennessee students have a legitimate property interest in educational benefits and, therefore, in actually attending school.") (citation omitted); Seal v. Morgan, 229 F.3d 567, 574 (6th Cir. 2000) ("It is undisputed that [a student] enjoyed a property interest in his public high school education under Tennessee law.  Tennessee not only provides its citizens with the right to a free public education, but requires them to attend school through the age of eighteen.") (citations omitted).

38

The declaratory judgment defendants could also assert, as the Shelby County Commission has in a counterclaim, that the one-person, one-vote principle requires that residents of Shelby County residing in Memphis have representation on the Shelby County Board of Education. (See Shelby County Commission Countercl. ¶¶ 45-50, ECF No. 62.) Therefore, the declaratory judgment defendants could assert a coercive action arising under federal law by stating a federal cause of action. See Ohio ex rel. Skaggs, 629 F.3d at 530 (citing Mikulski, 501 F.3d at 560).

The declaratory judgment defendants could also assert state-law claims that necessarily depend on a substantial and disputed federal issue: whether the current constitution and electoral districts of the Shelby County Board of Education violate the United States Constitution. For example, the Shelby County Commission could assert, as it has in a counterclaim, that Tennessee law authorizes it to redistrict the Shelby County Board of Education and appoint members representing Memphis. See Tenn. Code Ann. § 49-2-201(a)(1) ("Members of county boards of education shall be residents of and elected from districts of substantially equal population established by resolution of the local legislative body."); (See Shelby County Commission Countercl. ¶¶ 45-50, ECF No. 62). That assertion necessarily raises the substantial and disputed federal issue of whether the Shelby County Board of Education's current electoral districts

are unconstitutional.  The federal interest in that issue is substantial and exercising jurisdiction would not disturb any congressionally approved balance of federal and state judicial responsibilities.  Therefore, the declaratory judgment defendants could assert a coercive action arising under federal law by asserting "state-law claims that necessarily depend on a substantial and disputed federal issue."  See Ohio ex rel. Skaggs, 629 F.3d at 530 (citing Mikulski, 501 F.3d at 560).

The Supreme Court has instructed "that a counterclaim—which appears as part of the defendant's answer, not as part of the plaintiff's complaint—cannot serve as the basis for 'arising under' jurisdiction."  Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 831 (2002).  That does not abrogate the principle that federal question jurisdiction exists over "a declaratory judgment action if the plaintiff has alleged facts in a well-pleaded complaint which demonstrate that the defendant could file a coercive action arising under federal law."  Stuart Weitzman, 542 F.3d at 862 (quoting Household Bank, 320 F.3d at 1251); see also Franchise Tax Bd. of State of Cal., 463 U.S. at 19; Bell & Beckwith, 766 F.2d at 913; Glover, 676 F. Supp. 2d at 618.  The Shelby County Board of Education has alleged facts in its well-pleaded complaint which demonstrate that the defendants could file a coercive action arising under federal law.  See Ohio ex rel. Skaggs, 629 F.3d at 530 (citing

Mikulski, 501 F.3d at 560). The Court has federal question jurisdiction over the Shelby County Board of Education's declaratory judgment action. See Stuart Weitzman, 542 F.3d at 862; Bell & Beckwith, 766 F.2d at 913.

The Court also has jurisdiction under 28 U.S.C. § 1343(a)(4) over the Shelby County Board of Education's claim against the Shelby County Commission. See 28 U.S.C. § 1343(a)(4).

The Shelby County Board of Education's claim raises four federal questions: (1) its federal cause of action under 42 U.S.C. § 1983, (2) its state-law claim against the Shelby County Commission, necessarily raising and depending on a substantial and disputed federal issue, (3) its declaratory judgment action alleging facts in a well-pleaded complaint which demonstrate that the defendants could file a coercive action arising under federal law, and (4) its claim against the Shelby County Commission under 28 U.S.C. § 1343(a)(4).

The Court has supplemental jurisdiction over the Shelby County Board of Education's remaining state-law claims because they "derive from a common nucleus of operative facts" and "form part of the same case or controversy" as the claims over which the Court has original jurisdiction. Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 209 (6th Cir. 2004); see 28 U.S.C. § 1367(a).

The Court has federal question jurisdiction over several of the parties' counterclaims.   The City of Memphis alleges that Public Chapter 1 violates the Equal Protection Clause of the Fourteenth Amendment.   (See City of Memphis Countercl. ¶¶ 14-31, ECF No. 49.)   The Shelby County Commission alleges that Public Chapter 1 violates the Fourteenth Amendment to the United States Constitution.   (See Shelby County Commission Countercl. ¶¶ 73-76, ECF No. 62.)   Those claims arise under federal law.   See Ohio ex rel. Skaggs, 629 F.3d at 530 (citing Mikulski, 501 F.3d at 560).   The Court has subject matter jurisdiction over them under 28 U.S.C. § 1331.   See 28 U.S.C. § 1331; Davis, 499 F.3d at 594.   Even if the claims did not arise under federal law, the Court would have supplemental jurisdiction over them.   See 28 U.S.C. § 1367.

The Court has supplemental jurisdiction over the parties' remaining counterclaims and cross-claims because they "derive from a common nucleus of operative facts" and "form part of the same case or controversy" as the claims over which the Court has original jurisdiction.   See O'Brien v. Ed Donnelly Enters., Inc., 575 F.3d 567, 581 (6th Cir. 2009); Harper, 392 F.3d at 209; see also Frisby v. Keith D. Weiner & Assocs. Co., LPA, 669 F. Supp. 2d 863, 872 (N.D. Ohio 2009) ("[T]his Court may exercise supplemental jurisdiction over the counterclaim as long as the counterclaim is part of the same 'case or controversy' as

the underlying claim, § 1367(a), not specifically excluded by § 1367(b), and not coupled with any persuasive reason to nevertheless decline jurisdiction under § 1367(c).").

The Court has federal question jurisdiction over the Intervening Plaintiffs' claim under 42 U.S.C. § 1983 that the Shelby County Commission has violated their due process rights under the Fourteenth Amendment. See 28 U.S.C. § 1331; Nolan v. Memphis City Schools, 589 F.3d 257, 264 (6th Cir. 2009). The Court has supplemental jurisdiction over the Intervening Plaintiffs' claim that the Shelby County Commission has violated Tennessee state law. See 28 U.S.C. § 1367; Nolan, 589 F.3d at 264.

## IV. Justiciability

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" Nat'l Rifle Ass'n of Am. v. Magaw, 132 F.3d 272, 279 (6th Cir. 1997) (quoting U.S. Const. art. III, § 2). "In an attempt to give meaning to Article III's 'case or controversy' requirement, the courts have developed a series of principles termed 'justiciability doctrines.'" Id. "The Article III doctrine that requires a litigant to have 'standing' to invoke the jurisdiction of a federal court is perhaps the most important." Id. (citing Allen v. Wright, 468 U.S. 737, 750 (1984)). "A second doctrine that 'cluster[s] about Article III' is

43

ripeness." Id. at 280 (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-79 (D.C. Cir. 1982)). "Third, the Supreme Court has stressed that the alleged injury must be legally and judicially cognizable and that the issues must be fit for judicial resolution." Id. (internal citation omitted).

When a plaintiff seeks a declaratory judgment, a court must ask three questions: (1) whether the plaintiff has standing, (2) "whether a particular challenge is brought at the proper time and is ripe for pre-enforcement review" through a declaratory judgment, and (3) "whether the issue currently is fit for judicial decision." Id.; see also Mich. State Chamber of Commerce v. Austin, 788 F.2d 1178, 1181-82 (6th Cir. 1986) (stating that a party seeking a declaratory judgment must have standing and demonstrate that the controversy is ripe for decision before the action is justiciable). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Mich. State Chamber of Commerce, 788 F.2d at 1181 (quoting Golden v. Zwickler, 394 U.S. 103, 108 (1969)).

## A.   Standing

"Standing to bring suit must be determined at the time the complaint is filed." Smith v. Jefferson Cnty. Bd. of Sch.

Comm'rs, 641 F.3d 197, 206 (6th Cir. 2011) (en banc) (citation omitted).  "A plaintiff must meet both constitutional and prudential requirements to establish individual standing."  Id. (citation omitted).

### 1.   Constitutional Requirements

The Sixth Circuit recently identified the minimum constitutional standards for individual standing under Article III:

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)); accord Fednav, Ltd. v. Chester, 547 F.3d 607, 614 (6th Cir. 2008).

The Shelby County Board of Education meets these requirements for standing based on the costs it must incur in assuming responsibility for educating Memphis schoolchildren. See Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ., 584 F.3d 253, 261 (6th Cir. 2009) (en banc) (concluding that the school districts "meet the three requirements for standing based on their allegation that they must spend state and local funds to pay for [No Child Left Behind Act] compliance").  The costs of educating more than 100,000

45

additional students and complying with federal and state mandates in educating those students constitute concrete and particularized, actual and imminent injury-in-fact of a legally-cognizable interest. See id. at 262 ("To the extent the funding received by the school district Plaintiffs under [No Child Left Behind] is insufficient to defray the cost of compliance with [No Child Left Behind] requirements, the districts have sustained a cognizable injury in fact."); see also Bd. of Educ. of Ottawa Twp. High Sch. Dist. 140 v. Spellings, 517 F.3d 922, 925 (7th Cir. 2008) (finding that school districts had standing based on the costs of complying with No Child Left Behind, reasoning that "[t]hose costs may not be a large fraction of the school district's budget, but the constitutional requirement of standing differs from a minimum-amount-in-controversy requirement. Any identifiable injury will do."); Magaw, 132 F.3d at 282 ("'[A]n economic injury which is traceable to the challenged action' satisfies the requirements of Article III standing." (quoting Linton by Arnold v. Comm'r of Health & Env't, 973 F.2d 1311, 1316 (6th Cir. 1992))). The Shelby County Board of Education acknowledges that it "has obligations under both state and federal law to provide a free public education to the school age children who currently reside in the boundaries of the City of Memphis." (Am. Compl. ¶ 44.) Therefore, the

first constitutional requirement for standing is satisfied. See Smith, 641 F.3d at 206.

The defendants named in the Amended Complaint have imposed the additional costs on the Shelby County Board of Education. (See, e.g., Am. Compl. ¶¶ 37, 60.)  The Shelby County Board of Education's injury is fairly traceable to the challenged actions of the defendants.  See Smith, 641 F.3d at 206; see also Sch. Dist. of City of Pontiac, 584 F.3d at 262 (finding a school district's obligation to spend non-federal funds to comply with No Child Left Behind traceable to the Secretary of the United States Department of Education's interpretation of No Child Left Behind).  Therefore, the second constitutional requirement for standing is satisfied.  See Smith, 641 F.3d at 206.

A determination that the Shelby County Board of Education is not responsible for educating Memphis schoolchildren until the completion of a procedure for transferring school administration would relieve the Shelby County Board of Education of the obligations the defendants have imposed on it. A favorable decision would be likely to redress the Board's injury.  Therefore, the third constitutional requirement for standing is satisfied.  See id.; see also Sch. Dist. of City of Pontiac, 584 F.3d at 262 (concluding that a declaratory judgment that school districts are not required to spend non-No Child Left Behind funds to comply with No Child Left Behind mandates

47

would forbid the Secretary from requiring the expenditure of non-federal funds on No Child Left Behind compliance, redressing the injury alleged by the school districts).

Because the three requirements for constitutional standing are satisfied, the Shelby County Board of Education has met the minimum standards and has standing. See Smith, 641 F.3d at 206; Sch. Dist. of City of Pontiac, 584 F.3d at 260-62; Bd. of Educ. of Ottawa Twp. High Sch. Dist. 140, 517 F.3d at 924-25; cf. Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency, 533 F.3d 258, 260-66 (5th Cir. 2008) (concluding that two school districts had standing to challenge whether a desegregation order could be properly applied to them based on the financial harm the school districts suffered from the desegregation order's prohibition against the school districts' accepting as many transfer students of any race or ethnicity as they wished in a nondiscriminatory manner, where the two school districts relied on transfer students for their financial viability); Sch. Bd. of the City of Richmond v. Baliles, 829 F.2d 1308, 1310-11 (4th Cir. 1987) (holding that a school board had standing to pursue on appeal the state's lack of funding to support desegregation efforts because the state's past unconstitutional conduct "allegedly has saddled the School Board with a school system whose high concentration of disadvantaged minority students requires large expenditures for compensatory education and other

48

education services," imposing a direct economic injury on the school board).

The Shelby County Board of Education has standing under an alternative theory. Because the Board recognizes that it "has obligations under both state and federal law to provide a free public education to the school age children who currently reside in the boundaries of the City of Memphis," (Am. Compl. ¶ 44), it has standing to sue in a representative capacity on behalf of Memphis schoolchildren affected by the defendants' actions. See Akron Bd. of Educ. v. State Bd. of Educ. of Ohio, 490 F.2d 1285, 1289-90 (6th Cir. 1974) (concluding that a board of education and its superintendent had standing to bring an action for injunctive relief against the state board of education for allegedly approving a transfer of an area formerly under the jurisdiction of the board of education to an adjoining school district, in alleged violation of students' Fourteenth Amendment rights, based on the board of education's and superintendent's identity of interests with students remaining within the school district and their parents); cf. Sch. Bd. of the City of Richmond, 829 F.2d at 1311 ("Having previously accorded the School Board standing to sue on behalf of the students, we find no reason to rule otherwise now.").

Memphis schoolchildren are alleged to face a concrete, particularized, and imminent invasion of their legally protected

interests in educational benefits under the Fourteenth Amendment. See Laney, 501 F.3d at 581; Seal, 229 F.3d at 574. Because the defendants' actions have allegedly caused the invasion of a legally protected interest, the imminent injury to the affected children is fairly traceable to the defendants' challenged actions. Because the Shelby County Board of Education seeks a declaratory judgment recognizing a transition period to ensure the affected children continue to be educated, a favorable decision would redress that injury. Therefore, the Shelby County Board of Education satisfies the constitutional requirements of standing under this alternative theory. See Smith, 641 F.3d at 206.

The parties do not dispute that all parties, in addition to the Shelby County Board of Education, have constitutional standing to assert their counterclaims and cross-claims or that the Intervening Plaintiffs have constitutional standing to assert their claims. All of those parties satisfy the constitutional requirements of standing. See id.

## 2.   Prudential Requirements

The Sixth Circuit recently identified the prudential requirements for standing:

> A plaintiff must also meet the following prudential requirements for standing developed by the Supreme Court. First, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of

> third parties." Second, a plaintiff must present a
> claim that is "more than a generalized grievance."
> Finally, the complaint must "fall within 'the zone of
> interests to be protected or regulated by the statute
> or constitutional guarantee in question.'"

Id. (citations omitted).

The first prudential requirement ordinarily bars a party from asserting standing to vindicate a third party's constitutional rights. Id. at 208 (citing Barrows v. Jackson, 346 U.S. 249, 255 (1953)). However, the "salutary rule against third-party standing is not absolute." Id. (citing Kowalski v. Tesmer, 543 U.S. 125, 129 (2004)). "The rule 'should not be applied where its underlying justifications are absent.'" Id. (citing Singleton v. Wulff, 428 U.S. 106, 114 (1976)). The Supreme Court has considered "two factual elements" in deciding whether to apply the rule:

> The first is the relationship of the litigant to the
> person whose right he seeks to assert. If the
> enjoyment of the right is inextricably bound up with
> the activity the litigant wishes to pursue, the court
> at least can be sure that its construction of the
> right is not unnecessary in the sense that the right's
> enjoyment will be unaffected by the outcome of the
> suit. Furthermore, the relationship between the
> litigant and the third party may be such that the
> former is fully, or very nearly, as effective a
> proponent of the right as the latter.

Id. (quoting Singleton, 428 U.S. at 114-15). "Elsewhere, the Court has described this test as requiring that the party asserting the right has a close relationship with the person who possesses the right, and that there is a hindrance to the

51

possessor's ability to protect his own interests." Id. (quoting Kowalski, 543 U.S. at 130) (internal quotation marks omitted).

The Shelby County Board of Education is attempting to remedy its own injury based on the costs imposed on it to educate Memphis schoolchildren. It is asserting its own legal rights and interests and not resting its claim to relief on third parties' legal rights or interests. Therefore, it satisfies the first prudential requirement of standing. See id. at 206.

The first prudential requirement also permits the Shelby County Board of Education to assert the rights of Memphis schoolchildren. The Shelby County Board of Education alleges that it "has obligations under both state and federal law to provide a free public education to the school age children who currently reside in the boundaries of the City of Memphis." (Am. Compl. ¶ 44.) Those obligations give it a close relationship with the interests of Memphis schoolchildren who possess the rights the Shelby County Board of Education seeks to assert. See, e.g., Smith, 641 F.3d at 208 (stating that "[t]he teachers may have a sufficiently close relationship to their students to satisfy the first prong of the test for third-party standing"); Akron Bd. of Educ., 490 F.2d at 1290 ("We believe here that in terms of loss of territory and tax dollars and in terms of identity of interest with the asserted rights of the

pupils and their parents, the Akron Board of Education and its Superintendent are true adversary parties and that their complaint states a 'Case' or 'Controversy' to enforce the Fourteenth Amendment within the intendment of Article III of the U.S. Constitution.").

The relationship between the Shelby County Board of Education and Memphis schoolchildren is "such that the former is fully, or very nearly, as effective a proponent of the right as the latter." Smith, 641 F.3d at 208. There are hindrances to the possessors' ability to protect their own interests against the defendants the Shelby County Board of Education has sued for violating those interests: the Memphis City Board of Education, the Memphis City Council, and the City of Memphis. (See Am. Compl. ¶ 43.) Those hindrances include the substantial expense of litigation and uncertainty about whether the Shelby County Board of Education or the Memphis City Board of Education is responsible for educating Memphis students, particularly given the Memphis City Schools' ongoing operation and the Memphis City Board of Education's continuing to conduct business. Memphis schoolchildren are not in a position to address the potential process effecting the transfer of administration of the Memphis City Schools to the Shelby County Board of Education.

The Sixth Circuit has found that a board of education has standing to assert the constitutional rights of students it is

responsible for educating.  See Akron Bd. of Educ., 490 F.2d at 1287-90 (finding that a board of education and a superintendent have standing to assert the constitutional rights of children); see also Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty., 836 F.2d 986, 998 (6th Cir. 1987) (stating that a local school board can have a state agency enjoined from taking a step to deprive students of their constitutional right to attend non-segregated schools, implying that a school board has standing to assert students' rights (citing Akron Bd. of Educ., 490 F.2d at 1288)); cf. Baliles, 829 F.2d at 1310-11 (finding that a school board has standing to bring claims on behalf of students); Brinkman v. Gilligan, 85 F. Supp. 2d 761, 771 n.19 (S.D. Ohio 1999) (stating that, in Akron Board of Education, the Sixth Circuit found that a local board of education had standing to litigate the constitutional rights of students).  Therefore, the first prudential requirement of standing does not bar the Shelby County Board of Education's claims on behalf of Memphis schoolchildren.  See Smith, 641 F.3d at 208.

Even if the Shelby County Board of Education did not have standing to assert the rights of Memphis schoolchildren in Counts 1 and 2 of the Amended Complaint, it would have standing to assert its other claims based on the obligations the defendants' actions have imposed on it.  For the reasons

54

discussed above, other bases of federal question jurisdiction would continue to exist.

The Shelby County Board of Education presents claims that are "more than a generalized grievance." See id. at 206. Its claims are based on unique injuries that are not "pervasively shared by a large class of citizens." Coal Operators & Assocs., Inc. v. Babbitt, 291 F.3d 912, 916 (6th Cir. 2002) (citation omitted). Therefore, the Shelby County Board of Education satisfies the second prudential requirement of standing. See Smith, 641 F.3d at 206; see also Monroe Retail, Inc. v. RBS Citizens, N.A., 589 F.3d 274, 278-79 (6th Cir. 2009).

The Shelby County Board of Education's claims "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Smith, 641 F.3d at 206 (quoting Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475 (1982)). Therefore, the Shelby County Board of education satisfies the third prudential requirement of standing. See id. The Shelby County Board of Education satisfies the prudential requirements of standing. See id.

The parties do not dispute that all parties, in addition to the Shelby County Board of Education, have standing to assert their counterclaims and cross-claims or that the Intervening

55

Plaintiffs have standing to assert their claims.  All parties satisfy the prudential requirements of standing.  See id.

### B.   Ripeness

"The ripeness doctrine prevents courts from 'entangling themselves in abstract disagreements' through premature adjudication." Miller v. City of Cincinnati, 622 F.3d 524, 532 (6th Cir. 2010) (quoting Grace Cmty. Church v. Lenox Twp., 544 F.3d 609, 615 (6th Cir. 2008)).  "Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review." Magaw, 132 F.3d at 280.

To determine whether a case is ripe, courts consider three factors:

> (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings.

Miller, 622 F.3d at 532 (quoting Grace Cmty. Church, 544 F.3d at 615).  The Sixth Circuit has also described the test for ripeness as "ask[ing] two basic questions: (1) is the claim 'fit[] . . . for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" Warshak v. United

56

States, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967)); accord Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 n.2 (2010) ("In evaluating a claim to determine whether it is ripe for judicial review, we consider both 'the fitness of the issues for judicial decision' and 'the hardship of withholding court consideration.'" (quoting Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003))).

Ripeness is more than a mere procedural question; it is determinative of jurisdiction." River City Capital, L.P. v. Bd. of Cnty. Comm'rs, 491 F.3d 301, 309 (6th Cir. 2007) (quoting Bigelow v. Mich. Dep't of Natural Res., 970 F.2d 154, 157 (6th Cir. 1992)). "If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." Id. (quoting Bigelow, 970 F.2d at 157). "This deficiency may be raised sua sponte if not raised by the parties." Bigelow, 970 F.2d at 157 (quoting S. Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 502 (9th Cir. 1990)).

The harm alleged by the Shelby County Board of Education is already occurring. The Board alleges that the defendants' actions have imposed on it "obligations under both state and federal law to provide a free public education to the school age children who currently reside in the boundaries of the City of

Memphis." (Am. Compl. ¶ 44.) The Board alleges that the defendants' actions of forcing it to assume those obligations without a transition plan have made it impossible for it to fulfill its obligations. (See, e.g., id. ¶¶ 31-37, 44.) Therefore, the first ripeness factor is satisfied. See Miller, 622 F.3d at 532.

The factual record in this case is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims. The actions of which the Shelby County Board of Education complains are already occurring and have been thoroughly documented in the record before the Court. The parties have agreed that the Court should proceed on the record before it. They do not dispute the material facts underlying this case. They dispute only the legal effect of those facts. The Court has sufficient information to adjudicate the merits of the parties' claims. Therefore, the second ripeness factor is satisfied. See id.

The parties would suffer significant hardship if judicial relief were denied at this stage of the proceedings. Without relief the legal existence of the Memphis City Board of Education would continue to be an open question, as would the obligations of the Shelby County School Board, the Shelby County Commission, and the City of Memphis, and the responsibilities of the state entities that oversee and fund the Memphis City

58

Schools.   Whether Memphis voters' lack of representation on the Shelby County Board of Education violates the one-person, one-vote principle would also be an open question.   Therefore, the third ripeness factor is satisfied.   See id.

Because the harm alleged by the Shelby County Board of Education is already occurring, the factual record is sufficiently developed to produce a fair adjudication of the parties' respective claims, and the parties would suffer significant hardship if judicial relief were denied at this stage of the proceedings, the Shelby County Board of Education's claims are ripe.   See Miller, 622 F.3d at 532 (quoting Grace Cmty. Church, 544 F.3d at 615); Warshak, 532 F.3d at 525 (quoting Abbott Laboratories, 387 U.S. at 149).

With three exceptions, the other parties' claims are also ripe.   The harm alleged by those parties is already occurring, the factual record is sufficiently developed to produce a fair adjudication of the merits of their respective claims, and they would suffer significant hardship if judicial relief were denied at this stage of the proceedings.   See Miller, 622 F.3d at 532. Their claims are fit for judicial decision in that they arise in a concrete factual context and concern a dispute that has already arisen, and the parties would suffer significant hardship if court consideration were withheld.   See Warshak, 532 F.3d at 525.   Therefore, all of the other parties' claims are

ripe with the three exceptions described below.  *See* *Miller*, 622 F.3d at 532; *Warshak*, 532 F.3d at 525.

The City of Memphis alleges that Public Chapter 1 violates Article II, Section 17 of the Tennessee Constitution because the addition of section (b)(3) to Tennessee Code Annotated § 49-2-502 is not germane to the subject expressed by the title of Public Chapter 1 or the purpose expressed in its preamble. (*See* City of Memphis Countercl. ¶¶ 14-22, ECF No. 49.)  The Memphis City Board of Education alleges that Public Chapter 1's addition of section (b)(3) to Tennessee Code Annotated § 49-2-502 is unconstitutional.  (*See* Memphis City Board of Education Countercl. and Cross-cl. ¶¶ 9-17, ECF No. 52.)  The Shelby County Commission alleges that Public Chapter 1 violates Article II, Section 17 of the Tennessee Constitution because it allows the creation of special school districts and municipal school districts.  (*See* Shelby County Commission Countercl. ¶¶ 77-85, ECF No. 62.)

Public Chapter 1 amended Tennessee Code Annotated § 49-2-502, inter alia, by adding the following sub-subsection:

> From and after the effective date of the transfer of the administration of the schools in the special school district to the county board of education, the restrictions imposed on the creation of municipal school districts, in § 6-58-112(b), and special school districts, in § 49-2-501(b)(3), shall no longer apply in such county.

2011 Tenn. Pub. Acts Chapter 1.

To the extent the addition of that sub-subsection might affect the constitutionality of Public Chapter 1 as whole, it is severable.  <u>See</u> Tenn. Code Ann. § 1-3-110; <u>In re Swanson</u>, 2 S.W.3d 180, 188-89 (Tenn. 1999).

Whether (b)(3) itself is constitutional is not properly before the Court.  Although the parties have not briefed the issue, any harm resulting from the addition of this sub-subsection would not occur until an attempt was made to create a municipal school district or special school district.  Nothing in the record suggests that such an attempt has been made or will be made in the future.  Any harm depends on contingent future events.  As the Supreme Court has explained, "[a] claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998) (quoting <u>Thomas v. Union Carbide Agricultural Prods. Co.</u>, 473 U.S. 568, 580-81 (1985)); <u>see also</u> <u>Magaw</u>, 132 F.3d at 280 ("Ripeness requires that the 'injury in fact be certainly impending.'  Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review.") (citations omitted).  The challenges to Public Chapter 1's addition of section (b)(3) to Tennessee Code Annotated § 49-2-502 are not ripe.

The City of Memphis, the Memphis City Board of Education, and the Shelby County Commission have offered no evidence that any harm they would suffer from the addition of section (b)(3) to Tennessee Code Annotated § 49-2-502 will ever come to pass. The factual record is not sufficiently developed to produce a fair adjudication of the merits of their claims about the addition of (b)(3).  Little hardship would result to them from denying judicial relief at this stage of the proceedings.  Their claims are not fit for judicial decision because they do not arise in a concrete factual context or concern a dispute that, based on the record before the Court, is likely to come to pass. Withholding court consideration would not result in significant hardship.

The challenges to Public Chapter 1's addition of section (b)(3) to Tennessee Code Annotated § 49-2-502 are not ripe.  See Texas, 523 U.S. at 300; Warshak, 532 F.3d at 525.  Because those challenges are not ripe, the Court lacks jurisdiction over them and they must be dismissed.  See River City Capital, 491 F.3d at 309.  Therefore, the claims of the City of Memphis, the Memphis City Board of Education, and the Shelby County Commission that section (b)(3) is unconstitutional are DISMISSED.

### C.  Fitness

Other than the challenges to Public Chapter 1's addition of section (b)(3) to Tennessee Code Annotated § 49-2-502, the

62

claims presented in this case satisfy the fitness requirement. See Magaw, 132 F.3d at 280. The parties' injuries are legally and judicially cognizable. The parties have suffered invasions of legally protected interests that are traditionally thought to be capable of resolution through the judicial process and are currently fit for judicial review. See id. The factual record is sufficiently developed to produce a fair adjudication of the merits of the claims presented. The claims arise in a concrete factual context and concern a dispute that has already arisen. Therefore, the fitness requirement is satisfied. See id.; see also Sch. Dist. of City of Pontiac, 584 F.3d at 263; Warshak, 532 F.3d at 525.

The justiciability requirements parties must satisfy to seek a declaratory judgment are satisfied in this case for all claims other than the challenges to Public Chapter 1's addition of section (b)(3) to Tennessee Code Annotated § 49-2-502. See Magaw, 132 F.3d at 279-80. Other than those challenges, the requests for declaratory judgments are properly before the Court because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Austin, 788 F.2d at 1181 (quoting Golden, 394 U.S. at 108). The parties have satisfied the Article III requirement that courts

adjudicate only "actual 'cases' and 'controversies.'"   Magaw,

132 F.3d at 279 (quoting U.S. Const. art. III, § 2).

**V.   Declaratory Judgment and Injunctive Relief**

  **A.   Declaratory Judgment**

The Declaratory Judgment Act "confer[s] on federal courts

unique and substantial discretion in deciding whether to declare

the rights of litigants." Scottsdale Ins. Co. v. Flowers, 513

F.3d 546, 554 (6th Cir. 2008) (quoting Wilton v. Seven Falls

Co., 515 U.S. 277, 286 (1995)).   "In passing the act, Congress

'created an opportunity, rather than a duty, to grant a new form

of relief to qualifying litigants.'"   Id. (quoting Wilton, 515

U.S. at 288).

In deciding whether to exercise jurisdiction over

declaratory judgment actions, courts consider five factors:

  (1) whether the declaratory action would settle the
  controversy;

  (2) whether the declaratory action would serve a
  useful purpose in clarifying the legal relations in
  issue;

  (3) whether the declaratory remedy is being used
  merely for the purpose of "procedural fencing" or "to
  provide an arena for res judicata;"

  (4) whether the use of a declaratory action would
  increase friction between our federal and state courts
  and improperly encroach upon state jurisdiction; and

  (5) whether there is an alternative remedy which is
  better or more effective.

Id. (quoting Grand Trunk W. R.R. Co. v. Consol. Rail Corp., 746 F.2d 323, 326 (6th Cir. 1984)); accord Northland Ins. Co. v. Stewart Title Guar. Co., 327 F.3d 448, 453 (6th Cir. 2003) (citation omitted).

Here, the controversy between the parties is a legal dispute, not a factual dispute. It turns on the legality and legal effect of actions already taken by the parties, such as the surrender of the Memphis City Schools' charter and the Shelby County Commission's ordinance and resolution expanding the number of positions on and redistricting the Shelby County Board of Education. A declaration of the parties' present duties, rights, and responsibilities as a result of those actions will settle the controversy between the parties. Among other things, a declaration will determine whether the Shelby County Board of Education bears responsibility for educating Memphis schoolchildren; when the transfer of administration of the Memphis City Schools to the Shelby County Board of Education may occur; whether the Shelby County Board of Education, as currently districted, violates the one-person, one-vote principle; whether Public Chapter 1 is constitutional; and whether the Shelby County Commission's ordinance and resolution are lawful. The first factor weighs strongly in favor of exercising jurisdiction. See Flowers, 513 F.3d at 554-56.

The second factor "is closely related to the first factor and is often considered in connection with it.  Indeed, it is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue."   Id. at 557 (citations omitted).  A declaratory judgment in this case will settle the controversy between the parties and will clarify the parties' rights, duties, and responsibilities, for example, whether the Shelby County Commission has the right to redistrict the Shelby County Board of Education and provide representation to Memphis residents and who bears responsibility for educating Memphis schoolchildren. A declaratory judgment will clarify the parties' legal relationships.  The second factor weighs strongly in favor of exercising jurisdiction. See id. at 556-58.

"The third factor is meant to preclude jurisdiction for 'declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a natural plaintiff and who seem to have done so for the purpose of acquiring a favorable forum.'"   Id. at 558 (quoting AmSouth Bank, 386 F.3d at 788). "The question is . . . whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first." Id. (quoting AmSouth Bank, 386 F.3d at 789).  Courts "are reluctant to impute an improper motive to a plaintiff where

there is no evidence of such in the record." Id. (citations
omitted).

There is no evidence of an improper motive in this record.
Nothing suggests that the parties' declaratory judgment actions
are motivated by "procedural fencing" or to provide an arena for
res judicata. The declaratory judgment actions are not likely
to create a race for res judicata. No party has indicated that
a state court action with issues related to those presented in
this case has been filed. The Sixth Circuit has explained that
"[a] district court should not deny jurisdiction to a plaintiff
who has not 'done any more than choose the jurisdiction of
federal rather than state court, a choice given by Congress.'"
Id. (quoting State Farm Fire & Cas. Co. v. Odom, 799 F.2d 247,
250 n.1 (6th Cir. 1986)). The third factor weighs strongly in
favor of exercising jurisdiction. See id. at 558-59.

To determine whether exercising jurisdiction would increase
friction between federal and state courts, courts consider three
sub-factors:

> (1) whether the underlying factual issues are
> important to an informed resolution of the case;
>
> (2) whether the state trial court is in a better
> position to evaluate those factual issues than is the
> federal court; and
>
> (3) whether there is a close nexus between underlying
> factual and legal issues and state law and/or public
> policy, or whether federal common or statutory law

dictates a resolution of the declaratory judgment action.

Id. at 560 (quoting Bituminous Cas. Corp. v. J&L Lumber Co., 373 F.3d 807, 814-15 (6th Cir. 2004)).

"The first of these sub-factors focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action." Id. Nothing in the record suggests that a state court action involving any of the parties and issues in this case has been filed. The underlying facts of this litigation are not in dispute. There is no risk that resolution of the issues raised in this case will require factual findings that might conflict with similar findings by a state court. The first sub-factor weighs strongly in favor of exercising jurisdiction. See id.

"The second sub-factor focuses on which court, federal or state, is in a better position to resolve the issues in the declaratory action." Id. Although state courts are generally in a better position to evaluate novel questions of state law, "[t]his is not to say that a district court should always turn away a declaratory judgment action when an undetermined question of state law is presented, but it is an appropriate consideration for the court to weigh in the exercise of its discretion." Id. (quoting Scottsdale Ins. Co. v. Roumph, 211

F.3d 964, 969 (6th Cir. 2000)).  "This consideration appears to have less force when the state law is clear and when the state court is not considering the issues."  Id.  In this case, the declaratory judgment actions raise several novel questions of Tennessee law, such as the constitutionality of Public Chapter 1 and its interaction with the 1961 Private Act.  However, a state court is not considering those issues and state law is clear on how those novel questions should be resolved.  The second sub-factor is neutral or weighs slightly in favor of exercising jurisdiction.  See id.

"The final sub-factor focuses on whether the issue in the federal action implicates important state policies and is, thus, more appropriately considered in state court."  Id. at 561. Several issues in this case implicate important state policies, such as which public entity has responsibility for educating Memphis schoolchildren and when the transfer of administration of the Memphis City Schools may occur.  However, those issues also implicate important federal policies, such as whether the Shelby County Board of Education, as currently districted, violates the one-person, one-vote principle.

Federal law plays a significant role in dictating the resolution of these declaratory judgment actions.  See id. at 560 (stating that part of the inquiry in the third sub-factor is "whether federal common or statutory law dictates a resolution

69

of the declaratory judgment action"). Federal law will
determine whether the Intervening Plaintiffs are entitled to a
declaration that they have the right to continue holding office
for the duration of their terms because of property interests in
their offices under the Fourteenth Amendment. Federal law will
also determine whether the Fourteenth Amendment rights of
Memphis schoolchildren have been violated. The third sub-factor
is neutral or weighs slightly in favor of exercising
jurisdiction. See Flowers, 513 F.3d at 561. Balancing the
three sub-factors, the fourth factor does not weigh strongly for
or against exercising jurisdiction. See id.

    "The final factor to consider is the availability of
alternative remedies." Id. "A district court should 'deny
declaratory relief if an alternative remedy is better or more
effective.'" Id. at 562 (quoting Grand Trunk, 746 F.2d at 326).
In this case, the parties could have brought a declaratory
judgment action in Tennessee courts. See, e.g., Colonial
Pipeline Co. v. Morgan, 263 S.W.3d 827, 837 (Tenn. 2008). That
alternative would have been better in some ways because of the
novelty of several issues in this case. However, Tennessee law
provides clear guidance in resolving those issues, and federal
law determines the resolution of other issues. See Flowers, 513
F.3d at 562 (finding that, although a declaratory action in
federal court raised undecided questions of Kentucky law, "given

70

that Kentucky precedent provides clear guidance as to the resolution of the legal issue presented, it cannot be said that the district court was a clearly inferior forum to resolve the issue"). The fifth factor weighs moderately against exercising jurisdiction, but "does not counsel so strongly against exercising jurisdiction" that the Court must refuse to exercise it. See id. at 562-63.

The Court of Appeals has not indicated how courts should balance the five factors in deciding whether to exercise jurisdiction over declaratory judgment actions. See id. at 563; Keiser Land Co. v. Naifeh, No. 1:09-cv-1253, 2010 WL 3220642, at *7 (W.D. Tenn. Aug. 13, 2010) (citing Flowers, 513 F.3d at 563). In this case, the first three factors strongly favor exercising jurisdiction, the fourth factor is neutral or weighs slightly in favor of exercising jurisdiction, and the fifth factor weighs moderately against exercising jurisdiction. Under similar circumstances, the Sixth Circuit has upheld a district court's exercise of jurisdiction. See Flowers, 513 F.3d at 563 (concluding that district court did not abuse its discretion in exercising jurisdiction where the first three factors favored exercising jurisdiction, the fourth factor was neutral, and the fifth factor weighed against exercising jurisdiction). Considering all of the factors, the Court will exercise

71

jurisdiction over these declaratory judgment actions.  See id.
at 554, 563.

### B.   Injunction

"[A] plaintiff seeking a permanent injunction must satisfy
a four-factor test before a court may grant such relief."
Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2756
(2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388,
391 (2006)).  "A plaintiff must demonstrate: (1) that it has
suffered an irreparable injury; (2) that remedies available at
law, such as monetary damages, are inadequate to compensate for
that injury; (3) that, considering the balance of hardships
between the plaintiff and defendant, a remedy in equity is
warranted; and (4) that the public interest would not be
disserved by a permanent injunction."  Id. (quoting eBay, 547
U.S. at 391); see also Audi AG v. D'Amato, 469 F.3d 534, 550
(6th Cir. 2006) (citing eBay, 547 U.S. at 391); CLT Logistics v.
River West Brands, --- F. Supp. 2d ---, No. 10-13282, 2011 WL
833802, at *21 (E.D. Mich. Mar. 4, 2011).

### VI. Analysis

This case is best analyzed in five parts: first, the
principles of statutory interpretation that govern the analysis
of the Tennessee laws at issue; second, the challenges to the
constitutionality of the 1961 Private Act and Public Chapter 1;
third, the applicability of the 1961 Private Act and Public

Chapter 1; fourth, how the 1961 Private Act, Public Chapter 1, and other Tennessee laws interact and the statutory scheme they create; and fifth, the implications of that statutory scheme for the parties' current legal relations.

### A.    Principles of Statutory Interpretation

"A federal court must always be aware of the federalism concerns that arise whenever it deals with state statutes." Eubanks v. Wilkinson, 937 F.2d 1118, 1125 (6th Cir. 1991). "Federal courts lack authority and power to give a limiting, narrowing construction to a state statute." Id. (citations omitted). "It is axiomatic that state courts are the final authority on state law." Hutchison v. Marshall, 744 F.2d 44, 46 (6th Cir. 1984). "State statutes mean what state courts say they mean." Id. (citing R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 499-500 (1941)); see also Estate of Tenenbaum v. Comm'r of Internal Revenue, 112 F.3d 251, 252 (6th Cir. 1997) ("Because it is the applicable state law rather than federal law that governs devolution of property at death and the ultimate impact of federal estate tax, the answer to this question is a matter of state statutory interpretation. Accordingly, we are bound by the Tennessee Supreme Court's construction of a Tennessee statute.").

"When there is no state [case]law construing a state statute, [we] must predict how the state's highest court would

interpret the statute." FDIC v. Jeff Miller Stables, 573 F.3d 289, 298 (6th Cir. 2009) (quoting United States v. Simpson, 520 F.3d 531, 535 (6th Cir. 2008)) (alterations in original). Ordinarily, "a state's intermediate appellate court decisions are the best authority in the absence of any supreme court precedent . . . ." Simpson, 520 F.3d at 536. Where a state's intermediate appellate courts have not decided an issue, courts "apply the general rules of statutory construction as embraced by the [state's] judiciary." Id.; see also Finstuen v. Crutcher, 496 F.3d 1139, 1148 (10th Cir. 2007) (stating that the court interprets state laws according to state rules of statutory construction) (citation omitted); Miller v. Kroger Co., 82 F. App'x 557, 558 (9th Cir. 2003) (stating that state law principles of statutory interpretation apply when reviewing questions of state substantive law) (citations omitted); Karlin v. Foust, 188 F.3d 446, 457 (7th Cir. 1999) (stating that, in interpreting a Wisconsin statute, "we apply Wisconsin law and Wisconsin principles of statutory construction") (citation omitted); Mun. Utils. Bd. of Albertville v. Ala. Power Co., 21 F.3d 384, 387 (11th Cir. 1994) ("When construing a state statute, we look to state rules of statutory construction, because the same rules of construction apply in a federal court as would apply in a state court.") (citation omitted); England v. Suzuki Motor Corp., 521 F. Supp. 2d 707, 708 (E.D. Tenn.

2007) (applying Tennessee rules of statutory construction in interpreting a Tennessee statute). The Court may also consider "other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination." Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999) (citation omitted).

There is no state case law construing Public Chapter 1 or the 1961 Private Act. Because state courts are the final authority on state law and what state statutes mean, the Court must predict how the Tennessee Supreme Court would interpret those statutes. See Jeff Miller Stables, 573 F.3d at 298; Hutchison, 744 F.2d at 46. To do so, the Court must "apply the general rules of statutory construction as embraced by the Tennessee judiciary." Simpson, 520 F.3d at 536. Other sources of guidance are not helpful because of the uniqueness of the state statutes at issue and the circumstances in which they apply.

"There is no real distinction between the canons of statutory construction in the federal courts and the canons of statutory construction as applied in [Tennessee courts]." In Matter of Estate of Gray v. Internal Revenue Serv., No. 03A01-9507-CH-00227, 1996 WL 64006, at *3 (Tenn. Ct. App. Feb. 15, 1996). "When dealing with statutory interpretation, well-

75

defined precepts apply." <u>Estate of French v. Stratford House</u>, 333 S.W.3d 546, 554 (Tenn. 2011) (citation omitted). The "primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope." <u>Id.</u> (citation omitted). "Legislative intent is to be ascertained whenever possible from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language." <u>Eastman Chem. Co. v. Johnson</u>, 151 S.W.3d 503, 507 (Tenn. 2004) (quoting <u>Lipscomb v. Doe</u>, 32 S.W.3d 840, 844 (Tenn. 2000)). "In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing." <u>Estate of French</u>, 333 S.W.3d at 554 (citation omitted).

"When a statute is clear, we apply the plain meaning without complicating the task." <u>Id.</u> (citation omitted); <u>accord</u> <u>Eastman Chem. Co.</u>, 151 S.W.3d at 507 ("When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application.") (citations omitted). In such circumstances, the "obligation [of courts] is simply to enforce the written language." <u>Estate of French</u>, 333 S.W.3d at 554 (citation

omitted).   When a statute is ambiguous, courts "may refer to the broader statutory scheme, the history of the legislation, or other sources to discern its meaning."   Id. (citation omitted). "The statute must be construed in its entirety, and it should be assumed that the legislature used each word purposely and that those words convey some intent and have a meaning and a purpose." Eastman Chem. Co., 151 S.W.3d at 507 (citation omitted).   "The background, purpose, and general circumstances under which words are used in a statute must be considered, and it is improper to take a word or a few words from its context and, with them isolated, attempt to determine their meaning." Id. (citation omitted).   "Courts must presume that a legislative body was aware of its prior enactments and knew the state of the law at the time it passed the legislation."   Estate of French, 333 S.W.3d at 554 (citation omitted).

"It is a further well-settled rule of construction that 'statutes in pari materia—those relating to the same subject or having a common purpose—are to be construed together, and the construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute.'" Graham v. Caples, 325 S.W.3d 578, 582 (Tenn. 2010) (quoting Wilson v. Johnson Cnty., 879 S.W.2d 807, 809 (Tenn. 1994)).   "Where a conflict is presented between two statutes, a more specific statutory provision takes

77

precedence over a more general provision." Id. (citation omitted). "Finally, '[a] construction which places one statute in conflict with another must be avoided; therefore, we must resolve any possible conflict between statutes in favor of each other, so as to provide a harmonious operation of the laws.'" Id. (quoting Cronin v. Howe, 906 S.W.2d 910, 912 (Tenn. 1995)).

### B.   Constitutionality of 1961 Private Act and Public Chapter 1

"It is well-settled in Tennessee that 'courts do not decide constitutional questions unless resolution is absolutely necessary to determining the issues in the case and adjudicating the rights of the parties.'" Waters v. Farr, 291 S.W.3d 873, 882 (Tenn. 2009) (quoting State v. Taylor, 70 S.W.3d 717, 720 (Tenn. 2002)). "Our charge is to uphold the constitutionality of a statute wherever possible." Id. (citation omitted); accord State v. Robinson, 29 S.W.3d 476, 480 (Tenn. 2000). "In evaluating the constitutionality of a statute, we must indulge every presumption and resolve every doubt in favor of constitutionality." Vogel v. Wells Fargo Guard Servs., 937 S.W.2d 856, 858 (Tenn. 1996) (citation omitted). "A statute comes to a court 'clothed in a presumption of constitutionality [because] the Legislature does not intentionally pass an unconstitutional act.'" Id. (quoting Cruz v. Chevrolet Grey Iron, 247 N.W.2d 764, 769 (Mich. 1976)). "In evaluating the

constitutionality of a statute, we begin with the presumption that an act of the General Assembly is constitutional." Waters, 291 S.W.3d at 882 (quoting State v. Pickett, 211 S.W.3d 696, 700 (Tenn. 2007)); accord State v. Mitchell, 339 S.W.3d 629, 642 (Tenn. 2011).

The most contested statutes in this case are the 1961 Private Act and Public Chapter 1.

### 1.   Constitutionality of 1961 Private Act

The 1961 Private Act amends the Memphis City Board of Education's charter "to authorize the Board of Education of the Memphis City Schools to dissolve the charter of the Memphis City Schools and to surrender the same to the Secretary of State, at such time as the said Board of Education shall determine by resolution that such action is desirable, all of which shall be subject to the approval, by resolution, of the Board of Commissioners of the City of Memphis." 1961 Tenn. Priv. Acts Chapter 375. The 1961 Act provides that all laws in conflict with it are repealed and that it shall become effective after approval by a vote of not less than two-thirds of the City of Memphis Board of Commissioners. Id. At the end of the Act, Joe C. Carr, the Tennessee Secretary of State, certified that it "was properly ratified and approved and is therefore operative and in effect in accordance with its provisions." Id.

79

In its amended complaint, the Shelby County Board of Education alleges that the 1961 Private Act is unconstitutional under Article XI, Section 9 of the Tennessee Constitution. (Am. Compl. ¶¶ 52-56.) During oral argument, counsel for the Shelby County Board of Education addressed the 1961 Private Act and said that "[w]e are not challenging the validity or constitutionality of its enactment at this time, your Honor. We're withdrawing our attack on the face of [sic] validity of the statute." (Hr'g Tr. 157:1-4, May 12, 2011.) When asked, "As far as you're concerned, this statute was validly and constitutionally enacted; and it exists, for whatever purpose," he responded, "Yes." (Id. 157:5-8.) The Shelby County Board of Education asserts in its final brief that "[t]he 1961 Private Act was either superseded by state law or it must be read in pari materia with state law provisions providing for an orderly transition period for the consolidation of school systems." (Br. 13, ECF No. 242.) The Board also asserts, in the alternative, that, "because there is no rational basis for permitting a school system to make dissolution effective immediately, the 1961 Private Act is superceded and impliedly repealed by general law in accordance with Article XI, § 8 of the Tennessee Constitution." (Id. at 19.)

### a)   Article XI, Section 9

To the extent the Shelby County Board of Education continues to challenge the constitutionality of the 1961 Private Act under Article XI, Section 9 of the Tennessee Constitution, its challenge is not well-taken.  Article XI, Section 9 states in part:

> The General Assembly shall have no power to pass a special, local or private act having the effect of removing the incumbent from any municipal or county office or abridging the term or altering the salary prior to the end of the term for which such public officer was selected, and any act of the General Assembly private or local in form or effect applicable to a particular county or municipality either in its governmental or its proprietary capacity shall be void and of no effect unless the act by its terms either requires the approval by a two-thirds vote of the local legislative body of the municipality or county, or requires approval in an election by a majority of those voting in said election in the municipality or county affected.

Tenn. Const. art. XI, § 9.  The 1961 Private Act satisfies the two-thirds vote requirement of Article XI, Section 9.  See Tenn. Const. art. XI, § 9; Cnty. of Shelby v. McWherter, 936 S.W.2d 923, 935-36 (Tenn. Ct. App. 1996).  The Secretary of State has certified that it does.  The 1961 Private Act satisfies the requirements of Article XI, Section 9.

### b)  Article XI, Section 8

The Shelby County Board of Education's argument in the alternative that "the 1961 Private Act is superceded and impliedly repealed by general law in accordance with Article XI, § 8 of the Tennessee Constitution" is not well-taken.  (Br. 19,

ECF No. 242.)   In Tennessee, "the firmly established rule [is] that in order for the provisions of Article XI, Section 8 to come into play, the local act under attack must contravene some general law that has mandatory, statewide application." Knox Cnty. ex rel. Kessel v. Lenoir City, 837 S.W.2d 382, 383 (Tenn. 1992) (citation omitted).   As discussed below, subsequent legislation has not amended or repealed the 1961 Private Act. The Act does not contravene or suspend general law.   Therefore, the 1961 Private Act does not violate Article XI, § 8 of the Tennessee Constitution.   See Tenn. Const. art. XI, § 8; Knox Cnty. ex rel. Kessel, 837 S.W.2d at 383; Knox Cnty. Educ. Ass'n v. Knox Cnty. Bd. of Educ., 60 S.W.3d 65, 74 (Tenn. Ct. App. 2001) (citations omitted).   The 1961 Private Act is constitutional.

## 2.   Constitutionality of Public Chapter 1

Several parties argue that Public Chapter 1 is unconstitutional under the United States Constitution and the Tennessee Constitution.   They allege that Public Chapter 1 violates the Fourteenth Amendment because it is impermissibly vague, disproportionately affects a minority population, and does not provide for proportional representation of Memphis citizens in the development of a transition plan. (See City of Memphis Countercl. ¶ 31, ECF No. 49; Shelby County Commission Countercl. ¶¶ 73-76, ECF No. 62; Memphis City Council Br. 30-39,

ECF No. 241.)  They also allege that Public Chapter 1 violates the following provisions of the Tennessee Constitution: (1) Article II, § 17 (City of Memphis Countercl. ¶ 22, ECF No. 49; Memphis City Board of Education Countercl. ¶ 16, ECF No. 52; Shelby County Commission Countercl. ¶¶ 77-85, ECF No. 62), (2) Article XI, § 8 (City of Memphis Countercl. ¶ 23, ECF No. 49; Shelby County Commission Countercl. ¶¶ 65-72, ECF No. 62), (3) Article II, § 24 (Shelby County Commission Countercl. ¶¶ 86-90, ECF No. 62), and (4) Article I, § 20 and Tennessee Code Annotated § 1-3-101 (Shelby County Commission Countercl. ¶¶ 91-96, ECF No. 62).

### a)   Challenges Under United States Constitution

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). The Supreme Court "insist[s] that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Id. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." Id. "A statute is void for vagueness where it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, or is so

indefinite that it encourages arbitrary and erratic arrests and convictions.'" Northland Family Planning Clinic, Inc. v. Cox, 487 F.3d 323, 340-41 (6th Cir. 2007) (quoting Colautti v. Franklin, 439 U.S. 379, 390 (1979)); accord Colley, 467 F.3d at 508-09; see also Miller, 622 F.3d at 539 ("In pursuing a void-for-vagueness claim, a plaintiff must establish to a court's satisfaction that '[a regulation's] prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion.'" (quoting United Food & Commercial Workers Union v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 358-59 (6th Cir. 1998))); Jones v. Caruso, 569 F.3d 258, 276 (6th Cir. 2009) ("A law or regulation can be deemed unconstitutionally vague if 'men of common intelligence must necessarily guess at its meaning and differ as to its application . . . .'" (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926))).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982). The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Id. at 498-99. The void for

vagueness doctrine "is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing . . . statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." Colten v. Kentucky, 407 U.S. 104, 110 (1972); accord Grundstein v. Ohio, No. 1:06 CV 2381, 2006 WL 3499990, at *4 (N.D. Ohio Dec. 5, 2006). "Article I, section 8 of the Tennessee Constitution provides an identical protection" of due process. City of Knoxville v. Entm't Res., Inc., 166 S.W.3d 650, 655 (Tenn. 2005).

The Shelby County Commission argues that Public Chapter 1 violates the Fourteenth Amendment and Article I, § 8 of the Tennessee Constitution because it is impermissibly vague. (See Shelby County Commission Mem. 26-29, ECF No. 139-1.) It argues that Public Chapter 1 does not provide adequate guidance about developing a transition plan to combine Memphis City Schools and Shelby County Schools. (See id. at 28.) Certain questions are allegedly unanswered, such as whether the Memphis City Schools cease to exist as a special school district during the transition planning period, who will fund the transition planning commission, whether the transition plan must be approved and, if so, by whom, who constitutes a "competent citizen," whether there is a distinction between a "member" of

the transition planning commission and an "ex officio" member of the commission, and whether the transition planning commission is self-governing. (See id.)

The Shelby County Commission's argument is not well-taken. Public Chapter 1 provides for a transfer of school administration that will occur at the beginning of the third full school year immediately following certification of the election results. See 2011 Tenn. Pub. Acts Chapter 1. It provides that the transition planning commission shall develop a comprehensive transition plan considering and providing for matters set forth in two Tennessee statutes. See id. It then states how the transition planning commission shall be selected. See id.

Although Public Chapter 1 does not answer every question the Shelby County Commission raises, it does not contain any prohibitions or provide for any penalties. It is a civil statute, not a criminal statute. Therefore, Public Chapter 1 is entitled to greater tolerance of vagueness than the Court would allow an act with criminal penalties. See Vill. of Hoffman Estates, 455 U.S. at 498-99. The standards it creates for a transition planning commission and a comprehensive transition plan are not vague. They provide clear guidance to a person of ordinary intelligence about what is required to comply with the statute. Persons of common intelligence need not guess at its

86

meaning or differ as to its application. Therefore, Public Chapter 1 is not void for vagueness under the Fourteenth Amendment or Article I, section 8 of the Tennessee Constitution. See Grayned, 408 U.S. at 108; Northland Family Planning Clinic, 487 F.3d at 340-41; Miller, 622 F.3d at 539; Jones, 569 F.3d at 276.

The City of Memphis has alleged in its counterclaim that Public Chapter 1 violates the Equal Protection Clause of the Fourteenth Amendment because it disproportionately affects a minority population. (See City of Memphis Countercl. ¶ 31, ECF No. 49.) In its final brief, the City "reserved its 14th Amendment claims for future argument and hearing as necessary." (City of Memphis Br. 5, ECF No. 239.) The City has not presented any evidence relevant to its Fourteenth Amendment claims. Therefore, the court cannot conclude that Public Chapter 1 violates the Fourteenth Amendment under the City of Memphis' theory at this time.

The Memphis City Council argues in its final brief that Public Chapter 1 violates the Equal Protection Clause of the Fourteenth Amendment because it does not provide for proportional representation of City of Memphis residents in the transition planning process. (See Memphis City Council Br. 30-39, ECF No. 241.) The transition planning commission is a state entity whose positions are filled through appointments and

designated officials, not elections.  See 2011 Tenn. Pub. Acts Chapter 1.  The Memphis City Council provides no authority for the proposition that Memphis residents are constitutionally entitled to proportional representation on an appointed state commission.  The Court cannot find any.  See, e.g., Nixon v. Kent Cnty., 76 F.3d 1381, 1390 (6th Cir. 1996) (en banc).  The Court also cannot accept the City Council's argument the one-person, one-vote principle requires proportional representation.  See, e.g., Sailors v. Bd. of Educ. of Cnty. of Kent, 387 U.S. 105, 108-11 (1967); Moore v. Detroit Sch. Reform Bd., 293 F.3d 352, 365-66 (6th Cir. 2002); Mixon v. State of Ohio, 193 F.3d 389, 403 (6th Cir. 1999); Burton v. Whittier Reg'l Vocational Technical Sch. Dist., 587 F.2d 66, 69 (1st Cir. 1978); Spivey v. State of Ohio, 999 F. Supp. 987, 995 (N.D. Ohio 1998).  The transition planning commission is non-legislative and has no plenary authority.  See 2011 Tenn. Pub. Acts Chapter 1.  Its only authority is to make recommendations.  See id.  Therefore, Public Chapter 1 does not violate the Equal Protection Clause under the Memphis City Council's theory.  Public Chapter 1 is constitutional under the United States Constitution.

### b)   Challenges Under Tennessee Constitution

#### (1)      Article II, § 17

Article II, § 17 of the Tennessee Constitution provides that:

> Bills may originate in either House; but may be amended, altered or rejected by the other. No bill shall become a law which embraces more than one subject, that subject to be expressed in the title. All acts which repeal, revive or amend former laws, shall recite in their caption, or otherwise, the title or substance of the law repealed, revived or amended.

Tenn. Const. art. II, § 17.  "The purpose of Article II, § 17, is to prevent 'surprise and fraud' and to inform legislators and the public about the nature and scope of proposed legislation." Tenn. Mun. League v. Thompson, 958 S.W.2d 333, 338 (Tenn. 1997). "The Supreme Court has held that this provision is 'to be liberally construed, so that the General Assembly [will] not be unnecessarily embarrassed in the exercise of its legislative powers and functions.'"  State ex rel. Tipton v. City of Knoxville, 205 S.W.3d 456, 467 (Tenn. Ct. App. 2006) (quoting Tenn. Mun. League, 958 S.W.2d at 336) (alteration in original).

"[I]f the title is general or broad and comprehensive, all matters which are germane to the subject may be embraced in the act."  Tenn. Mun. League, 958 S.W.2d at 336.  "If the matters are naturally and reasonably connected with the subject expressed in the title, then they are properly included in the act."  Id. (citations omitted).  "If, on the other hand, the legislature has adopted a restrictive title where a particular part or branch of a subject is carved out and selected, then the body of the act must be confined to the particular portion expressed in the limited title."  Id. at 336-37 (citation

89

omitted).   "The principal question in this analysis is whether the '[s]ubject matter of the act is germane to that expressed in the [caption].'"   State ex rel. Tipton, 205 S.W.3d at 467 (quoting Chattanooga-Hamilton Cnty. Hosp. Auth. v. City of Chattanooga, 580 S.W.2d 322, 326 (Tenn. 1979)) (alterations in original).

Several parties argue that Public Chapter 1 violates Article II, § 17 of the Tennessee Constitution because section (b)(3), amending Tennessee Code Annotated § 49-2-502 to remove restrictions on the creation of municipal and special school districts, is not germane to the subject matter expressed by the title.  (See City of Memphis Countercl. ¶¶ 21-22, ECF No. 49; Memphis City Board of Education Countercl. ¶¶ 14-17, ECF No. 52; Shelby County Commission Countercl. ¶¶ 77-85, ECF No. 62.)  As discussed above, to the extent those challenges address the constitutionality of section (b)(3) itself, they are not ripe.

To the extent parties argue that the addition of section (b)(3) invalidates all provisions of Public Chapter 1 under Article II, § 17 of the Tennessee Constitution, their arguments are not well-taken.

Even if section (b)(3) were unconstitutional, the remaining provisions of Public Chapter 1 would be unaffected.  The Tennessee General Assembly "has specifically declared that the provisions of the Tennessee Code are severable."  In re Swanson,

90

2 S.W.3d at 188.   Tennessee Code Annotated § 1-3-110 provides that:

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

Tenn. Code Ann. § 1-3-110.   "[W]hen a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion omitted, then elision of the unconstitutional portion is appropriate."   In re Swanson, 2 S.W.3d at 189 (citations omitted).   In this case, the conclusion can be reached that the General Assembly would have enacted Public Chapter 1 even if it had not added section (b)(3). Therefore, declaring section (b)(3) unconstitutional would not affect the constitutionality or the applicability of Public Chapter 1.

Considering Public Chapter 1 as if section (b)(3) were elided, the remaining provisions do not violate Article II, § 17.   The Court must liberally construe Article II, § 17 of the

Tennessee Constitution.   *State ex rel. Tipton*, 205 S.W.3d at 467.   The title of Public Chapter 1 is general, broad, and comprehensive.   Therefore, Public Chapter 1 may embrace "all matters which are germane to the subject."   Tenn. Mun. League, 958 S.W.2d at 336.   It may properly include matters "naturally and reasonably connected with the subject expressed in the title."   Id.

All remaining provisions of Public Chapter 1 fall within its title, "AN ACT to amend Tennessee Code Annotated, Title 49, Chapter 2, relative to administration of local education agencies."   2011 Tenn. Pub. Acts Chapter 1.   Under Tennessee law, a "[l]ocal education agency" is broadly defined to include "any county, city, or special school district, unified school district, school district of any metropolitan form of government or any other school system established by law."   Tenn. Code Ann. § 49-3-302(11).   Public Chapter 1 addresses the process for a proposed transfer of the administration of schools in a special school district to a county board of education.   See 2011 Tenn. Pub. Acts Chapter 1.

The remaining provisions of Public Chapter 1 relate to the same subject matter and are "naturally and reasonably connected with the subject expressed in the title."   Tenn. Mun. League, 958 S.W.2d at 336.   "[T]he '[s]ubject matter of the act is germane to that expressed in the [caption].'"   State ex rel.

92

*Tipton*, 205 S.W.3d at 467 (quoting <u>Chattanooga-Hamilton Cnty.</u>
<u>Hosp. Auth.</u>, 580 S.W.2d at 326).  The remaining provisions of
Public Chapter 1 are constitutional under Article II, § 17 of
the Tennessee Constitution.  <u>See</u> Tenn. Const. art. II, § 17;
<u>Tenn. Mun. League</u>, 958 S.W.2d at 336; <u>State ex rel. Tipton</u>, 205
S.W.3d at 467.

(2)          **Article XI, § 8**

"Article XI, section 8 is implicated when a statute
'contravene[s] some general law which has mandatory statewide
application.'"  <u>McCarver v. Ins. Co. of State of Pa.</u>, 208 S.W.3d
380, 384 (Tenn. 2006) (quoting <u>Riggs v. Burson</u>, 941 S.W.2d 44,
53 (Tenn. 1997)); <u>see also</u> <u>Leech v. Wayne Cnty.</u>, 588 S.W.2d 270,
273 (Tenn. 1979) ("In order for the provisions of [Article XI, §
8] to come into play, an act which is either local or local in
effect must contravene some general law which has mandatory
statewide application.") (citation omitted).  "Even if a statute
does suspend a general law, that statute will be upheld unless
it creates classifications which are 'capricious, unreasonable,
or arbitrary.'"  <u>McCarver</u>, 208 S.W.3d at 384 (quoting <u>Riggs</u>, 941
S.W.2d at 53).  "[U]nless the classification 'interferes with
the exercise of a fundamental right or operates to the peculiar
disadvantage of a suspect class,' Article XI, section 8 requires
only that the legislative classification be rationally related
to the objective it seeks to achieve."  <u>City of Chattanooga v.</u>

93

Davis, 54 S.W.3d 248, 276 (Tenn. 2001) (citation omitted).  "If any reason can be conceived to justify the classification, it will be upheld as reasonable." Riggs, 941 S.W.2d at 53.

Public Chapter 1 does not contravene or suspend a general law with mandatory statewide application.  The record demonstrates that Public Chapter 1 does not apply only to Shelby County and would apply to two other counties if the special school districts in those counties decided to transfer administration to the counties.  It may apply to other counties in the future if student population changes occur.  Instead of contravening a mandatory general law, Public Chapter 1 fills a void in the law by providing legislative guidance about how to conduct the transfer of administration from a special school district to a county board of education where transferring administration would increase enrollment in the county school system by one hundred percent or more.  See 2011 Tenn. Pub. Acts Chapter 1.

Even if Public Chapter 1 contravened a general law, it would be constitutional.  It does not create classifications that are capricious, unreasonable, or arbitrary.  It also does not interfere with the exercise of a fundamental right or operate to the peculiar disadvantage of a suspect class.  Therefore, it is constitutional because it is "rationally related to the objective it seeks to achieve." Davis, 54 S.W.3d

94

at 276. It is rationally related because it provides guidance about how to plan the transfer of administration of schools, an inevitably complex process when a smaller school system absorbs a larger one. Because it is rationally related to the objective it seeks to achieve, Public Chapter 1 satisfies the requirements of Article XI, § 8. See id.

### (3) Article II, § 24

Article II, § 24 of the Tennessee Constitution provides, in part, that "[n]o law of general application shall impose increased expenditure requirements on cities or counties unless the General Assembly shall provide that the state share in the cost." Tenn. Const. art. II, § 24.

Public Chapter 1 does not violate Article II, § 24 for two reasons. First, it does not require special school districts to transfer the administration of schools to counties. Therefore, it does not require increased expenditures and does not violate Article II, § 24. See Swafford v. City of Chattanooga, 743 S.W.2d 174, 178 (Tenn. Ct. App. 1987) (concluding that the General Assembly's increasing the limits of liability under the Governmental Tort Liability Act from $20,000 to $40,000 without sharing in the cost did not conflict with Article II, § 24 because "[t]he only 'expenditure requirements' would be those that result solely from the negligent acts or omissions of a city or county itself; the Act does not require cities and

counties to commit those negligent acts or omissions"); see also Knox Cnty. v. City of Knoxville, 1987 WL 31640, at *6 (Tenn. Ct. App. Dec. 30, 1987) (concluding that a statute requiring the state commissioner of education to determine that teachers' rights and privileges will not be impaired, interrupted, or diminished before a change in governmental structure or organization becomes effective did not violate Article II, § 24 because "[t]he statute does not require that cities and counties abolish, transfer, or reorganize their school systems, and absent a local system's taking such a step, the statute imposes no expenditure requirements, direct or indirect, on a city or county").

Second, even if the state-cost-share requirement applied, the state adequately shares in the cost through school funding. "[A]rticle II, Section 24, the State Spending Clause, gives the General Assembly the widest discretion in assigning the relative shares of responsibility of the state and local governments for funding state mandated services." Tenn. Small School Sys. v. McWherter, 851 S.W.2d 139, 156 (Tenn. 1993); see also Morris v. Snodgrass, 886 S.W.2d 761, 763 (Tenn. Ct. App. 1994) ("This Court concludes that the Legislature is constitutionally empowered to elect what the share of the State shall be in the subject expenses."). Where the General Assembly had passed a statute requiring the state commissioner of education to

96

determine that teachers' rights and privileges will not be impaired, interrupted, or diminished before a change in governmental structure or organization becomes effective, the Tennessee Court of Appeals found that "the state cost share requirement would be adequately met by the additional [average daily attendance] funds provided because of the County School System's increased enrollment." Knox Cnty., 1987 WL 31640, at *6. The court noted that "[t]he constitution mandates only that there be a state share; it does not mandate the size or proportion of that share." Id. The state-cost-share requirement is satisfied in this case by state funding of Memphis City Schools and Shelby County Schools. See id. Public Chapter 1 does not violate Article II, § 24 of the Tennessee Constitution.

### (4) Article I, § 20 and Tennessee Code Annotated § 1-3-101

Article I, § 20 of the Tennessee Constitution provides "[t]hat no retrospective law, or law impairing the obligations of contracts, shall be made." Tenn. Const. art. I, § 20; accord Doe v. Sundquist, 2 S.W.3d 919, 923 (Tenn. 1999). The Tennessee Supreme Court has "construed this provision as prohibiting laws 'which take away or impair vested rights acquired under existing laws or create a new obligation, impose a new duty, or attach a new disability in respect of transactions or considerations

97

already passed.'"    Doe, 2 S.W.3d at 923 (quoting Morris v. Gross, 572 S.W.2d 902, 907 (Tenn. 1978)).  "A 'vested right,' although difficult to define with precision, is one 'which it is proper for the state to recognize and protect and of which [an] individual could not be deprived arbitrarily without injustice.'"    Id.  (quoting Morris, 572 S.W.2d at 905) (alteration in original).

"In considering whether a statute impairs a vested right under article I, section 20, we frequently have observed that statutes which are procedural or remedial in nature may be applied retrospectively."  Id. (citation omitted).  "In general, a statute is procedural 'if it defines the . . . proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right.'"   Id. (quoting Kuykendall v. Wheeler, 890 S.W.2d 785, 787 (Tenn. 1994)).  "A statute is remedial if it provides the means by which a cause of action may be effectuated, wrongs addressed, and relief obtained."   Id. (citation omitted).  "We have clarified, however, that even a procedural or remedial statute may not be applied retrospectively if it impairs a vested right or contractual obligation in violation of article I, section 20."  Id. at 923-24 (citation omitted).

"Our case law indicates that deciding whether a 'vested right' exists and has been impaired by retrospective application

of a statute entails consideration of many factors, none of which is dispositive." Id. at 924 (citations omitted). "In short, there is no precise formula to apply in making this determination." Id. Certain factors are relevant:

> [I]n determining whether a retroactive statute impairs or destroys vested rights, the most important inquiries are (1) whether the public interest is advanced or retarded, (2) whether the retroactive provision gives effect to or defeats the bona fide intentions or reasonable expectations of affected persons, and (3) whether the statute surprises persons who have long relied on a contrary state of the law.

Id. (quoting Ficarra v. Dep't of Regulatory Agencies, 849 P.2d 6, 16 (Colo. 1993)) (alteration in original). In addition to those factors, the Tennessee Supreme Court has instructed courts to consider "the extent to which a statute appears to be procedural or remedial." Id. (citation omitted).

Public Chapter 1 does not violate Article I, § 20 of the Tennessee Constitution for two reasons. First, it is not a retrospective statute. "For the purpose of Article I, Section 20, a retrospective statute is one which operates forward but looks backward in that it attaches new consequences or legal significance in the future to past acts or facts that existed before the statute came into effect." Estate of Bell v. Shelby Cnty. Health Care Corp., 318 S.W.3d 823, 836 n.4 (Tenn. 2010) (citations omitted); see also City of Clarksville v. Dixon, No. M2004-01656-COA-R3-CV, 2005 WL 3504589, at *4 (Tenn. Ct. App.

Dec. 20, 2005) ("A law is retrospective if it changes the legal consequences of acts completed before its effective date." (quoting <u>Miller v. Florida</u>, 482 U.S. 423, 430 (1987))) (internal quotation marks omitted).   Public Chapter 1 provides that "[t]his act shall take effect on becoming law, the public welfare requiring it, and shall apply to any proposed § 49-2-502 transfer pending on or after such date."   2011 Tenn. Pub. Acts Chapter 1.   Before Public Chapter 1 was passed, Tennessee Code Annotated § 49-2-502 provided that, "[b]efore a transfer is effectuated, however, a referendum shall first be conducted on the subject, and the school system of the special school district shall not be transferred to the county unless a majority of the voters who cast votes in the referendum vote in favor of the transfer."   Tennessee Code Annotated § 49-2-502 (2009).   Because Public Chapter 1 affects only transfers of administration pending on or after it was signed into law on February 11, 2011, and a referendum had not occurred before Public Chapter 1 was passed, Public Chapter 1 does not attach new consequences or legal significance to past acts or facts that existed before it came into effect.   It does not violate Article I, § 20 of the Tennessee Constitution.   See <u>Estate of Bell</u>, 318 S.W.3d at 836 n.4.

Second, Public Chapter 1 does not take away or impair vested rights.   The Tennessee Supreme Court has rejected the

"proposition that political power conferred by the Legislature can become a vested right as against the government, in any body of men." Caldwell v. Harris, 204 S.W.2d 1019, 1022 (Tenn. 1947) (quoting Luehrman v. Taxing Dist. of Shelby Cnty., 70 Tenn. 425 (1879)). "Municipal grants of franchise . . . are always subject to the control of the legislative power for the purposes of amendment, modification, or entire revocation." Id. (citation omitted). "It follows that a county as a mere arm of the sovereign power can have, as against the legislative power of the sovereign, no vested rights in the powers conferred upon it for governmental purposes . . . ." Maury Cnty. ex rel. Maury Reg'l Hosp. v. Tenn. State Bd. of Equalization, 117 S.W.3d 779, 787 (Tenn. Ct. App. 2003) (quoting State ex rel. Bell v. Cummings, 172 S.W. 290, 291 (Tenn. 1914)). The Shelby County Commission cannot claim that Public Chapter 1 impaired its vested rights. See Caldwell, 204 S.W.2d at 1022; Maury Cnty. ex rel. Maury Reg'l Hosp., 117 S.W.3d at 787; see also First Util. Dist. of Carter Cnty. v. Clark, 834 S.W.2d 283, 287 (Tenn. 1992); Nichols v. Tullahoma Open Door, Inc., 640 S.W.2d 13, 18 (Tenn. Ct. App. 1982).

The Shelby County Commission also cannot claim that the vested rights of voters or any other persons were impaired by Public Chapter 1 because the referendum did not occur until after Public Chapter 1 had been signed into law on February 11,

2011.   Public Chapter 1 advances the public interest, does not defeat the bona fide intentions or reasonable expectations of affected persons, and does not surprise persons who relied on the law as it existed before Public Chapter 1.   It is a procedural and remedial statute.   Public Chapter 1 does not violate Article I, § 20 of the Tennessee Constitution, see Doe, 2 S.W.3d at 923-24, or Tennessee Code Annotated § 1-3-101, see Tenn. Code Ann. § 1-3-101.   It is constitutional under the Tennessee Constitution.

### C.   Applicability of 1961 Private Act and Public Chapter 1

#### 1.   Applicability of 1961 Private Act

The Shelby County Board of Education argues that the 1961 Private Act does not fully apply because it conflicts with general state law in that it does not require a voter referendum, protection of teachers and commissioner approval, or an orderly process or transition period to a combined school system.   (See Br. 13-14, ECF No. 242.)   The Board contends, however, that a conflict with state law can be avoided if the 1961 Private Act does not authorize "immediate dissolution" of the Memphis City Schools' charter.   (See id. at 14-15.)   "If, however, the charter surrender under the 1961 Private Act is interpreted to authorize an immediate dissolution, then the Act has been superceded by general state law, namely, Sections 49-5-

203 and 49-2-502, as amended." (Id. at 15.) The Tennessee Department of Education and Commissioner Kevin Huffman take the same position. (See Resp. 29-30, ECF No. 153; Resp. 8, ECF No. 154.)

"Although a private act is superseded as far as is necessary to give effect to a general statutory scheme of statewide application, repeals by implication are disfavored and are recognized only when no reasonable construction allows the subject acts to stand together." Knox Cnty. Educ. Ass'n, 60 S.W.3d at 74 (citations omitted). "The general rule is that when 'two acts conflict and cannot be reconciled, the prior act will be repealed or amended by implication to the extent of the inconsistency between the two.'" Hayes v. Gibson Cnty., 288 S.W.3d 334, 337 (Tenn. 2009) (quoting Cronin, 906 S.W.2d at 912). "Repeals by implication, however, are disfavored in Tennessee, and therefore 'will be recognized only when no fair and reasonable construction will permit the statutes to stand together.'" Id. (quoting Cronin, 906 S.W.2d at 912). "Consequently, a court will hold a later statute to have repealed an earlier statute by implication only when the conflict between the statutes is irreconcilable." Id. at 337-38 (citations omitted). "[T]he Legislature is presumed to have knowledge of its prior enactments and to know the state of the law at the time it passes legislation." Cronin, 906 S.W.2d at

912 (citation omitted). "A construction which places one statute in conflict with another must be avoided; therefore, we must resolve any possible conflict between statutes in favor of each other, so as to provide a harmonious operation of the laws." Id. (citation omitted); see also Crider v. Cnty. of Henry, 295 S.W.3d 269, 277 (Tenn. Ct. App. 2008) (interpreting private act to "give[] effect to both the private act and the statute, resulting in a 'harmonious operation of the laws'" (quoting Knox Cnty. Educ. Ass'n, 60 S.W.3d at 74)).

The 1961 Private Act establishes a procedure for the Memphis City Board of Education to surrender the charter of the Memphis City Schools. The Act authorizes the Board of Education to dissolve the City Schools' charter and to surrender it to the Tennessee Secretary of State, subject to the approval of the Memphis City Council. 1961 Tenn. Priv. Acts Chapter 375.

The 1961 Private Act does not provide for a lapse of time between the date the charter is surrendered and the date the dissolution of the charter becomes effective. See id. The dissolution of the Memphis City Schools' charter becomes effective when the charter is surrendered to the Secretary of State. See id. Because the 1961 Private Act is clear and unambiguous, the Court must apply that plain meaning in its normal and accepted use. See Estate of French, 333 S.W.3d at 554; Eastman Chem. Co., 151 S.W.3d at 507.

The Shelby County Board of Education argues that, even if the 1961 Private Act authorizes immediate dissolution of the Memphis City Schools' charter, the Act has been superseded by two provisions of general state law: Tennessee Code Annotated §§ 49-2-502 and 49-5-203.  (Br. 15, ECF No. 242.)  According to the Shelby County Board of Education:

> This Court may therefore interpret both Tenn. Code Ann. § 49-5-203 (teacher protection) and § 49-2-502, as amended by Chapter 1 of the Public Acts of 2011, as impliedly amending Ch. 375 of the Private Acts of 1961 to require (1) the approval of the Commissioner of Education before a change in governmental structure or organization becomes effective, and (2) a transition period, the appointment of a transition planning commission, and the formulation of a comprehensive transition plan.  In the alternative, where this Court finds conflict between the Private Act and the general laws, the general laws must prevail.

(Id. at 18 (citation omitted).)

As Tennessee courts have explained, the Court may only conclude that Public Chapter 1 and Tennessee Code Annotated § 49-5-203 repealed the 1961 Private Act by implication if no fair and reasonable construction permits them to stand together and the conflict between them is irreconcilable.  See Hayes, 288 S.W.3d at 337-38; Knox Cnty. Educ. Ass'n, 60 S.W.3d at 74.  The Court presumes that the Tennessee General Assembly was aware of the 1961 Private Act and the state of the law when it passed Public Chapter 1 and enacted Tennessee Code Annotated § 49-5-203.  See Cronin, 906 S.W.2d at 912.

105

A fair and reasonable construction of Public Chapter 1, the 1961 Private Act, and Tennessee Code Annotated § 49-5-203 permits them to stand together and avoids placing them in conflict with each other.  Public Chapter 1 and Tennessee Code Annotated § 49-5-203 are clear.  By its plain terms, Public Chapter 1 imposes, under certain circumstances, a process that must be completed before the administration of the schools in a special school district may be transferred to the county board of education.  See 2011 Tenn. Pub. Acts Chapter 1 (stating that a transition plan must be developed if "the proposed transfer of the administration of the schools in the special school district to the county board of education would result in an increase in student enrollment within the county school system of one hundred percent (100%) or more" and a majority of voters who cast votes in a referendum vote in favor of the transfer) (emphasis added).

Tennessee Code Annotated § 49-5-203(d) provides an additional step in the transfer process.  See Tennessee Code Annotated § 49-5-203(d).  It requires the Tennessee Commissioner of Education to determine that teachers' rights and privileges will not be impaired, interrupted, or diminished before a change in governmental structure or organization becomes effective. See id. ("Prior to the change in any governmental structure or organization becoming effective, the commissioner of education

shall determine that the rights and privileges protected by this section are not impaired, interrupted or diminished.").

Public Chapter 1 and Tennessee Code Annotated § 49-5-203 are consistent with the 1961 Private Act. They are silent about whether a board of education administering schools in a special school district may elect to surrender the special school district's charter. Such a surrender transfers responsibility for operating the schools in the special school district to the county. See Tenn. Code Ann. § 49-1-102(c) ("There shall be a local public school system operated in each county or combination of counties.") (emphasis added); Tenn. Small School Sys., 851 S.W.2d at 151 ("The certain conclusion is that Article XI, Section 12 of the Tennessee Constitution guarantees to the school children of this state the right to a free public education."); Knox Cnty. v. City of Knoxville, 786 S.W.2d 936, 937 (Tenn. 1990) (stating that, after the City of Knoxville voters approved repealing city charter provisions permitting the operation of a municipal school district, the Knox County Board of Education was left "with the responsibility of providing education to all students within the county borders as of 1 July 1987"); Hardaway v. Bd. of Educ. of Hamilton Cnty. Sch., No. E2003-01547-COA-R3-CV, 2004 WL 533941, at *2 (Tenn. Ct. App. Mar. 18, 2004) ("Because the City repealed all provisions of its Charter relative to the operation of a school system which

onerated [sic] the County School Board with the burden and responsibility of operating all public schools in Hamilton County, Dr. Jesse Register, Superintendent of the Hamilton County Schools, as provided by Tenn. Code Ann. § 49-5-203, developed and submitted to the Tennessee Commissioner of Education, Dr. Jane Walters, a Personnel Plan for County-Wide School System which she approved on April 10, 1997.").

The 1961 Private Act has not been amended or repealed. It authorizes the Memphis City Board of Education to dissolve the Memphis City Schools' charter and surrender it to the Tennessee Secretary of State by resolution subject to approval, by resolution, of the Memphis City Council. See 1961 Tenn. Priv. Acts Chapter 375. The Memphis City Board of Education passed a resolution to surrender the Memphis City Schools charter that specifically invoked the 1961 Private Act. (See Preliminary Injunction Hr'g Ex. 13, at 4.) The Memphis City Council passed a resolution accepting and approving the Memphis City Board of Education's surrender of the Memphis City Schools' charter. (Preliminary Injunction Hr'g Ex. 13, at 2.) The City Council's resolution was received by the Tennessee Secretary of State at 1:21 p.m. on February 11, 2011. (See Preliminary Injunction Hr'g Ex. 13, at 1.) The 1961 Private Act applies in this case, and the conditions for dissolving the Memphis City Schools'

charter have been fulfilled.   See 1961 Tenn. Priv. Acts Chapter 375.

## 2.   Applicability of Public Chapter 1

Several parties have argued that Public Chapter 1 does not apply because Memphis City Schools is not a special school district.   (See, e.g., City of Memphis Br. 3, ECF No. 239; Shelby County Commission Br. 9-12, ECF No. 240; Memphis City Council Br. 3-30, ECF No. 241.)   That argument is not well-taken.

"Special school district" is a term of art under Tennessee law.   It is a type of school district authorized by the Tennessee General Assembly.   See, e.g., Tenn. Code Ann. § 49-3-302(11); Halbert v. Shelby Cnty. Election Comm'n, 31 S.W.3d 246, 248 (Tenn. 2000); State ex rel. Bd. of Educ. of Memphis City Schools v. City of Memphis, 329 S.W.3d 465, 472 (Tenn. Ct. App. 2010); City of Humboldt v. McKnight, No. M2002-02639-COA-R3-CV, 2005 WL 2051284, at *16 (Tenn. Ct. App. Aug. 25, 2005). Tennessee courts have concluded that Memphis City Schools is a special school district.   See Halbert, 31 S.W.3d at 248 (stating, in the analysis, that "[t]he Memphis City Schools is a special school district whose charter comprises a series of Private Acts of the Tennessee General Assembly, the earliest of which was enacted in 1869"); State ex rel. Bd. of Educ. of Memphis City Schools, 329 S.W.3d at 469-70, 474 (finding that

109

the City of Memphis is required "to fund the [Memphis City Schools], a special school district established by private acts of the General Assembly" and stating that "[a]s the Attorney General opined in 2005, the City cannot effectively amend existing law and legislate the [Memphis City Schools] out of existence as a special school district by reducing funding"). Those findings are not dicta. They are essential to the courts' holdings. See Halbert, 31 S.W.3d at 248; State ex rel. Bd. of Educ. of Memphis City Schools, 329 S.W.3d at 469-70, 474. Because "state courts are the final authority on state law," this Court cannot conclude that Tennessee courts have misinterpreted Tennessee law. Hutchison, 744 F.2d at 46; see also Israfil v. Russell, 276 F.3d 768, 771 (6th Cir. 2001) ("Principles of comity require federal courts to defer to a state's judgment on issues of state law and, more particularly, on issues of state procedural law. Because state courts are the final authority on state law, federal courts must accept a state court's interpretation of its statutes and its rules of practice.") (citations omitted).

The Tennessee Attorney General has persuasively demonstrated that Memphis City Schools is a special school district in a series of opinions. See Tenn. Op. Att'y Gen. No. 05-021, 2005 WL 740142, at *2 (Mar. 10, 2005); Tenn. Op. Att'y Gen. No. 03-037, 2003 WL 1829259, at *1, 4 (Apr. 2, 2003); Tenn.

110

Op. Att'y Gen. No. 96-055, 1996 WL 147606, at *1-2 (Mar. 27, 1996).   The Tennessee Court of Appeals cited the Attorney General's 2005 opinion with approval in <u>State ex rel. Bd. of Educ. of Memphis City Schools v. City of Memphis</u>.   <u>See</u> <u>State ex rel. Bd. of Educ. of Memphis City Schools</u>, 329 S.W.3d at 471, 474.   The court's reference is worth repeating: "As the Attorney General opined in 2005, the City cannot effectively amend existing law and legislate the MCS out of existence <u>as a special school district</u> by reducing funding."   <u>Id.</u> at 474 (emphasis added).

The Tennessee General Assembly has passed numerous private acts affecting the Memphis City School system in the decades since its alleged abolition.   <u>See, e.g.</u>, 1995 Tenn. Priv. Acts Chapter 67; 1961 Tenn. Priv. Acts Chapter 375.   The referendum in which Memphis residents voted identified the Memphis City School system as a special school district.   (<u>See</u> Br. 3, ECF No. 242.)   The Memphis City Council resolution approving the Memphis City Board of Education's charter surrender specifically refers to the Memphis City Schools as a "Special School District." (Preliminary Injunction Hr'g Ex. 13, at 1.)

Memphis City Schools is a special school district.   Section 49-2-502(a) authorizes and empowers school boards of special school districts to transfer administration of schools to county boards of education and provides that a transfer may not be

111

completed before voters approve the transfer in a referendum. See Tenn. Code Ann. § 49-2-502(a). Public Chapter 1 states that it "shall apply to any proposed § 49-2-502 transfer pending" after the act becomes law. 2011 Tenn. Pub. Acts Chapter 1. The Governor of Tennessee signed Public Chapter 1 into law no later than noon on February 11, 2011. (See Aff. ¶ 2, ECF No. 153-3.) Voters approve the referendum to transfer the administration of Memphis City Schools to the Shelby County Board of Education on March 8, 2011. (See Br. 3, ECF No. 242.) Because Memphis City Schools is a special school district and the administration of Memphis City Schools could not be transferred to the Shelby County Board of Education before voters approved the transfer on March 8, 2011, the transfer of administration of Memphis City Schools to the Shelby County Board of Education is a § 49-2-502 transfer pending after Public Chapter 1 became law. See 2011 Tenn. Pub. Acts Chapter 1. Therefore, Public Chapter 1 applies to the transfer of administration of the Memphis City Schools to the Shelby County Board of Education. See id.

### D. Statutory Scheme

Public Chapter 1, the 1961 Private Act, and other provisions of Tennessee law governing education are about the same subject and share a common purpose of fulfilling the Tennessee Constitution's guarantee "that the General Assembly shall maintain and support a system of free public schools that

provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare students intellectually for a mature life." Tenn. Small School Sys., 851 S.W.2d at 150-51. They are "statutes in pari materia" and must be construed together "so as to provide a harmonious operation of the laws." Graham, 325 S.W.3d at 582.

The 1961 Private Act provides a procedure for the Memphis City Board of Education to surrender the charter of the Memphis City Schools. See 1961 Tenn. Priv. Acts Chapter 375. Once surrendered pursuant to the terms of the 1961 Private Act, the Shelby County Board of Education assumes ultimate responsibility for educating Memphis schoolchildren. Tennessee Code Annotated § 49-1-102(c) mandates that "[t]here shall be a local public school system operated in each county or combination of counties." Tenn. Code Ann. § 49-1-102(c) (emphasis added). The Tennessee Supreme Court has held that Article XI, Section 12 of the Tennessee Constitution guarantees Tennessee schoolchildren the right to a free public education. See Tenn. Small School Sys., 851 S.W.2d at 151; see also Tenn. Small School Sys. v. McWherter, 894 S.W.2d 734, 734 (Tenn. 1995). Taken together, Tennessee Code Annotated § 49-1-102(c) and Tennessee schoolchildren's right to a free public education require that, where a separate school system within a county renounces

113

responsibility for educating schoolchildren, the county must assume responsibility for educating them.  See, e.g., Knox Cnty., 786 S.W.2d at 937; Hardaway, 2004 WL 533941, at *2; see also S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ, 58 S.W.3d 706, 715 (Tenn. 2001) ("[W]hile county boards of education are not part of the general county government in the sense that they derive their powers and duties from the county charter, they are in essence part of that local government, exclusively vested with statutory authority in all matters relating to public education.") (citation omitted); Phillips v. Anderson Cnty., 698 S.W.2d 76, 77 (Tenn. Ct. App. 1985) ("Since the City of Clinton has not undertaken to educate its residents in grades 7 through 12, the county is obligated to educate the students residing inside the city limits of Clinton for these grades.").

Although Tennessee law "does not place an affirmative duty on counties to operate a school system when all of the county's students are served by municipal or special school districts," State ex rel. Bd. of Educ. of Memphis City Schools, 329 S.W.3d at 472 (citation omitted), that principle does not apply where a school system within a county has renounced responsibility for educating schoolchildren.  See, e.g., Tenn. Code Ann. § 49-1-102(c); Knox Cnty., 786 S.W.2d at 937; Hardaway, 2004 WL 533941, at *2; Phillips, 698 S.W.2d at 77.  In those circumstances, the

county must assume responsibility for schoolchildren within the county.  See Tenn. Code Ann. § 49-1-102(c); Tenn. Small School Sys., 851 S.W.2d at 151.

Public Chapter 1 addresses a matter different from the ultimate responsibility for educating schoolchildren.  It concerns how and when the "administration of the schools in the special school district [may be transferred] to the county board of education." 2011 Tenn. Pub. Acts Chapter 1.  Transferring administration refers to the organization and operation of schools in a special school district that becomes part of a county school district.  Ultimate responsibility is the final accountability for educating students.  The transfer of ultimate responsibility to the county can occur by default.  Public Chapter 1 does not address or limit the default outcome of a county's assuming ultimate responsibility when a special school district surrenders its charter.  See id.  The Tennessee General Assembly could have addressed that outcome, for example, by amending Tennessee Code Annotated § 49-1-102(c).  Presumptively aware of Tennessee Code Annotated § 49-1-102(c) and its possible consequences given the 1961 Private Act, Estate of French, 333 S.W.3d at 554, the General Assembly chose not to do so when it passed Public Chapter 1.

Tennessee Code Annotated § 49-5-203 also addresses a matter different from the ultimate responsibility for educating

115

schoolchildren.   It concerns the determination the Tennessee
Commissioner of Education must make before a change in the
governmental structure or organization of a school system
becomes effective.  See Tenn. Code Ann. § 49-5-203.  The purpose
is to protect teachers' rights.   See id.   Although the
Commissioner's determination is a step that must occur before
the transfer of administration or the change in organization is
complete, it is not a condition that must be satisfied before
the process begins.  The transition process need not be delayed
until the Commissioner decides that teachers' rights will not be
impaired, interrupted, or diminished.  See id.  The process of
transferring administration may, indeed on this record it must,
begin before the Commissioner makes his decision.  See id.

As counsel for the Shelby County Board of Education and the
Tennessee Department of Education stated during the evidentiary
hearing, the State of Tennessee cannot require a city to operate
a school system.  (See Hr'g Tr. 176:20-22, 252:3-7, May 12,
2011.)  When a city chooses to discontinue its school system and
the system's charter is surrendered, the transfer of ultimate
responsibility for the schools in that system is not subject to
the Commissioner of Education's determination.

### E.   Implications of Statutory Scheme

On December 20, 2010, when the Memphis City Board of
Education voted to surrender the charter of the Memphis City

116

Schools, the Board chose to do two things. (See Preliminary Injunction Hr'g Ex. 13, at 4-5.) It began the process of transferring responsibility for educating Memphis schoolchildren to the Shelby County Board of Education under the 1961 Act, and it began the separate process of transferring administration of schools in Memphis to the Shelby County Board of Education under § 49-2-502.

The Memphis City Board of Education voted to surrender the Memphis City Schools' charter as authorized by the 1961 Private Act. See 1961 Tenn. Priv. Acts Chapter 375; (Preliminary Injunction Hr'g Ex. 13, at 4). That began the process of transferring responsibility for educating Memphis schoolchildren to the Shelby County Board of Education. The Memphis City Council accepted the surrender of the charter, and the charter was surrendered to the Secretary of State. (Preliminary Injunction Hr'g Ex. 13, at 2.) Under the 1961 Private Act, the surrender became effective when the Secretary of State received it on February 11, 2011. See 1961 Tenn. Priv. Acts Chapter 375. That step completed the process for transferring responsibility for educating Memphis schoolchildren to the Shelby County Board of Education. See, e.g., Tenn. Code Ann. § 49-1-102(c); Knox Cnty., 786 S.W.2d at 937; Hardaway, 2004 WL 533941, at *2; Phillips, 698 S.W.2d at 77. The Shelby County Board of Education acknowledges that it "has obligations under both state

117

and federal law to provide a free public education to the school age children who currently reside in the boundaries of the City of Memphis."  (Am. Compl. ¶ 44.)

The Memphis City Board of Education also requested that the Shelby County Election Commission conduct a referendum to transfer the administration of the Memphis City Schools to the Shelby County Board of Education pursuant to Tennessee Code Annotated § 49-2-502.  (See Preliminary Injunction Hr'g Ex. 13, at 4-5.)  A referendum was held on March 8, 2011, in which voters were asked, "Shall the Administration of the Memphis City School System, a Special School District, be Transferred to the Shelby County Board of Education?"  (Br. 3, ECF No. 242.) Approximately two-thirds of those voting approved the transfer by voting yes.  The Shelby County Election Commission certified the results on March 17, 2011.  See id.  All conditions for beginning the transfer planning process have been completed.

Because voter approval of the transition of administration occurred after Public Chapter 1 became law, the provisions of Public Chapter 1 apply to the transfer of the administration of the Memphis City Schools to the Shelby County Board of Education.  See 2011 Tenn. Pub. Acts Chapter 1.  Before the transfer of administration can be completed, a comprehensive transition plan must be developed that meets the requirements of Tennessee Code Annotated § 49-2-502(b)(2).  See Tenn. Code Ann.

118

§ 49-2-502(b).   The transfer cannot be completed before "the beginning of the third, full school year immediately following certification of the election results." Id.

Although the Tennessee Commissioner of Education must make a determination that teachers' rights will not be impaired, interrupted, or diminished before the administration of the city schools may be finally transferred to the Shelby County Board of Education, the transition planning process has begun.

These conclusions have a number of implications for the current legal relations of the parties.   The principal issues are: (1) Memphis schoolchildren's Fourteenth Amendment rights, (2) responsibility for educating Memphis schoolchildren, (3) transfer of the administration of the Memphis City Schools to the Shelby County Board of Education, (4) constitutionality of the current electoral districts for the Shelby County Board of Education, (5) rights of the Intervening Plaintiffs to continue holding office, (6) legality of the Shelby County Commission's actions, (7) authority of the Memphis City Board of Education to continue to operate, (8) responsibility for funding Memphis City Schools, and (9) commissioner of education approval.

## 1.   Memphis   Schoolchildren's   Fourteenth Amendment Rights

The Fourteenth Amendment rights of Memphis schoolchildren have not been violated.   "The Fourteenth Amendment forbids the

119

State from depriving any person of life, liberty, or property
without due process of law." Laney, 501 F.3d at 581 (citation
omitted).    "[S]tate laws creating free education to all
residents between five and twenty-one years of age coupled with
a compulsory-attendance law create a claim of entitlement to
public education." Id. (citation omitted). "Tennessee has
created a free education system and requires attendance in
school." Id. (citation omitted). "Thus Tennessee students have
a legitimate property interest in educational benefits and,
therefore, in actually attending school." Id.; see also Seal,
229 F.3d at 574 ("It is undisputed that [a student] enjoyed a
property interest in his public high school education under
Tennessee law.").

In this case, the Shelby County Board of Education has the
ultimate responsibility for educating Memphis schoolchildren,
and Memphis schoolchildren have received a free public education
to date. There is no evidence that Memphis schoolchildren's
right to equal protection has been violated. Therefore, the
Fourteenth Amendment rights of Memphis schoolchildren have not
been violated. See, e.g., Laney, 501 F.3d at 581.

### 2. Responsibility for Educating Memphis Schoolchildren

The Shelby County Board of Education has the ultimate
responsibility for educating Memphis schoolchildren. It must

120

ensure that there is a local public school system that fulfills
the mandate under the Tennessee Constitution that all children
within Shelby County receive a free public education.  See Tenn.
Code Ann. § 49-1-102(c) ("There shall be a local public school
system operated in each county or combination of counties.")
(emphasis added); Tenn. Small School Sys., 851 S.W.2d at 151
("The certain conclusion is that Article XI, Section 12 of the
Tennessee Constitution guarantees to the school children of this
state the right to a free public education.").

The responsibility imposed on the Shelby County Board of
Education by Tennessee law makes it responsible for overseeing
all aspects of the transition planning process, including
adopting and implementing a comprehensive transition plan.  The
Board is also responsible for long-term planning decisions that
comply with state law and ensure the effective education of
Memphis schoolchildren in future years, including years after
the administration of Memphis City Schools and Shelby County
Schools has been combined.

### 3.    Transfer of Administration

The process of overseeing and planning the transfer of
administration of the Memphis City Schools to the Shelby County
Board of Education has begun.  Until that process is complete,
Memphis City Schools and Shelby County Schools operate
separately pursuant to Tennessee Code Annotated § 49-2-

502(b)(1), although the Shelby County Board of Education bears ultimate responsibility for educating all public schoolchildren in Shelby County.  <u>See</u> Tenn. Code Ann. § 49-1-102(c); <u>Tenn. Small School Sys.</u>, 851 S.W.2d at 151.

The Shelby County Board of Education has the responsibility for overseeing and planning the transition process to a combined school system.  The Board must consider and, as it deems appropriate, approve and implement the comprehensive transition plan developed by the transition planning commission and reviewed by the Department of Education.  The Shelby County Board of Education must make all final decisions about the transition process that will affect the future unified school system and all schoolchildren in Shelby County.  It must submit a plan to the Commissioner of Education to ensure that teachers' rights are protected.

The Shelby County Board of Education is responsible for deciding all of the matters referenced in Tennessee Code Annotated § 49-2-502(b)(2), including those set forth in Tennessee Code Annotated §§ 49-2-1201(i) and 49-2-1204.  <u>See</u> Tenn. Code Ann. § 49-2-502(b)(2).  The Board is responsible for reconciling differences between the Memphis City Schools and the Shelby County Schools in textbooks and curriculum, student transportation, computer systems, charter schools, optional schools, board policies and procedures, sources of funding,

122

insurance benefits of retirees, telephone systems, facilities, special education services, administrative structures, employees' rights and privileges, and security services.

The City of Memphis, the Memphis City Council, and the Memphis City Board of Education have no authority to oversee or plan the transfer of the administration of the Memphis City Schools to the Shelby County Board of Education.

### 4. Constitutionality of Shelby County Board of Education's Current Electoral Districts

The Shelby County Board of Education's current electoral districts exclude Memphis residents.  Memphis residents cannot vote for the current members of the Shelby County Board of Education.  See Burson, 121 F.3d at 246-51 (finding that including Memphis voters in the electorate for the Shelby County Board of Education violated the United States Constitution where the Shelby County Board of Education was not responsible for educating Memphis schoolchildren).  Memphis residents are not represented on the current Shelby County Board of Education.

The Supreme Court has held "that as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election . . . ."  Hadley v. Junior Coll.

Dist. of Metro. Kansas City, 397 U.S. 50, 56 (1970). "Education has traditionally been a vital governmental function and these trustees, whose election the State has opened to all qualified voters, are governmental officials in every relevant sense of that term." Id. "[O]nce a State has decided to use the process of popular election and 'once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded.'" Id. at 59 (quoting Gray, 372 U.S. at 381).

The Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." Dunn, 405 U.S. at 336 (citations omitted); see also Burson, 121 F.3d at 247 ("[W]here a citizen can demonstrate that he lives in the relevant political jurisdiction, there is a strong presumption that he is entitled to vote in its elections. Exclusion of such a citizen from the franchise is subject to strict scrutiny, and will only be upheld upon a showing of a compelling state interest." (citing Duncan, 69 F.3d at 93)).

In Duncan, the Sixth Circuit held that the relevant jurisdiction in school board elections is the school district. Duncan, 69 F.3d at 93. The Sixth Circuit reaffirmed that principle in Burson. Burson, 121 F.3d at 248 (citing Duncan, 69 F.3d at 93). In Burson, the court concluded that "the

124

Constitution prevents the State of Tennessee from including Memphis voters in the electorate for the Shelby County Board of Education under the circumstances of this case" because the Shelby County Board of Education did not educate students residing in Memphis.  Id. at 246, 251.

Circumstances and Tennessee's statutory scheme for educating children have changed since Burson.  The Memphis City Schools have surrendered their charter, and the General Assembly has enacted Public Chapter 1.  The Shelby County Board of Education is no longer responsible only for a separate and distinct school system outside the City of Memphis.  It now has ultimate responsibility for educating Memphis schoolchildren, making final decisions about the education of those children, and overseeing the transition process to a combined school system that the Board unanimously opposed.  (See Minutes 17, ECF No. 240-2).  Memphis residents are not represented on the Shelby County Board of Education and have not been permitted to vote for its members.  The question is whether such an arrangement violates the one-person, one-vote principle.  It does.

Although the Sixth Circuit has found that the relevant jurisdiction for purposes of one-person, one-vote analysis in school board elections is the school district, Duncan and Burson presented the more common arrangement in which responsibility for educating students parallels traditional school system

125

boundaries.  See Burson, 121 F.3d at 246; Duncan, 69 F.3d at 90,
93.  The Sixth Circuit did not address the situation at issue in
this case, in which a school district's charter has been
surrendered, a county board of education has ultimate
responsibility for educating students formerly outside the
county school system, and the county board must oversee a
transfer of administration, but that transfer is not complete
for several years.

Under principles articulated by the Supreme Court, Memphis
residents have a constitutional right to vote for members of the
Shelby County Board of Education.  See, e.g., Kramer v. Union
Free Sch. Dist. No. 15, 395 U.S. 621, 632-33 (1969).  In Kramer,
the Supreme Court considered a New York law permitting residents
to vote in school district elections only if they owned or
leased taxable real property in the district or had children in
local public schools.  See id. at 622.  A person who did not own
or lease taxable real property and did not have a child in
public school brought a class action in federal court
challenging the constitutionality of the voter eligibility
requirements.  See id. at 622, 624-25.  Because the New York law
denied some otherwise qualified bona fide residents the right to
vote, the Supreme Court examined it to determine whether their
exclusion promoted a compelling state interest.  See id. at 626-
28.  The Court noted that the law disenfranchised many people,

126

including senior citizens, clergy, military personnel, and parents who did not own or lease qualifying property and whose children were too young to attend school.  See id. at 630.

The Supreme Court held the New York law unconstitutional. See id. at 632-33.  It found that excluding people with a distinct and direct interest in school board decisions from voting was constitutionally impermissible:

> Whether classifications allegedly limiting the franchise to those resident citizens 'primarily interested' deny those excluded equal protection of the laws depends, inter alia, on whether all those excluded are in fact substantially less interested or affected than those the statute includes.  In other words, the classifications must be tailored so that the exclusion of appellant and members of his class is necessary to achieve the articulated state goal. Section 2012 does not meet the exacting standard of precision we require of statutes which selectively distribute the franchise.  The classifications in § 2012 permit inclusion of many persons who have, at best, a remote and indirect interest, in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions.

Id. at 632 (emphasis added).

In other cases, the Supreme Court has struck down laws excluding people from voting in elections that would substantially affect them and where they had direct interests. See, e.g., City of Phoenix v. Kolodziejski, 399 U.S. 204, 208-09, 213 (1970) (holding that the exclusion of non-property owners from an election for the approval of the issuance of general obligation bonds is unconstitutional because non-

property owners have a substantial interest in public facilities
and services available in the city and would be substantially
affected by the election's outcome); Cipriano v. City of Houma,
395 U.S. 701, 702-06 (1969) (per curiam) (holding that
provisions of Louisiana law giving only "property taxpayers" the
right to vote in elections to approve the issuance of revenue
bonds by a municipal utility were unconstitutional because non-
property owners were affected by utility services and utility
rates, making them "as substantially affected and directly
interested in the matter voted upon as are those who are
permitted to vote").

The Shelby County Board of Education's decisions will
substantially affect Memphis residents, and Memphis residents
have a direct interest in those decisions.  The Shelby County
Board of Education bears the responsibility for educating
Memphis schoolchildren under Tennessee law.

The Shelby County Board of Education must oversee the
transition process to a combined school system and plan for
educating Memphis schoolchildren after Memphis City Schools and
Shelby County Schools have been combined.  The Board must make
present decisions necessary to provide for the future education
of Memphis schoolchildren, including curricular decisions, the
hiring of teachers and staff, compliance with state and federal
requirements, and long-term planning.  Those decisions are of

the utmost importance to Memphis residents.  They will shape the education of Memphis schoolchildren and the vitality of the City of Memphis for years to come.  They cannot be delayed until the transition process has been completed.  They are an essential part of that process.  Despite Memphis residents' substantial and direct interests in the Board's decisions, the Shelby County Board of Education has no representatives elected by Memphis voters and has unanimously opposed assuming control of Memphis City Schools.

For purposes of one-person, one-vote analysis, Memphis residents are part of a school district governed by the Shelby County Board of Education, not the Memphis City Board of Education.  See Burson, 121 F.3d at 246-48; Duncan, 69 F.3d at 93-94.  They are part of the relevant geopolitical entity but denied the right to vote.  See Burson, 121 F.3d at 246; Duncan, 69 F.3d at 93.  Compared to the residents challenging the New York law in Kramer, Memphis residents have a far more substantial, distinct, and direct interest in school board decisions.  See Kramer, 395 U.S. at 632-33; see also Kolodziejski, 399 U.S. at 208-09, 213; Cipriano, 395 U.S. at 702-06.  The current electoral districts exclude more than senior citizens, clergy, military personnel, and parents who do not own or lease property and whose children are too young to attend school.  See Kramer, 395 U.S. at 630.  They exclude

parents whose children attend Memphis City Schools from voting for the members of the school board responsible for educating their children, and they exclude people who own taxable real property in Memphis. There is no legitimate or compelling interest in preventing Memphis residents from voting for members of the Shelby County Board of Education. Therefore, the current electoral system for members of the Shelby County Board of Education is unconstitutional. See Kolodziejski, 399 U.S. at 208-09, 213; Cipriano, 395 U.S. at 702-06; Kramer, 395 U.S. at 632-33; Burson, 121 F.3d at 248; Duncan, 69 F.3d at 90, 93.

This is not a case of extraterritoriality, where a public body has some control over non-residents who cannot vote in elections for that body. In Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60 (1978), the Supreme Court held that residents of a small, unincorporated community on the outskirts of Tuscaloosa did not have a right to vote in Tuscaloosa elections although the residents were subject to the city's police jurisdiction, sanitary regulations, the criminal jurisdiction of the city's court, and the city's power to license businesses, trades, and professions. See Holt Civic Club, 439 U.S. at 61-62, 70. The Supreme Court reasoned:

> No decision of this Court has extended the "one man, one vote" principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions. On the contrary, our cases have

130

> uniformly recognized that a government unit may
> legitimately restrict the right to participate in its
> political processes to those who reside within its
> borders.

Id. at 68-69 (citations omitted). The Court concluded that the
effects of a city's purely internal decisions may extend beyond
a city's boundaries, but those effects provide no basis to
extend the right to vote in city elections to persons residing
outside the city. See id. at 69-70.

The Sixth Circuit reached a similar conclusion in Mixon.
There, an Ohio law changed the composition of the Cleveland
School Board by allowing the Mayor of Cleveland to appoint a new
school board for the Cleveland School District, consisting of
Cleveland and four adjacent areas. Mixon, 193 F.3d at 393-94.
Before the law was passed, school district residents voted for
school board members. See id. at 394. Residents of areas
outside Cleveland within the Cleveland School District alleged
that the law was unconstitutional because they could not vote
for the Mayor of Cleveland. See id. at 404. The Sixth Circuit
found the law constitutional. See id. at 404-06. It reasoned
that Kramer, Cipriano, and Kolodziejski were distinguishable as
cases "rais[ing] issues of voter inclusion, in which residents
within a certain area are excluded from voting on particular
matters," whereas the case at bar was one like Holt,
"address[ing] voter disenfranchisement when a municipality has

some control over non-residents who cannot vote in municipal elections, *i.e.*, cases of extraterritorial jurisdiction." Id. at 404. Acknowledging that Kramer seemingly conflicts with Holt, the Sixth Circuit reconciled the cases:

> The lesson of *Holt* and *Kramer* is an important one: If residents of the relevant jurisdiction are excluded from participation, as in *Kramer*, then the court subjects the legislation to strict scrutiny. If, however, the legislation merely concerns extraterritorial jurisdiction over non-residents, courts employ rational basis review, granting the States wide latitude to create political subdivisions and exercise state legislative power.

Id. at 405 (citation omitted). The Sixth Circuit concluded that Cleveland's appointive system "appears more like the exercise of extraterritorial jurisdiction seen in *Holt* than the outright denial of the right to vote in *Kramer*" and upheld the law under rational basis review. Id. at 406. The court specifically noted that the situation would be different if the school board were an elected body and only Cleveland residents could vote in school board elections:

> If the municipal school boards were elected bodies and only the Cleveland residents could vote in the school board election, then the relevant geopolitical entity would be the municipal school district, *Kramer* likely would apply, and problems of voter inclusion would arise.

Id. at 405-06.

This is the case contemplated in Mixon where a school board is an elected body, but only residents of certain areas are able

to vote for school board members. _See_ _id._ This case is distinguishable from _Holt_ and _Mixon_ because Memphis residents are part of the relevant jurisdiction: Memphis schoolchildren attend schools now overseen by the Shelby County Board of Education. Issues of voter inclusion are present and _Kramer_ applies. _See_ _id._ The Shelby County Board of Education's current electoral districts are unconstitutional because the exclusion of Memphis residents is not necessary to promote a compelling state interest. _See_ _Kramer_, 395 U.S. at 627; _see also_ _Mixon_, 193 F.3d at 402 ("If the challenged legislation grants the right to vote to some residents while denying the vote to others, then we must subject the legislation to strict scrutiny and determine whether the exclusions are necessary to promote a compelling state interest.") (citation omitted).

Where an apportionment scheme is unconstitutional, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." _Reynolds_, 377 U.S. at 585. "[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a[n] . . . apportionment case, even though the existing apportionment scheme was found invalid." _Id._ "In

133

awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." Id. "With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." Id.

"[A]ny relief accorded can be fashioned in the light of well-known principles of equity." Id. (quoting Baker v. Carr, 369 U.S. 186, 250 (1962) (Douglas, J., concurring)); see also Bell v. Hood, 327 U.S. 678, 684 (1946) ("[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.") (citations omitted). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971). "Federal courts are courts in law and in equity, and a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." Carter-Jones Lumber Co. v. Dixie

134

Distrib. Co., 166 F.3d 840, 846 (6th Cir. 1999) (citation omitted).

"Once a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'" Hills v. Gautreaux, 425 U.S. 284, 293-94 (1976) (quoting Milliken v. Bradley, 418 U.S. 717, 744 (1974)). "Thus, '[r]emedial techniques . . . will probably often differ with the circumstances of the challenged . . . [practice] and a variety of local conditions." Hellebust v. Brownback, 42 F.3d 1331, 1336 (10th Cir. 1994) (quoting Reynolds, 377 U.S. at 585) (alterations in original). As a limiting principle, "equitable remedies imposed in consequence of a violation of the law may 'extend no farther than required by the nature and the extent of that violation.'" Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty., 836 F.2d 986, 1000 (6th Cir. 1987) (quoting Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 399 (1982)). That principle "is particularly important when it is proposed that the remedial powers of the federal courts be exercised 'to restructure the operation of local and state governmental entities.'" Id. (quoting Hills, 425 U.S. at 293).

There is a constitutional violation, and a remedy is mandated.

5.   **Right of Intervening Plaintiffs to Hold Office**

Because the Intervening Plaintiffs are elected public officials, they do not have constitutionally protected property rights in their offices. See Snowden v. Hughes, 321 U.S. 1, 12 (1944) ("And it is not without significance that we are not cited to and have been unable to find a single instance in which this Court has entertained the notion that an unlawful denial by state authority of the right to state office is without more a denial of any right secured by the Fourteenth Amendment."); Taylor v. Beckham, 178 U.S. 548, 577 (1900) ("The decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. . . . In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right."); Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005) (concluding that a school board member "lacks a constitutionally cognizable property interest in her employment as an elected official"); Burks v. Perk, 470 F.2d 163, 165 (6th Cir. 1972) ("The Commissioners do not have a constitutional right to public employment.  Public office is not property within the meaning of the Fourteenth Amendment.") (citations omitted); McIntosh v. Barbour, No. 4:10CV072-P-S, 2010 WL 5169045, at *4 (N.D. Miss. Dec. 14, 2010) (finding that a superintendent does "not have a

property interest in his position as an elected superintendent
despite the purported existence of an employment contract
between [him] and the school district"); Kurita v. State Primary
Bd. of Tenn. Democratic Party, No. 3:08-0948, 2008 WL 4601574,
at *13 (M.D. Tenn. Oct. 14, 2008) (collecting cases for the
proposition that "nomination or election to a public office is
not property within the meaning of the Fourteenth Amendment")
(citations omitted).  Intervening Plaintiffs have no protected
property right in their offices.

### 6. Legality of Shelby County Commission's Actions

On February 28, 2011, the Shelby County Commission passed
an ordinance increasing the number of members on the Shelby
County Board of Education from seven to twenty-five during any
transition period after voters have approved the transfer of
administration of the Memphis City Schools to the Shelby County
Board of Education.  (See Preliminary Injunction Hr'g Ex. 4, at
2.)  The number of positions was chosen so that areas in Shelby
County outside the City of Memphis could continue to be
represented by their current school board members and Memphis
residents would be represented on the Shelby County Board of
Education proportionally to their population.  (See id.)
Because voters approved the referendum, the transition planning
process for a combined school system has begun.  The Shelby

137

County Commission's ordinance, if valid, would increase the number of members on the Shelby County Board of Education to twenty-five. (See id.)

A Shelby County Commission resolution establishes twenty-five corresponding electoral districts. (See Preliminary Injunction Hr'g Ex. 7, at 2-3.) The resolution also provides that, if the Shelby County Commission cannot implement its plan to create twenty-five electoral districts, it adopts an alternative plan redistricting Shelby County into seven electoral districts to be filled through an election in August 2012. (See id.)

Under Tennessee law, the Shelby County Commission cannot expand the number of seats on the Shelby County Board of Education from seven to twenty-five. The Tennessee Court of Appeals has already considered that question. It found that:

> The Shelby County Charter specifically incorporates the provisions of Chapter 381 of the Private Acts of 1923, relating to education. Chapter 381 of the Private Acts of 1923 authorized seven board members to be appointed to the board of education in Shelby County. [Tennessee Code Annotated] § 49-2-201(a)(1) simply does not vary the Shelby County Charter provisions relating to the number of members which may sit on the school board. This omission does not render [Tennessee Code Annotated] § 49-2-201(a)(1) unconstitutionally vague.

McWherter, 936 S.W.2d at 929-30 (citations omitted). The Shelby County Charter still contains the provision incorporating

Chapter 381 of the Private Acts of 1923.   See Shelby County Charter § 6.02B, available at http://www.shelbycountytn.gov/ DocumentView.aspx?DID=475.   The Shelby County Charter can only be amended as provided in Section 5.05, which requires a referendum.   Id. § 5.05.   The charter provision incorporating Chapter 381 of the Private Acts of 1923 has not been validly amended.

"[S]tate courts are the final authority on state law." Hutchison, 744 F.2d at 46.   The Tennessee Court of Appeals has found that the Shelby County Charter requires that the Shelby County Board of Education have seven members.   The Shelby County Charter has not changed.   Therefore, the Shelby County Commission's expansion of the Shelby County Board of Education to twenty-five members and creation of twenty-five electoral districts violates the Charter and Tennessee law.   Hutchison, 744 F.2d at 46.

### 7.   Authority of Memphis City Board of Education to Continue to Operate

The Memphis City Board of Education has continued to make decisions affecting the operation of Memphis City Schools, although the Shelby County Board of Education has the ultimate responsibility for educating Memphis schoolchildren.   The Memphis City Council has approved the Memphis City Board of Education's surrender of the Memphis City Schools' charter, and

139

the charter has been surrendered to the Tennessee Secretary of State.   The surrender of the Memphis City Schools' charter does not affect the validity of the Memphis City Board of Education's actions to date.   See, e.g., Jordan v. Knox Cnty., 213 S.W.3d 751, 777-78 (Tenn. 2007); State v. Hart, 61 S.W. 780, 781 (Tenn. 1901); see also Cherry Hill Fire Co. No. 1 v. Cherry Hill Fire Dist. No. 3, 646 A.2d 1150, 1154-55 (N.J. Super. Ct. Ch. Div. 1994).

In its resolution adopted on December 20, 2010, the Memphis City Board of Education also sought to transfer the administration of the Memphis City Schools to the Shelby County Board of Education pursuant to Tennessee Code Annotated § 49-2-502, subject to the approval of the voters of the City of Memphis.   The voters approved the transfer of administration to become effective at the beginning of the school year in 2013. Pending completion of the transfer of administration, the Memphis City Board of Education has authority to operate the Memphis City Schools, to wind up its business and affairs, and to assist the Shelby County Board of Education in exercising its responsibility for educating Memphis schoolchildren, including transferring Memphis City Schools' assets to the Shelby County Board of Education.   See, e.g., KHB Holdings, Inc. v. Duncan, No. E2002-02062-COA-R3CV, 2003 WL 21488268, at *2-3 (Tenn. Ct. App. June 25, 2003); Tenn. Downs, Inc. v. Gibbons, 15 S.W.3d

140

843, 846 (Tenn. Ct. App. 1999).  Ultimate responsibility for
decisions affecting the education of Memphis schoolchildren lies
with the Shelby County Board of Education.  The City of Memphis
and the Memphis City Council have no authority to oversee the
winding up of the Memphis City Board of Education or to arrange
the transfer of the Memphis City Schools' assets to the Shelby
County Board of Education.

### 8.   Responsibility for Funding Memphis City Schools

In State ex rel. Bd. of Educ. of Memphis City Schools v.
City of Memphis, the Tennessee Court of Appeals concluded that
Shelby County and the City of Memphis "are required to fund the
City schools in conformance with the [Basic Education Program],
the anti-supplanting statutes, and the [maintenance of local
effort] provisions."  State ex rel. Bd. of Educ. of Memphis City
Schools, 329 S.W.3d at 474.  The court affirmed the trial
court's order that the City of Memphis provide "additional
funding for the 2008-2009 school year in the amount of
$57,460,947 to meet its statutory obligation as required by the
'maintenance of effort' provisions of our state's education
statutes."  Id. at 466-67.

The case before the Court does not affect the City of
Memphis' obligation to fund the education of Memphis
schoolchildren.  The City of Memphis remains obligated to

141

continue to fund the education of Memphis schoolchildren to the extent found in State ex rel. Bd. of Educ. of Memphis City Schools v. City of Memphis, at least until the transfer of administration of the Memphis City Schools to the Shelby County Board of Education has been fully effected.

**9.   Commissioner of Education Approval**

The purpose of Tennessee Code Annotated § 49-5-203 is to protect the rights of teachers. Pursuant to Tennessee Code Annotated § 49-5-203(d), the parties must promptly provide all information to the Tennessee Commissioner of Education necessary for him to determine that teachers' rights and privileges will not be impaired, interrupted, or diminished by the transfer of administration. See Tenn. Code Ann. § 49-5-203(d). Because the Commissioner of Education has not received that information, he has not failed in his responsibility to require that the rights and privileges of teachers who work at Memphis City Schools will not be impaired, interrupted, or diminished. As the public body responsible for overseeing the transition process, the Shelby County Board of Education must ensure that the Commissioner of Education has the information necessary to make his determination. The Board is required to submit a plan, in a form satisfactory to the Commissioner, to ensure that teachers' rights are protected. Until the Commissioner makes his determination, the transfer of administration of Memphis City

142

Schools to the Shelby County Board of Education cannot be completed.

**VII. Conclusion**

Based on the parties' requested relief and the Court's findings and conclusions, the Court makes the following determinations and ORDERS the following declaratory relief. The Court DECLARES:

(1)   The 1961 Private Act is constitutional and has not been impliedly amended or superseded. The Memphis City Board of Education has validly surrendered the charter of the Memphis City Schools in compliance with the Act.

(2)   Public Chapter 1 is constitutional and applies to the transfer of administration of the Memphis City Schools to the Shelby County Board of Education.

(3)   The Memphis City Schools has been abolished for all purposes except the winding down of its operations and the transfer of administration to the Shelby County Board of Education under the terms of Public Chapter 1 and Tennessee education law.

(4)   The surrender of the Memphis City Schools' charter does not affect the validity of the Memphis City Board of Education's actions to date.

(5)   The Shelby County Board of Education is responsible for educating Memphis schoolchildren under Tennessee law. It is required to oversee the transition process to a combined school system and plan for educating Memphis schoolchildren after Memphis City Schools and Shelby County Schools have been combined. The Board must adopt and implement a comprehensive transition plan. It must make present decisions necessary to provide for the future education of Memphis schoolchildren, including curricular decisions, the hiring of teachers and staff, compliance with state and federal requirements, and long-term planning.

(6)  Until the beginning of the school year in 2013, when the transfer of administration will be completed, the Memphis City Board of Education has authority to operate the Memphis City Schools, to wind up its business and affairs, and to assist the Shelby County Board of Education in exercising its responsibility for educating Memphis schoolchildren, including providing support and information during the transition process and transferring Memphis City Schools' assets to the Shelby County Board of Education.

(7)  At the beginning of the school year in 2013, the Memphis City Board of Education will cease to exist.

(8)  The Shelby County Board of Education must promptly give the Tennessee Commissioner of Education all information necessary to determine that the rights and privileges of teachers who work at Memphis City Schools will not be impaired, interrupted, or diminished.

(9)  The Memphis City Board of Education must promptly give the Tennessee Commissioner of Education all necessary information to determine that the rights and privileges of teachers who work at Memphis City Schools will not be impaired, interrupted, or diminished.

(10) The Shelby County Board of Education is required to prepare and submit to the Tennessee Commissioner of Education a plan, in a form satisfactory to the Commissioner, to ensure that teachers' rights are protected.

(11) Once he receives all necessary information, the Tennessee Commissioner of Education is required to determine whether the rights and privileges of teachers who work at Memphis City Schools will be impaired, interrupted, or diminished.

(12) All parties with appointing authority are required to appoint their respective members of the transition planning commission, which is to develop a comprehensive transition plan to be submitted to the Tennessee Department of Education for review and

144

comments and to the Shelby County Board of Education for consideration and approval, as it deems appropriate.

(13) The City of Memphis and the Memphis City Council have no authority to oversee the Memphis City Schools during the winding up period or to oversee the transfer of administration of the Memphis City Schools to the Shelby County Board of Education.

(14) The City of Memphis has the obligation during the transition process to maintain its funding of the Memphis City Schools.  All amounts owed by the City of Memphis to provide for the education of Memphis schoolchildren remain due.

(15) The Shelby County Commission lacks authority to expand the Shelby County Board of Education to twenty-five members or to create twenty-five electoral districts for positions on the Shelby County Board of Education.

(16) The Shelby County Board of Education's current electoral districts are unconstitutional.

All pending motions in this case are DENIED AS MOOT.

The parties who have requested injunctive relief have not established their entitlement or have couched their requests in such vague terms that relief would be inappropriate.  Their injunction requests are also unnecessary given the Court's declaratory relief.  See Doran v. Salem Inn, Inc., 422 U.S. 922, 930-31 (1975); United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d 985, 998 (7th Cir. 1989); Doe v. Stephens, 851 F.2d 1457, 1467 (D.C. Cir. 1988).  Therefore, the parties' requests for injunctive relief are DENIED.

The parties are DIRECTED to submit their requests for a remedy for the constitutional violation identified in this Order by Friday, August 12, 2011.

So ordered this 8th day of August, 2011.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE