IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| BOARD OF EDUCATION OF SHELBY COUNTY, TENNESSEE, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 11-2101 |
| MEMPHIS CITY BOARD OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

| | |
|---|---|
| THE BOARD OF COUNTY COMMISSIONERS OF SHELBY COUNTY, TENNESSEE, | ) ) ) ) |
| Third-Party Plaintiff, | ) ) |
| v. | ) ) |
| ROBERT E. COOPER, JR., et al., | ) ) ) |
| Third-Party Defendants. | ) |

ORDER

The original Complaint in this matter was filed by the Board of Education of Shelby County, Tennessee (the "Shelby County Board") on February 11, 2011.  (ECF No. 1.)  On June 26, 2012, Third-Party Plaintiff the Board of County Commissioners of Shelby County, Tennessee (the "Commissioners") moved to file a

Third-Party Complaint for declaratory relief, permanent and preliminary injunctive relief, and an expedited hearing. (ECF No. 288.) The Commissioners allege that Chapter 905 and Chapter 970 of the Tennessee Public Acts of 2012 and Chapter 1, Section 3 of the Tennessee Public Acts of 2011 violate the Fourteenth Amendment to the Constitution of the United States and Article 11, Sections 8 and 9 of the Constitution of the State of Tennessee. The Third-Party Complaint names as Defendants Robert E. Cooper in his official capacity as Attorney General of the State of Tennessee; Tre Hargett in his official capacity as Secretary of State of the State of Tennessee; Mark Goins in his official capacity as Coordinator of Elections; the Tennessee Department of State: Division of Elections; the Tennessee Department of Education; and Kevin Huffman in his official capacity as Commissioner of the State of Tennessee Department of Education (collectively, the "State"); and the Shelby County Election Commission. On July 5, 2012, the Court granted the Commissioners' motion. (ECF No. 290.) The Third-Party Complaint was entered on July 5, 2012. (ECF No. 305.)

On July 9, 2012, the Court entered an order allowing the City of Germantown, the Town of Collierville, the City of Bartlett, and the City of Lakeland to intervene as Defendants. (ECF No. 293.) On July 12, 2012, the Court granted an oral motion allowing the City of Millington and the Town of Arlington

2

to intervene and align with the other intervening Defendants (collectively, the "Municipalities"). On July 11, 2012, the Court entered an order allowing the City of Memphis and the Memphis City Council (collectively, the "Memphis City Plaintiffs") to join as Third-Party Plaintiffs. (ECF No. 304.)

On July 12, 2012, the Court held a hearing and denied the Commissioners' request for a preliminary injunction. On July 13, 2012, the Court bifurcated the Commissioners' Tennessee and United States constitutional claims.

The Commissioners filed an Amended Complaint on August 14, 2012. (ECF No. 358.) The Commissioners moved to file a Second Amended Complaint on August 16, 2012. (ECF No. 359.) On August 21, 2012, the Court granted that motion. (ECF No. 370.) The Second Amended Complaint was entered on August 22, 2012. (ECF No. 371.) The Third Amended Complaint was entered on October 5, 2012. (ECF No. 429) (the "Third Am. Compl.").)

A trial was held on September 4 and 5, 2012, at which the Court received proof in the form of testimony and exhibits and heard oral arguments. On October 4, 2012, all parties except the State filed proposed findings of fact and conclusions of law. (See Memphis Pls.' Findings of Fact and Conclusions of Law, ECF No. 420; Commissioners' Findings of Fact and Conclusions of Law, ECF No. 421; The Municipalities' Findings of Fact and Conclusions of Law, ECF No. 422.) On October 5, 2012,

3

the State filed proposed findings of fact and conclusions of law and adopted portions of the Municipalities' findings of fact and conclusions of law.  (ECF No. 425; 427.)  The Court makes the following findings of fact and conclusions of law and orders the following relief.

### I.  Background

In 1869, the State of Tennessee granted the Memphis City Board of Education a charter to operate a public school system in Memphis.  (August 8, 2011 Order 5-6, ECF No. 243.) (the "August 8 Order.")  From 1869 to 2010, Memphis City Schools grew to become the largest school system in Tennessee and the twenty-third largest public school system in the United States.  (Id. 3.)  It served approximately 105,000 students in 209 schools. (Id.)  The student demographics were 85.7% African-American, 7.0% Caucasian, 5.9% Hispanic, and 1.4% other races and nationalities.  (Id.)  Memphis City Schools owned land valued at $34,699,701, buildings and improvements valued at $802,832,197, and machinery and equipment valued at $54,694,705.  (Id. 3-4.) Memphis City Schools had approximately 16,000 full and part-time staff, including more than 7,000 teachers.  (Id. 4.)

The City of Memphis is located in Shelby County, Tennessee. The Shelby County Board operated the Shelby County Schools, a separate school system that included all public schools in Shelby County outside Memphis.  (Id. 4.)  Shelby County Schools

had more than 48,000 students and was the fourth largest school system in Tennessee. (Id.) The student demographics were 55.2% Caucasian, 36.1% African-American, 4.0% Hispanic, 0.4% Native American, and 4.3% Asian/Pacific Islander. (Id.) Shelby County Schools had 51 schools and more than 5,200 employees. (Id.)

On December 20, 2010, the Memphis Board of Education (the "Memphis City Board") voted to dissolve the Charter of the Memphis City Schools under Chapter 375 of the Private Acts of 1961. (Id. 4.)

When the Memphis City Board adopted its December 20, 2010 resolution, Tennessee Code Annotated § 49-2-502(a) provided in its entirety that:

> The school board, school commissioners, school trustees or other duly constituted administrative officials of any special school district are authorized and empowered to transfer the administration of the schools in the special school district to the county board of education of the county in which the special school district is located. Before a transfer is effectuated, however, a referendum shall first be conducted on the subject, and the school system of the special school district shall not be transferred to the county unless a majority of the voters who cast votes in the referendum vote in favor of the transfer. The referendum shall be held by the county election commission when requested by the school board of the special school district, and the expenses of the election shall be paid from the funds of the special school district.

Tenn. Code Ann. § 49-2-502(a) (2009).

On January 19, 2011, the Shelby County Election Commission scheduled a referendum for City of Memphis voters that was held on March 8, 2011.  (August 8 Order 7.)   The referendum posed the question, "Shall the Administration of the Memphis City School System, a Special School District, be Transferred to the Shelby County Board of Education?"    (Id.)    The voters answered affirmatively.

On January 27, 2011, the Shelby County Board discussed the combination of its schools with Memphis City Schools.  (Id.) The Board adopted a resolution stating in part, "**NOW THEREFORE, BE IT RESOLVED** THAT THE SHELBY COUNTY BOARD OF EDUCATION UNANIMOUSLY OPPOSSES [sic] THE TRANSFER OF THE MEMPHIS CITY SCHOOL SYSTEM TO THE SHELBY COUNTY BOARD OF EDUCATION."  (Id.)

On February 10, 2011, the Memphis City Council passed a resolution approving the surrender of the Memphis City Schools' charter and dissolving the Memphis "special school district." (Id. 8.)   The resolution stated, in relevant part:

> **NOW, THEREFORE BE IT RESOLVED,** by the Memphis City Council that the Resolution of the Board of Education of the Memphis City Schools to surrender its Charter and dissolve the Memphis special school district is hereby accepted and approved, effective immediately, and a transition thereafter to be implemented in accordance with the plan of dissolution hereinafter set forth.
>
> **BE IT FURTHER RESOLVED,** that the Comptroller of the City is directed certify [sic] this Resolution and plan of dissolution and the Mayor is directed to cause to be filed with the Tennessee Secretary of State a

certified copy of this Resolution and plan of dissolution on February 11, 2011.

(August 8 Order 8-9.)

The Tennessee General Assembly adopted and, no later than noon on February 11, 2011, the Governor of Tennessee signed and dated Chapter 1 of the Tennessee Public Acts of 2011. (Id. 9.) The signed and dated bill was delivered to the Senate Engrossing Clerk's office at approximately 1:00 p.m. on February 11, 2011, and subsequently taken to the Tennessee Secretary of State's office for entry. (Id.)

Chapter 1 amended Tennessee Code Annotated § 49-2-502 to require that:

> Notwithstanding the provisions of subsection (a) or any other law to the contrary, *if* the proposed transfer of the administration of the schools in the special school district to the county board of education would result in an increase in student enrollment within the county school system of one hundred percent (100%) or more, *and if* a majority of the voters who cast votes in the referendum vote in favor of the transfer; *then* a comprehensive transition plan shall be developed, *and* the transfer shall take effect at the beginning of the third, full school year immediately following certification of the election results.

Tenn. Code Ann. § 49-2-502(b)(1).

Chapter 1 provides that the comprehensive transition plan is to be developed by a transition planning commission:

> (2) The comprehensive transition plan shall be developed by a transition planning commission. The transition plan shall consider and provide for each of the matters set forth in § 49-2-1201(i) and § 49-2-

7

1204. Prior to its implementation, the transition plan shall be submitted to the department of education for review and comments. The transition planning commission shall consist of twenty-one (21) members, as follows:

> (A) The county mayor, the chair of the county board of education and the chair of the board of education of the special school district shall serve as ex officio members of the commission;
>
> (B) The county mayor, the chair of the county board of education and the chair of the board of education of the special school district shall each appoint five (5) competent citizens to serve as members of the transition planning commission; and
>
> (C) The governor, the speaker of the senate and the speaker of the house of representatives shall jointly appoint three (3) competent citizens to also serve as members of the transition commission.

Tenn. Code Ann. § 49-2-502(b)(2).

Chapter 1 also eliminates restrictions on municipal school districts and special school districts:

> (3) From and after the effective date of the transfer of the administration of the schools in the special school district to the county board of education, the restrictions imposed on the creation of municipal school districts, in § 6-58-112(b), and special school districts, in § 49-2-501(b)(3), shall no longer apply in such county.

Tenn. Code Ann. § 49-2-502(b)(3). Chapter 1 took effect on becoming law and applies to any proposed § 49-2-502 transfer pending on or after that date.

On February 11, 2011, the Shelby County Board filed a complaint seeking declaratory relief related to the merger of

the Memphis City and Shelby County Schools.  (ECF No. 1.)  After holding a hearing on May 12 and 13, 2011, the Court concluded that Sections 1 and 2 were constitutional.  The Court concluded that the transfer of administration of the Memphis City Schools to the Shelby County Board would take effect in August, 2013. The Court withheld ruling on the constitutionality of Section 3, reasoning that whether Section 3 "is unconstitutional is not properly before the Court.  Although the parties have not briefed the issue, any harm resulting . . . would not occur until an attempt was made to create a municipal school district or special school district."  (August 8 Order 61.)

On September 28, 2011, the Court entered a consent decree providing that "effective October 1, 2011, the Memphis and Shelby County school systems will be governed by the Shelby County Board of Education."  (ECF No. 262.)  The transition period was scheduled to be completed by the beginning of the 2013-14 school year.

In March 2012, five of the six Municipalities passed ordinances requesting that the Shelby County Election Commission hold referenda to authorize the formation of municipal school districts.  (Third Am. Compl. ¶ 35.)  On March 20, 2012, the Tennessee Attorney General issued an opinion that the proposed referenda would violate Chapter 1 because "the establishment of a municipal school system . . . can only be undertaken by a

municipality in Shelby County once the transition period is complete." Tenn. Op. Att'y Gen. No. 12-39, 2012 Tenn. AG LEXIS 41, at *9 (Mar. 5, 2012). The Shelby County Election Commission voted, on March 21, 2012, to deny the Municipalities' requests to hold referenda. (Third Am. Compl. ¶ 37.)

The general law in Tennessee is that "[a]n existing municipality that does not operate a school system or a municipality incorporated after May 19, 1998, may not establish a school system." Tenn. Code Ann. § 6-58-112(b)(1). In early 2012, the Tennessee General Assembly considered legislation relating to municipal school districts and the transfer of special school districts under Public Chapter 1. (Third Am. Compl. ¶ 38.) On May 9, 2012, the Governor of Tennessee signed Public Chapter 905, and it became law. (Id. ¶ 47.) On May 15, 2012, the Governor signed Public Chapter 970, and it became law. (Id. ¶ 41.)

Chapter 970 amended § 6-58-112(b) and provides, in relevant part:

> From and after the effective date of the transfer of the administration of the schools in a special school district to the county board of education pursuant to § 49-2-502(b), the restrictions imposed by § 6-58-112(b)(1) on creation of municipal school districts no longer apply within such county.

Chapter 905 establishes criteria for creating municipal schools:

(a) If a municipality is located within any county in which a transition planning commission has been created pursuant to § 49-2-502(b); and if the municipality is authorized by its charter, as set forth by statute or private act, to operate a city school system; and if the proposed city school system would possess a student population of sufficient size to comply with state requirements; then the governing body of the municipality may request the county election commission to conduct a referendum pursuant to § 49-2-106; however, if a special election is requested, then the municipality shall pay the costs of the election.

(b) If a majority of the voters participating in the referendum elect to raise local funds to support the proposed city school system, then the governing body of the municipality shall, by ordinance, establish a city board of education in compliance with § 49-2-201; however, there shall be not less than three (3) nor more than eleven (11) members, and the members may be elected in the same manner, either from districts or at large, or a combination of both, used to elect members of the governing body of the municipality. In order to comply with the § 49-2-201 requirement for staggered four-year terms, the governing body of the municipality shall establish initial terms that vary in length; however, all subsequently elected members, other than members elected to fill a vacancy, shall be elected to four-year terms. If a special election is requested to elect members of the initial board of education, then the municipality shall pay the costs of the election. The members shall take office on the first day of the first month following certification of the election results.

(c) The initial board of education shall plan and manage the formation of the new city school system and, subsequently, shall manage and operate the system when student instruction commences. The board shall possess all powers and duties granted to or required of boards of education as set forth by § 49-2-203 or other statute, including, but not limited to,

employment of a full-time director of schools and other personnel; and construction, acquisition, lease, or modification of buildings and facilities.

(d) Upon the commissioner's determination of the new city school system's general readiness to commence student instruction, city schools shall open between August 1 and the first Monday following Labor Day; however, in no event shall the city schools open prior to the effective date of the transfer of the administration of the schools in the special school district to the county board of education pursuant to § 49-2-502(b).

Tenn. Code. Ann. § 49-2-203(a). A school system will possess a student population of sufficient size under subdivision (a) if it has a scholastic population within its boundaries that will assure an enrollment of at least 1,500 pupils in its public schools. Tenn. Comp. R. & Regs. 0520-01-08.01.

Under the authority granted by Chapter 1, Chapter 905, and Chapter 970, the Municipalities held referenda on August 2, 2012, to authorize the creation of municipal school districts. (Third Am. Compl. ¶¶ 53-54.) A majority of the voters in each municipality approved the creation of the districts. (Id. ¶ 54.)

**II. Jurisdiction**

The Court's August 8, 2011 Order sets out the basis for subject-matter jurisdiction over the February 11, 2011 Complaint. (See August 8 Order 27.) ("Because the Shelby County Board of Education asserts a right to relief under 42 U.S.C. §

1983 for these alleged constitutional violations [], the Court has federal question jurisdiction over the Board's claims.") The Court exercised supplemental jurisdiction over the Shelby County Board's state-law claims and the state-law counterclaims brought by the Commissioners. (Id. 28, 41.)

The Third Amended Complaint alleges jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2201. (Third Am. Compl. ¶ 15.) It also alleges federal question jurisdiction under 42 U.S.C. § 1983. (Id. ¶¶ 111-62.) The Commissioners bring suit on behalf of the school children of Shelby County, alleging a deprivation of their Equal Protection rights under the Fourteenth Amendment. (Id. ¶¶ 65-81.) The Commissioners seek a declaration that Section 3 of Public Chapter 1, Public Chapter 905, and Public Chapter 970 (collectively, the "School Acts") are unconstitutional under the United States and Tennessee Constitutions. (Id. at 37.) They also seek an injunction to prevent the implementation of the School Acts. (Id.)

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "The Declaratory Judgment Act does not create an independent

13

basis for federal subject matter jurisdiction." Heydon v. MediaOne of Se. Mich., Inc., 327 F.3d 466, 470 (6th Cir. 2003) (citations omitted). "The Act only provides courts with discretion to fashion a remedy." Id. (citation omitted). "A federal court accordingly 'must have jurisdiction already under some other federal statute' before a plaintiff can 'invok[e] the Act.'" Davis v. United States, 499 F.3d 590, 594 (6th Cir. 2007) (quoting Toledo v. Jackson, 485 F.3d 836, 839 (6th Cir. 2007)).

"A district court has subject matter jurisdiction over any civil action 'arising under the Constitution, laws, or treaties of the United States.'" Id. (quoting 28 U.S.C. § 1331). "A claim arises under federal law when the plaintiff's statement of his own cause of action shows that it is based upon federal laws or the federal Constitution." Id. (quoting Cobb v. Contract Transp., Inc., 452 F.3d 543, 548 (6th Cir. 2006)). "A complaint arises under federal law if it . . . states a federal cause of action." Ohio ex rel. Skaggs v. Brunner, 629 F.3d 527, 530 (6th Cir. 2010) (citing Mikulski v. Centerior Energy Corp., 501 F.3d 555, 560 (6th Cir. 2007) (en banc)). "To determine whether a claim arises under federal law, a court, under the well-pleaded-complaint rule, generally looks only to the plaintiff's complaint." Gentek Bldg. Prods., Inc v. The Sherwin-Williams Co., 491 F.3d 320, 325 (6th Cir. 2007) (internal citation

omitted); see also Williams v. Union Capital Mortg. Corp., No. 1:11CV2435, 2012 U.S. Dist. LEXIS 90492, at *5 (N.D. Ohio June 29, 2012).

Count Three of the Third Amended Complaint alleges that the "Shelby County Municipal School Acts will result in a return to more racially segregated schools in Shelby County in violation of the Fourteenth Amendment Equal Protection Guarantees and 42 U.S.C. § 1983, et. seq." (Third Am. Compl. ¶ 112.) Creating a predominantly African-American school system allegedly "robs the children of Shelby County of the right to be educated in a racially integrated system and requires the Shelby County Commission to fund schools that are de facto segregated as the schools of Shelby County [were] before Brown v. Board of Education [] forced integration of the Shelby County Schools." (Id. ¶ 126) (emphasis in original.) Because the Commissioners bring suit under § 1983 to enforce the Equal Protection rights of Shelby County school children, the Court has federal question jurisdiction. See, e.g., Spurlock v. Metro. Gov't of Nashville & Davidson Cnty., No. 3:09-cv-00756, 2012 U.S. Dist. LEXIS 104970, at *3 (M.D. Tenn. July 27, 2012) (a § 1983 suit challenging a school board's re-zoning plan under the Fourteenth Amendment raises a federal question).

The Court has supplemental jurisdiction over the Commissioners' state-law claims because they "derive from a

common nucleus of operative fact" and "form part of the same case or controversy" as the claims over which the Court has original jurisdiction. Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 209 (6th Cir. 2004) (internal citations omitted); see also 28 U.S.C. § 1367(a).

### III. Justiciability

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" Nat'l Rifle Ass'n of Am. v. Magaw, 132 F.3d 272, 279 (6th Cir. 1997) (quoting U.S. Const. art. III, § 2). "In an attempt to give meaning to Article III's 'case or controversy' requirement, the courts have developed a series of principles termed 'justiciability doctrines.'" Id. "The Article III doctrine that requires a litigant to have 'standing' to invoke the jurisdiction of a federal court is perhaps the most important." Id. (citing Allen v. Wright, 468 U.S. 737, 750 (1984)). "A second doctrine that 'cluster[s] about Article III' is ripeness." Id. at 280 (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-79 (D.C. Cir. 1982)). "Third, the Supreme Court has stressed that the alleged injury must be legally and judicially cognizable and that the issues must be fit for judicial resolution." Id. (internal citation omitted).

When a plaintiff seeks a declaratory judgment, a court must ask three questions: (1) whether the plaintiff has standing, (2)

"whether a particular challenge is brought at the proper time and is ripe for pre-enforcement review" through a declaratory judgment, and (3) "whether the issue currently is fit for judicial decision." Id.; see also Mich. State Chamber of Commerce v. Austin, 788 F.2d 1178, 1181-82 (6th Cir. 1986) (a party seeking a declaratory judgment must have standing and demonstrate that the controversy is ripe for decision before the action is justiciable). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Mich. State Chamber of Commerce, 788 F.2d at 1181 (quoting Golden v. Zwickler, 394 U.S. 103, 108 (1969)).

### A.   Standing

"Standing to bring suit must be determined at the time the complaint is filed." Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs, 641 F.3d 197, 206 (6th Cir. 2011) (en banc) (citation omitted). "A plaintiff must meet both constitutional and prudential requirements to establish individual standing." Id. (citation omitted).

### 1. Constitutional Requirements

The Sixth Circuit has stated the minimum constitutional standards for individual standing under Article III:

17

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)); accord Fednav, Ltd. v. Chester, 547 F.3d 607, 614 (6th Cir. 2008).

A threshold constitutional question is whether the Commissioners, as a political subdivision of the State of Tennessee, have standing to sue the Municipalities and the State officers and departments under 42 U.S.C. § 1983. Section 1983 provides a right of action against any person who deprives a citizen or other person of "any rights, privileges, or immunities secured by the Constitution" while acting "under color of any statute, ordinance, regulation, custom or usage" of a state or territory. As a general rule, "political subdivisions cannot sue the state of which they are part under the United States Constitution." Greater Heights Acad. v. Zelman, 522 F.3d 678, 680 (6th Cir. 2008).

A municipal corporation, "in its own right, receives no protection from the Equal Protection or Due Process Clauses vis-à-vis its creating state." South Macomb Disposal Auth. v. Washington, 790 F.2d 500, 505 (6th Cir. 1986) (emphasis added) (citations omitted); see also City of Moore, Oklahoma v.

18

Atchison, Topeka & Santa Fe Ry. Co., 699 F.2d 507, 511-512 (10th Cir. 1983) ("[P]olitical subdivisions of a state lack standing to challenge the validity of a statute on Fourteenth Amendment grounds."). Because corporations, both public and private, "are not 'citizens' within the meaning of the Fourteenth Amendment, they can never assert the denial of privileges and immunities under section 1983." South Macomb, 790 F.2d at 503-04 (internal citations omitted). The relationship between political subdivisions "is a matter of state concern; the Fourteenth Amendment protections do not apply." Id. Federal courts do not "adjudicate what is essentially an internal dispute between two local government entities, one of which is asserting unconstitutional conduct on the part of the other." Id. at 507 n.1 (Engel, J., concurring).

This Circuit has recognized that there "may be occasions in which a political subdivision is not prevented, by virtue of its status as a subdivision of the state, from challenging the constitutionality of state legislation." Id. at 504. Although a political subdivision is prohibited from asserting its own rights under § 1983, it may bring suit on behalf of third parties with whom the subdivision shares a "close relationship." See Akron Bd. of Educ. v. State Bd. of Educ., 490 F.2d 1285, 1289 (6th Cir. 1974) (a board of education and school superintendent had standing based on "a close relationship

between the plaintiffs who seek to bring an action and the class of persons whose constitutional rights are claimed to be violated"). The Commissioners seek to bring this action on behalf of "the citizens and the schoolchildren of Shelby County." (Third Am. Compl. ¶ 66.)

In Akron Bd. Of Educ., plaintiffs challenged the transfer of a neighborhood in a plurality African-American school district to an adjacent all-white district. Id. at 1287. The plaintiffs alleged that the transfer would compel them "to take action in violation of constitutionally and statutorily protected rights of children in the Akron City School District." Id. The Sixth Circuit concluded that the Akron City School District had suffered a distinct injury. Id. In addition to their "close relationship" to Akron's students, plaintiffs had standing to protect themselves from the threat of liability for facilitating the implementation of unconstitutional school districts. Id. at 1290.

The Commissioners are elected to represent Shelby County as a whole. The Tennessee General Assembly has vested them with the authority to appropriate county education funds. See State ex rel. Weaver v. Ayers, 756 S.W.2d 217, 225 (Tenn. 1988). Facilitating and funding allegedly unconstitutional school districts could "subject plaintiffs to being defendants in a suit to restrain conduct which they appear to abhor and which

they avow to be unconstitutional." Akron Bd. of Educ., 490 F.2d
at 1290; see also Bd. of Educ. v. Allen, 392 U.S. 236, 241 n.5
(1968) ("Believing § 701 to be unconstitutional, they are in the
position of having to choose between violating their oath and
taking a step – refusal to comply with § 701 – that would likely
bring their expulsion from office and also a reduction in state
funds for their school districts."). The Sixth Circuit has
recognized that state and local authorities can be "held jointly
responsible . . . for segregated conditions in local schools,
where the state officials had shown 'consistent inaction in
preventing increased segregation' and had consistently provided
funding and other assistance." United States v. School Dist. of
Ferndale, Mich., 577 F.2d 1339, 1347-48 (6th Cir. 1978)
(emphasis added) (quoting Oliver v. Michigan State Bd. of Ed.,
508 F.2d 178, 186-87 (6th Cir. 1974)).

The Commissioners could be forced to defend an action
alleging conduct they abhor and that they believe to be
unconstitutional. An order declaring the School Acts
unconstitutional and issuing an injunction would alleviate the
risk of action against the Commissioners and the threat of
liability for facilitating and funding unconstitutional school
districts. The Commissioners have suffered an injury-in-fact
that is concrete and particularized. That injury is imminent
and not conjectural in that the Municipalities are proceeding to

21

establish their own school districts.  The injury is fairly traceable to that action and would be redressed by a favorable decision.

### 2.  Prudential Requirements

The Commissioners also satisfy prudential standing requirements.  As stated by the Sixth Circuit:

> A plaintiff must also meet the following prudential requirements for standing developed by the Supreme Court.  First, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  Second, a plaintiff must present a claim that is "more than a generalized grievance." Finally, the complaint must "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"

Smith, 641 F.3d at 206 (citations omitted).

The first prudential requirement ordinarily bars a party from asserting standing to vindicate a third party's constitutional rights.  Id. at 208 (citing Barrows v. Jackson, 346 U.S. 249, 255 (1953)).  However, the "salutary rule against third-party standing is not absolute."  Id. (citing Kowalski v. Tesmer, 543 U.S. 125, 129 (2004)).  "The rule 'should not be applied where its underlying justifications are absent.'"  Id. (citing Singleton v. Wulff, 428 U.S. 106, 114 (1976)).  The Supreme Court has considered "two factual elements" in deciding whether to apply the rule:

> The first is the relationship of the litigant to the person whose right he seeks to assert.  If the

enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.

Id. (quoting Singleton, 428 U.S. at 114-15). "Elsewhere, the Court has described this test as requiring that the party asserting the right has a close relationship with the person who possesses the right, and that there is a hindrance to the possessor's ability to protect his own interests." Id. (quoting Kowalski, 543 U.S. at 130) (internal quotation marks omitted); see also Akron Bd. of Educ., 490 F.2d at 1289.

The Commissioners allege that they have "obligations, under both state and federal law, to facilitate the free public education of school age children residing" in Shelby County. (Third Am. Compl. ¶ 67.) "If allowed to stand, the Shelby County Municipal School Acts will enable demographically homogenous Municipalities to segregate the children of Shelby County into as many as seven different school districts." (Id. ¶ 68.) The Commissioners allege that the operative effect of the School Acts would diminish the school children of Shelby County's opportunity to attend integrated schools. (Id. ¶¶ 70-71.) The Commissioners allege that the Supreme Court of the United States has "deemed this diminished ability to receive an

23

education in a racially integrated school to be 'one of the most serious injuries recognized in our legal system.'"   (Id. ¶ 71) (quoting Allen, 468 U.S. at 756.)

The Commissioners were originally a defendant in this case. The Shelby County Board was a plaintiff.  In its August 8 Order, the Court concluded that the Shelby County Board, which has elected not to pursue a claim in this case, was authorized to assert the rights of school children in its system because it had "obligations under both state and federal law to provide a free public education to the school age children who currently reside in the boundaries of the City of Memphis. . . . Those obligations give it a close relationship with the interests of Memphis schoolchildren who possess the rights the Shelby County Board [] seeks to assert."  (August 8 Order 52.)

There are differences between a local school board and a county legislative body under Tennessee law; the "'two entities have separate, origins, functions, and management.'"   See Hill v. McNairy Cnty., No. 03-1219-T, 2004 U.S. Dist. LEXIS 970, at *4-5 (W.D. Tenn. Jan. 15, 2004) (quoting Rollins v. Wilson Cnty. Gov't, 154 F.3d 626, 630 (6th Cir. 1998) ("Under Tennessee law, the school systems are separate from the county governments."). "The board of commissioners has no supervisory authority over the board of education," but the Tennessee General Assembly has "manifestly vested the authority to appropriate funds for county

24

purposes (including education)" in the Commissioners alone. <u>Ayers</u>, 756 S.W.2d at 225.

Although local school systems and county governments "have separate origins and functions and the management of each is autonomous of the other, interaction between the two entities is a necessity." <u>Putnam Cnty. Educ. Ass'n v. Putnam Cnty. Comm'n.</u>, No. M2003-03031-COA-R3-CV, 2005 Tenn. App. LEXIS 450, at *17 (Tenn. Ct. App. Aug. 1, 2005). "This is because the county controls the purse strings, and it is not compelled to provide the funding requested by the schools system, while the supervision and control of the county, the employment of teachers, the fixing of salaries, and erecting of buildings is vested in the county board of education." <u>Id.</u> at *17-18 (citation omitted). "[T]ension – if not litigation – occurs when the county refuses to adopt the budget proposed by the school system." <u>Id.</u> at *18.

The closeness between the Commissioners and Shelby County school children is "a matter of degree rather than of legal principle." <u>See</u> <u>Akron Bd. of Educ.</u>, 490 F.2d at 1289. Although the responsibilities of boards of education and county commissions are separate, Tennessee law acknowledges that educating children is a collaboration between administrative and financial bodies. <u>See</u> <u>Putnam Cnty. Comm'n.</u>, 2005 Tenn. App. LEXIS 450, at *17 ("[I]nteraction between the two entities is a

necessity."). The Commissioners' funding obligations under Tennessee law make them an "immediate object" of the creation of municipal school districts. See Akron Bd. of Educ., 490 F.2d at 1290. Given that the Sixth Circuit has found that an injury to the purse is sufficient to establish a "close relationship" between a school board and its students, the controller of that purse also has standing to protect the rights of students. See id., at 1289 ("But in our instant case, not only are children transferred, but tax dollars otherwise due the Akron School Board are transferred too."). "The Supreme Court 'has found an adequate "relation" . . . when nothing more than a buyer-seller connection was at stake.'" Smith, 641 F.3d at 208 (quoting Kowalski, 543 U.S. at 139) (Ginsburg, J., dissenting) (collecting cases).

The relationship between the Commissioners and Shelby County school children is "such that the former is fully, or very nearly, as effective a proponent of the right as the latter." Id. Under the School Acts, the Municipalities may separate from the Shelby County Schools and form municipal school districts. The Commissioners allege that the resulting school districts would be racially homogeneous. (Third Am. Compl. ¶ 122-23.) The Commissioners bring this action to ensure that students "receive an adequate education in an integrated school system, as mandated by the Fourteenth Amendment of the

United States Constitution, as interpreted by the United States Supreme Court in <u>Brown v. Bd. of Educ.</u>, 347 U.S. 483 (1954)." (<u>Id.</u> ¶ 65.)   The Commissioners are an effective proponent of the rights of Shelby County school children.

The school children of Shelby County face hindrances in pursuing their own claims.   The Municipalities have voted to approve municipal schools that would open in August, 2013.   The "minimal present impact" of the School Acts "would be much less likely to come to the attention of [] parents or arouse their concern" than it would the Commissioners'.   See <u>Akron Bd. of Educ.</u>, 490 F.2d at 1295.   If jurisdiction is refused "in a precedent-setting case because the potential litigants, alert to the possible constitutional abuse, are denied standing, quite a bit of the unconstitutional camel may be in the tent before the tent's less alert occupants are awakened." <u>Id.</u> at 1290.   Shelby County school children also face the substantial costs of litigation and uncertainty over the operation of the School Acts.   Burdensome litigation costs have been cited by the Sixth Circuit as a "systemic practical challenge[]" to filing suit. See <u>Smith</u>, 641 F.3d at 209 (characterizing <u>Powers v. Ohio</u>, 499 U.S. 400, 414 (1991)).

Given the costs and uncertainties, Shelby County school children are not in a position to address the operation of the School Acts.   The strong probability is that the children would

not be heard or, if heard, could not command the resources to prosecute their cause effectively.   They would be unable to vindicate their federal constitutional rights in federal court.

The Commissioners also present claims that are "more than a generalized grievance." See id. at 206.  Their claims are based on the alleged racial effects of the School Acts.  The Sixth Circuit has concluded that state subdivisions may bring suit to vindicate the Equal Protection rights of school children.   See Akron Bd. of Educ., 490 F.2d at 1290.  The Commissioners satisfy the second prudential requirement of standing.

The Commissioners' claims "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"  Smith, 641 F.3d at 206 (quoting Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475 (1982)). The Commissioners satisfy the third prudential requirement of standing.

### 3.   Standing of the Memphis City Plaintiffs

"[T]he presence of one party that has standing to bring a claim suffices to make identical claims brought[] by other parties to the same lawsuit justiciable."  See 1064 Old River Rd., Inc. v. City of Cleveland, 137 F. App'x 760, 765 (6th Cir. 2005); see also Clinton v. City of New York, 524 U.S. 417, 431 (1998) ("Because both the City of New York and the health care

28

appellees have standing, we need not consider whether the appellee unions also have standing to sue."). The claims brought by the Memphis City Plaintiffs are identical to those brought by the Commissioners. The Commissioners have standing. The Memphis City Plaintiffs have standing.

### B.   Ripeness

"The ripeness doctrine prevents courts from 'entangling themselves in abstract disagreements' through premature adjudication." Miller v. City of Cincinnati, 622 F.3d 524, 532 (6th Cir. 2010) (quoting Grace Cmty. Church v. Lenox Twp., 544 F.3d 609, 615 (6th Cir. 2008)). "Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review." Magaw, 132 F.3d at 280.

To determine whether a case is ripe, courts consider three factors:

> (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings.

Miller, 622 F.3d at 532 (quoting Grace Cmty. Church, 544 F.3d at 615). The Sixth Circuit has also described the test for ripeness as "ask[ing] two basic questions: (1) is the claim 'fit[] . . . for judicial decision' in the sense that it arises

in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" Warshak v. United States, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967)); accord Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 n.2 (2010) ("In evaluating a claim to determine whether it is ripe for judicial review, we consider both 'the fitness of the issues for judicial decision' and 'the hardship of withholding court consideration.'" (quoting Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003))).

"'Ripeness is more than a mere procedural question; it is determinative of jurisdiction.'" River City Capital, L.P. v. Bd. of Cnty. Comm'rs, 491 F.3d 301, 309 (6th Cir. 2007) (quoting Bigelow v. Mich. Dep't of Natural Res., 970 F.2d 154, 157 (6th Cir. 1992)). "'If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed.'" Id. (quoting Bigelow, 970 F.2d at 157). "'This deficiency may be raised sua sponte if not raised by the parties.'" Bigelow, 970 F.2d at 157 (quoting S. Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 502 (9th Cir. 1990)).

In the Court's August 8 Order, the Court stated that whether Section 3 of Chapter 1 of the Public Acts of 2011, which

provides for new school districts, "is constitutional is not properly before the Court.   [A]ny harm resulting from the addition of this sub-section would not occur until an attempt was made to create a municipal school district or special school district.   Nothing in the record suggests that such an attempt has been made or will be made in the future.   Any harm depends on contingent future events."   (August 8 Order 61.)   The contingencies of August 8, 2011, have become reality.

Chapter 905 provides the procedural mechanism for creating municipal school districts.   Chapter 970 suspends Tennessee's general prohibition on municipal school districts in counties in which a transition of administration has become effective.   The Municipalities have begun the creation of municipal school districts under Chapters 905 and 970.   They have conducted local referenda under Chapter 905, and the voters have approved the creation of municipal school districts.   The factual record has been fully developed by the parties, and the Court has conducted a trial.   Withholding a determination until a later date would cause uncertainty about the validity of municipal school systems that would create a hardship to the Commissioners and to the Municipalities.

C.   **Fitness**

The claims presented in this case satisfy the fitness requirement.   See Magaw, 132 F.3d at 290.   The alleged injuries

are legally and judicially cognizable.  The Commissioners and the Memphis City Plaintiffs have alleged invasions of legally protected interests that are traditionally thought to be capable of resolution through the judicial process and are currently fit for judicial review.  See id.  The factual record is sufficiently developed to produce a fair adjudication of the merits of the claims presented.  Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165 (6th Cir. 1983); see also Magaw, 132 F.3d at 290.  The claims arise in a concrete factual context and concern a dispute that has already arisen.  The fitness requirement is satisfied.

## IV.  Facts

Before Memphis City Schools surrendered its charter, it was one of fifteen special school districts in Tennessee.  (Rep. of Dr. Swanson 21; see also Tr. Exs. 3, 23.)  Those fifteen districts operated in eight counties: Shelby, Gibson, Carroll, Scott, Henry, Marion, Wilson, and Williamson Counties.  All other Tennessee counties were served by a combination of county and municipal school districts.  (Tr. Exs. 3, 23.)

At trial on September 4 and 5, 2012, the parties offered proof about the applicability of the School Acts to Gibson, Carroll, Marion, Wilson, Williamson, Henry, and Scott Counties. The proof addressed three principal issues: 1) whether Gibson and Carroll Counties fall under the School Acts; 2) the

possibility of any municipality in any of the seven counties other than Shelby falling under Chapter 905 and Chapter 970; and 3) the intent of the Tennessee General Assembly in passing the School Acts.

The Commissioners and the Memphis City Plaintiffs offered the expert testimony of Dr. David Swanson.  The Court accepted Dr. Swanson as an expert qualified to render opinions in the field of "population forecasting."  (Trial Tr. 115:5-7.)  A "forecast" is defined "as the projection that is most likely to provide an accurate prediction of the future population or enrollment.  As such, it represents a specific viewpoint regarding the validity of the underlying data and assumptions." (Rep. of Dr. Swanson 3.)

Dr. Swanson performed two tasks.  First, he forecast the school-age population (ages 5-18) and enrollment of Scott, Wilson, Marion, Henry, and Williamson Counties.  (Trial Tr. 115:13-15; 129:8-11.)  In addressing those five counties, he determined whether the school-age population and/or enrollment in each special schools district would increase in the future to a level that would equal or exceed the forecasted enrollment of its county school system.  (Id. 115:24-25; 116:1-9.)  Second, Dr. Swanson forecast the school-age populations and/or enrollments in eight municipalities in Carroll County.  (Id. 115:16-17.)  Dr. Swanson did not perform population forecasts

33

for Gibson County because "it has no county school system and, as such, appears not to meet the requirements of Public Chapter 1." (Rep. of Dr. Swanson 1.)

The Municipalities offered Dr. Michael Hicks as an expert in population forecasting. (Trial Tr. 209:25-210:1.) After voir dire, the Court rejected Dr. Hicks as an expert in population forecasting and recognized him as an expert in the field of "regional economics." (Id. 217:2-11; 230:13-16.)

Gibson County was the focus of the parties' proof about the applicability of Chapter 905. Gibson County is located in West Tennessee and is part of the Jackson-Humboldt Metropolitan Statistical Area. Its population was 49,683 as of the 2010 decennial census. Gibson County has ten municipalities: Bradford, Dyer, Gibson, Kenton, Medina, Rutherford, Trenton, Yorkville, Humboldt, and Milan. (Third Am. Compl. ¶ 90.) The two largest municipalities are Humboldt, which has a population of 8,452, and Milan, which has a population of 7,851. (Tr. Ex. 48.)

Gibson County has not operated a county school system since 1981, when a Private Act created the Gibson County Special School District ("Gibson County SSD"). See Humboldt v. McKnight, No. M2002-02639-COA-R3-CV, 2005 Tenn. App. LEXIS 540, at *2 (Tenn. Ct. App. Aug. 25, 2005). All K-12 students are currently served by one municipal school district and four

special school districts.  Id. at *5; see also Third Am. Compl. ¶ 91.  The four special school districts are: Bradford Special School District ("Bradford SSD"), which serves 543 students; Milan Special School District ("Milan SSD"), which serves 2,087 students; Trenton Special School District ("Trenton SSD"), which serves 1,337 students and Gibson County SSD, which serves 3,586 students.  (Tr. Ex. 4.)  Gibson County is the only county in Tennessee in which all students are served by a combination of special school districts and a municipal school district.  (Tr. Exs. 3, 23.)

Gibson County is exempt from operating a county school system, which Tennessee Code Annotated § 49-2-501(b)(2)(C) generally requires.  See McKnight, 2005 Tenn. App. LEXIS 540, at *2, *6; (see also Dep. Of Mary Sneed Reel 8:17-23) (Gibson County does not operate a school system).  When the Private Act created the Gibson County SSD, "Gibson County, in effect, went out of the education business since no students were left to serve."  McKnight, 2005 Tenn. App. LEXIS 540, at *7.  Gibson County's exemption lasts so long as all students in the county are served by a municipal or special school district.  Id. at *2.  Since 1981, Gibson County has not "operated or administered a school system," but the Gibson County Board of Education has appointed members.  Id. at *7.  The Gibson County Board of Education has no "operational components of education," receives

35

no funding for education, and the county has changed its property tax rate to reflect the elimination of funding for education. Id. Gibson County does not have a school superintendent. (Dep. Of Mary Sneed Reel 8:24-9:1.)

Dr. Swanson did not examine Gibson County in his report because it has "no county school system and, as such, appears not to meet the requirements of Public Chapter 1." (Rep. of Dr. Swanson 1.) Dr. Hicks forecast that Gibson County, as a part of the Jackson-Humboldt area, would likely experience population growth "shifting from more urban to more rural or exurban areas, simply because of infill issues in urban areas." (Trial Tr. 267:11-14.) Dr. Hicks' model, which accounts for economic conditions, forecasts Gibson County's 2030 population to reflect a growth rate of 13.7% from 2010. (Id. 274:15-18.) Dr. Hicks did not forecast the population growth in Gibson County's municipalities.

Dr. Hicks and Dr. Swanson also testified about Chapter 905's applicability to Carroll County, which is located in West Tennessee and has a population of 28,522. (Rep. of Dr. Swanson 33.) There are eight municipalities in Carroll County: Atwood, Bruceton, Clarksburg, Hollow Rock, Huntingdon, McKenzie, McLemoresville, and Trezevant. McKenzie, the largest municipality, has a population of 5,310. (Tr. Ex. 51.)

36

Huntingdon has a population of 3,985.  (Tr. Ex. 52.)  No other municipality has a population of more than 1,500.

Tennessee Code Annotated § 49-2-501(b)(1)(B) provides that there can be no more than six school districts, regardless of form, in any Tennessee County with a population greater than 25,000.  There are currently six school districts in Carroll County.  Carroll County Schools serves two students, all of whom are in remedial programs.  (Rep. of Dr. Swanson 2; see also Tr. Ex. 4.)  The remaining students in Carroll County are served by five special school districts.  (Rep. of Dr. Swanson 2.)  Those districts are: South Carroll Special School District ("South Carroll SSD"), which serves 359 students; West Carroll Special School District ("West Carroll SSD"), which serves 985 students; McKenzie Special School District ("McKenzie SSD"), which serves 1,375 students; Hollow Rock-Bruceton Special School District ("Hollow Rock-Bruceton SSD"), which serves 653 students; and Huntingdon Special School District ("Huntingdon SSD"), which serves 1,193 students.  (Tr. Ex. 4.)

Dr. Swanson forecast age-group populations for the eight municipalities in Carroll County.  (Trial Tr. 128:18-20.)  His purpose was to determine whether any of the school-age populations in these municipalities would meet or exceed the 1,500-pupil requirement in Chapter 905.  (Id. 128:23-25.)  He forecast the 2030 population in the 4-18 age group to be 134 in

Atwood, 249 in Bruceton, 122 in Clarksburg, 59 in Hollow Rock, 639 in Huntingdon, 1,177 in McKenzie, 185 in McLemoresville, and 142 in Trezevant.  (See Rep. of Dr. Swanson 41; see also Trial Tr. 131:1-12.)  Dr. Swanson opined that no municipality in Carroll County could have a student-age population of 1,500. (Trial Tr. 131:7-11.)

Dr. Hicks did not forecast the age-group population in Carroll County's municipalities.  He projected the population growth of the total population under age 19 to be 9.4%.  (See Rep. of Dr. Michael Hicks 7.)  He projected Carroll County's total population growth by 2030 to be 14.6%.  (Id. 6.)

The five remaining special school districts in Tennessee are: the Paris Special School District ("Paris SSD") in Henry County; Richard City Special School District ("Richard City SSD") in Marion County; Franklin Special School District ("Franklin SSD") in Williamson County; Oneida Special School District ("Oneida SSD") in Scott County; and Lebanon Special School District ("Lebanon SSD") in Wilson County.  (Rep. of Dr. Swanson 2.)  Dr. Swanson opined that it is "so unlikely as to be virtually impossible" that any of the special school districts would fall under Chapter 1.  (Trial Tr. 135:15-24.)

Paris SSD serves 1,630 students.  (Tr. Ex. 4.)  Henry County Schools serves 3,070 students.  (Id.)  Dr. Swanson forecast the Henry County school-age population would be 3,320

38

in 2030.  (Rep. of Dr. Swanson 27.)  He forecast the Paris SSD school-age population would be 1,513.  (Id.)  He opined that Paris SSD would have to grow by 88.5% to equal the size of the Henry County Schools.  (Id. 19.)  He testified that the possibility of Paris SSD growing in school-age enrollment to equal or exceed the school-age population and/or enrollment of the Henry County Schools to be so unlikely as to be virtually impossible.  (Trial Tr. 120:11-24; 121:1-23.)

Richard City SSD serves 322 students.  (Tr. Ex. 4.)  Marion County Schools serves 4,185 students.  (Id.)  Dr. Swanson forecast the school-age population of Richard City SSD to fall to 172 by 2030.  (Rep. of Dr. Swanson 28.)  He forecast the population of Marion County Schools to be 4,331.  (Id.)  In other words, "Richard City School District had about 6 percent, almost 7 percent of the enrollment that the Henry School District had; and by the time you get to 2030, it's under 4 percent."  (Trial Tr. 122:10-13.)  Dr. Swanson described the possibility that Richard City SSD would grow to equal or exceed the population of Marion County Schools to be "so unlikely as to be virtually impossible."  (Id. 122:17.)

Oneida SSD serves 1,193 students.  (Tr. Ex. 4.)  Scott County Schools serves 2,850 students.  (Id.)  Dr. Swanson forecast the population of Oneida SSD to be 1,097 in 2030.  (Rep. of Dr. Swanson 29.)  He forecast the population of Scott

County Schools to be 2,697. (Id.) Dr. Swanson opined that the population of Oneida SSD is "shrinking slightly" relative to Scott County. (Trial Tr. 123:10-11.) Dr. Swanson testified that, "by the time you get to 2030, it's only going to be at about 41 percent, the Oneida Special School District, of the enrollment found in [Scott] County School District." (Trial Tr. 123:3-5.) He opined that the possibility that Oneida SSD would grow to equal or exceed the population of Scott County Schools to be "so unlikely as to be virtually impossible." (Id. 123:15.)

Franklin SSD serves 3,703 students. (Tr. Ex. 4.) Franklin SSD serves only grades K-8. (Trial Tr. 123:23-25.) Williamson County Schools serves 30,988 K-12 students. (Tr. Ex. 4.) Currently, Franklin SSD has approximately twenty percent of the enrollment in the Williamson County Schools. (Id. 124:7-8.) Dr. Swanson testified that, by 2030, Franklin SSD's enrollment will decrease to approximately ten percent of Williamson County Schools' enrollment. (Id. 124:8-9.) Dr. Swanson theorized that the forecasted decrease in ratio between Franklin SSD and Williamson County Schools is attributable to "Williamson County outside of Franklin [] growing at a faster rate than Franklin." (Id. 125:9-11.) Dr. Swanson testified that the possibility of the student enrollment of Franklin SSD growing to equal or

exceed Williamson County Schools by 2030 to be "so unlikely as to be virtually impossible." (Id. 126:2-7.)

Lebanon SSD serves 3,237 students. (Tr. Ex. 4.) Lebanon SSD serves only grades K-8. (Trial Tr. 125:17-19.) Wilson County serves 15,139 students. (Tr. Ex. 4.) Dr. Swanson forecast the enrollment of Wilson County Schools to increase to 18,596 students by 2030. (Rep. of Dr. Swanson 31.) Dr. Swanson forecast the enrollment of Lebanon SSD to be 3,256 by 2030. Dr. Swanson opined that the possibility of Lebanon SSD growing to equal or exceed the population of Wilson County Schools to be "so unlikely as to be virtually impossible." (Trial Tr. 126:1-3.)

Dr. Hicks did not forecast the expected populations for special school districts and county school districts in Marion, Henry, Scott, Wilson, or Williamson Counties. He projected population annual growth for age groups 19 and under from 2010 to 2030. (Rep. of Dr. Michael Hicks 6-7.)

**V. Law**

The first issue in this case is the constitutionality of Public Chapter 905 under Article XI, Section 9 ("Section 9") of the Tennessee Constitution. Any analysis begins "with the presumption . . . that the acts of the General Assembly are constitutional." Vogel v. Wells Fargo Guard Servs., 937 S.W.2d 856, 858 (Tenn. 1996) (citations omitted). Courts "'presume

41

that every word in a statute has meaning and purpose; each word should be given full effect if the obvious intention of the General Assembly is not violated by doing so.'" State v. White, 362 S.W.3d 559, 566 (Tenn. 2012) (quoting Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ., 244 S.W.3d 302, 309 (Tenn. 2007)). Courts have a "duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution." Davis-Kidd Booksellers v. McWherter, 866 S.W.2d 520, 529 (Tenn. 1993) (citations omitted). In other words, courts must "interpret constitutional provisions in a principled way that attributes plain and ordinary meaning to their words and that takes into account the history, structure, and underlying values of the entire document." Estate of Bell v. Shelby Cnty. Health Care Corp., 318 S.W.3d 823, 835 (Tenn. 2010). When addressing challenged statutes, if a court faces a "choice between two constructions, one of which will sustain the validity of the statute and avoid a conflict with the Constitution, and another which renders the statute unconstitutional," the court must choose the former. Davis-Kidd, 866 S.W.2d at 529-530.

Article XI, Section 9 provides, in relevant part:

[A]ny act of the General Assembly private or local in
form or effect applicable to a particular county or
municipality either in its governmental or its

42

> proprietary capacity shall be void and of no effect
> unless the act by its terms either requires the
> approval by a two-thirds vote of the local legislative
> body of the municipality or county, or requires
> approval in an election by a majority of those voting
> in said election in the municipality or county
> affected.

Adopted in 1953, Article XI, Section 9 reflects "[c]oncern about the General Assembly's abuse of [] power." Elijah Swiney, John Forrest Dillon Goes to School: Dillon's Rule in Tennessee Ten Years After Southern Constructors, 79 Tenn. L. Rev. 103, 118 (2011). "Prior to the 1950s, municipalities in Tennessee were creatures of private acts. They could be created, abolished, expanded, or weakened freely by statute." Id. Section 9 addresses the operation of private acts by vesting "control of local affairs in local governments, or in the people, to the maximum permissible extent." Farris v. Blanton, 528 S.W.2d 549, 552 (Tenn. 1975); see also Civil Service Merit Bd. v. Burson, 816 S.W.2d 725, 728 (Tenn. 1991). "[A]ny and all legislation 'private and local in form or effect' affecting Tennessee counties or municipalities, in any capacity, is absolutely and utterly void unless the Act requires approval of the appropriate governing body or of the affected citizenry." Farris, 528 S.W.2d at 551 (emphasis added). The drafters of Section 9 intended the amendment to "strengthen local self-government." Burson, 816 S.W.2d at 728.

The Section 9 question is whether the School Acts, "irrespective of [their] form, [are] local in effect and application." Farris, 528 S.W.2d at 551; see also Burson, 816 S.W.2d at 729. "The test is not the outward, visible or facial indices, nor the designation, description or nomenclature employed by the Legislature. Such a criterion would emasculate the purpose of [Section 9]." Farris, 528 S.W.2d at 551. Constitutional inquiries address "'whether the legislation [in question] was designed to apply to any other county in Tennessee, for if [a statute] is potentially applicable throughout the state it is not local in effect even though at the time of its passage it might have applied [to one county].'" Burson, 816 S.W.2d at 729 (alteration in original) (quoting Farris, 528 S.W.2d at 552). Potential applicability is viewed through a lens colored by "reasonable, rational and pragmatic rules [of construction] as opposed to theoretical, illusory, or merely possible considerations." Farris, 528 S.W.2d at 552.

Potential applicability turns on the substance of a statute, not its form. Id. at 554. The operation or application of a statute's classifications or conditions speaks to its potential applicability. See Doyle v. Metropolitan Gov't of Nashville and Davidson Cnty., 471 S.W.2d 371, 373 (Tenn. 1971) (finding that a statute's condition that "any city having a metropolitan form of government" was general because it

44

"applie[d] to all those who desire to come within its purview."
Id. at 373; see also Bozeman v. Barker, 571 S.W.2d 279, 280-81
(Tenn. 1978) (upholding a statute that fixed a minimum salary
for court officers in counties with more than 250,000 but less
than 600,000 people because it "presently applies to two
populous counties" and could "become applicable to many other
counties depending on what population growth is reflected by any
subsequent Federal Census"); Burson, 816 S.W.2d at 729-30
(upholding a statute with a population threshold because
population growth could bring other counties under the statute
in the future).

Section 9 also requires courts to consider whether
legislation "was designed" to apply to any other county. See
Farris, 528 S.W.2d at 552. To "design" means to act "on
purpose, purposefully, intentionally." IV Oxford English
Dictionary 519 (2d ed. 2001). The legislative intent may be
considered by courts, but there must be doubts about a statute's
application or ambiguities in the text. See Farris, 528 S.W.2d
at 555-56; see also Barker, 571 S.W.2d at 281.

To the extent legislative history may be considered,
"[r]elying on legislative history is a step to be taken
cautiously." BellSouth Telcoms. v. Greer, 972 S.W.2d 663, 673
(Tenn. Ct. App. 1997) (citing Piper v. Chris-Craft Indus., Inc.,
430 U.S. 1, 26 (1977)). Legislative history has a tendency to

include "self-serving statements favorable to particular interest groups prepared and included . . . to influence the courts' interpretation of the statute." Id. at 673-74 (citations omitted). To the extent courts address legislative history, they must review the complete history. See Galloway v. Liberty Mut. Ins. Co., 137 S.W.3d 568, 570 (Tenn. 2004) ("If the language of the statute is ambiguous, the court must examine the entire statutory scheme and the legislative history to ascertain and give effect to the legislative intent.") (citation omitted). "Courts have no authority to adopt interpretations of statutes gleaned solely from the legislative history that have no statutory reference points." Greer, 972 S.W.2d at 674 (citing Shannon v. United States, 512 U.S. 573, 583 (1994)).

Chapter 905 provides, in relevant part:

> If a municipality is located within any county in which a transition planning commission has been created pursuant to § 49-2-502(b); and if the municipality is authorized by its charter, as set forth by statute or private act, to operate a city school system; and if the proposed city school system would possess a student population of sufficient size to comply with state requirements; then the governing body of the municipality may request the county election commission to conduct a referendum pursuant to § 49-2-106; however, if a special election is requested, then the municipality shall pay the costs of the election.

The Commissioners argue that Chapter 905 is restricted to eight counties in Tennessee and can only realistically apply in one: Shelby County. The Commissioners contend that Chapter 905

applies only if a municipality in one of those eight counties has a sufficient population under Tennessee law to support a municipal school system. They also argue that Chapter 905's application is limited to counties in which a transition planning commission has been established under Tennessee Code Annotated § 49-2-502(b)(1). The Commissioners argue that, because Shelby County is the only county in Tennessee that: 1) meets the student population requirement; 2) has a transition planning commission; and 3) will meet Chapter 905's requirements either now or in the future, Chapter 905 is unconstitutional. The Commissioners argue that the possibility of additional municipalities in counties with special school districts falling under Chapter 905 is so remote as to be nonexistent.

The Memphis City Plaintiffs argue that Chapter 905 violates Section 9 because no municipality in any other county with a special school district can satisfy the population requirements under Tennessee law. The Memphis City Plaintiffs also argue that, because two of the eight counties with special school districts do not have functioning county boards of education, Chapter 905 cannot apply. The Memphis City Plaintiffs rely on Dr. Swanson's expert testimony to argue that no municipality in any other county with a special school district will fall under Chapter 905.

The Municipalities argue that Gibson County currently falls under Chapter 905.  The Municipalities argue that other counties may fall under the statute by modest population growth.  They rely on the expert testimony of Dr. Hicks, who opined that Tennessee counties would experience population growth.  The Municipalities contend that the Court need not address legislative history because Chapter 905 is unambiguous.  They argue that, even if Chapter 905 were ambiguous, the inferences to be drawn from its legislative history would be insufficient to overcome the presumption in favor of constitutionality.

The State argues that legislation applicable to more than one county or municipality through population change is general legislation.  The State contends that, so long as "another county or counties can bring themselves within the challenged act's purview, the Act is a general law, regardless of when, or whether, the county or counties may choose to do so."  (State's Findings of Fact and Conclusions of Law 10.)  The State contends that Gibson County currently meets the population requirements of Chapter 905.  The State also argues that Gibson County will be required to establish a county school system if one of its special school districts surrenders its charter.  The State argues that additional counties may fall under Chapter 905 in the future.

The threshold inquiry is the appropriate standard. The Commissioners argue that _Farris_ requires legislation to apply "throughout the State." The Commissioners argue that, if legislation does not apply "throughout the State," it is private legislation that is void without a provision for local approval. The Municipalities argue that the Commissioners' reliance on _Farris_ transforms the relevant inquiry from "potentially applicable" to "probably applicable." The Municipalities do not dispute _Farris_' directive that "reasonable, rational, and pragmatic" rules of construction be used; they contend that _Burson_ refines courts' inquiries under Section 9. They contend that, if a statute "'is potentially applicable throughout the state, it is not local in effect even though at the time of its passage it might have applied to [only one county].'" _Burson_, 816 S.W.2d at 729 (quoting _Farris_, 528 S.W.2d at 552) (alteration in original).

In _Farris_, the Tennessee Supreme Court invalidated Chapter 354 of the Public Acts of 1975 ("Chapter 354"), which provided, in relevant part, for "a run-off election in counties with a mayor as head of the executive or administrative branch of the county government." 528 S.W.2d at 551-52. Chapter 354 was enacted one year after the Shelby County Restructure Act, a private act that vested Shelby County's "executive and administrative powers [] in a county mayor." _Id._ at 552. As a

result of the Shelby County Restructure Act, Shelby County was unique among Tennessee counties because it, "and it alone, ha[d] a county mayor." Id.

The court invalidated Chapter 354 under Section 9, rejecting the argument that the Chapter 354 "was not intended to apply to one county alone, but rather applies to all counties in the state which now or hereafter have a mayor as head of the executive or administrative branch." Id. at 554. Chapter 354 applied only to Shelby County "under the present laws of the State." Id. There was no "general enabling act under which any other county may opt to so operate." Id. Indeed, no other county could fall under Chapter 354 "except by the affirmative action of the General Assembly." Id. at 552. Although the General Assembly might adopt similar private acts in the future, the court refused to "conjecture [about] what the law may be in the future." Id. The court came to the "inescapable" conclusion that Chapter 354 "was in actuality an amendment" to the Shelby County Restructure Act. Id. Because Chapter 354 did not contain a provision requiring local approval, it was void.

In Farris, the Tennessee Supreme Court stated the appropriate method of analyzing a statute under Article 11, Section 9:

> [W]e must determine whether this legislation was
> designed to apply to any other county in Tennessee,
> for if it is potentially applicable throughout the

> state, it is not local in effect even though at the
> time of its passage it might have applied to Shelby
> County only. But in determining potential
> applicability we must apply <u>reasonable, rational and
> pragmatic rules</u> as opposed to <u>theoretical, illusory or
> merely possible</u> considerations.

<u>Id.</u> (emphasis added). The Tennessee Supreme Court did not define reasonable, rational, pragmatic, theoretical, illusory, or possible. "Reasonable" is a common legal term that means "[f]air [or] proper . . . under the circumstances." <u>Black's Law Dictionary</u> 1272 (Bryan A. Garner ed. 7th ed. 1999). "Rational" is defined as "[h]aving sound judgment; sensible." XIII <u>Oxford English Dictionary</u>, at 291. "Pragmatic" means "practical; dealing with a practice; matter-of-fact." XII <u>Oxford English Dictionary</u>, at 278. Together, these terms require courts to apply fair, sensible, and matter-of-fact readings to statutes.

Theoretical, illusory, or merely possible considerations are distinguishable. <u>See</u> <u>Farris</u>, 528 S.W.2d at 552. Theoretical is defined as "existing only in theory, ideal, or hypothetical." XVII <u>Oxford English Dictionary</u>, at 901. "Illusory" means having "the quality of . . . tending to deceive by unreal prospects." VII <u>Oxford English Dictionary</u>, at 662. "Possible" refers to that "which may come about or take place without prevention by serious obstacles." XII <u>Oxford English Dictionary</u>, at 175. Together, these terms suggest that courts

must refrain from statutory interpretations that are hypothetical, unreal, or face serious obstacles.

In Farris, the application of Chapter 354 to other counties was "merely possible" or "theoretical." The Tennessee General Assembly would have been required to pass a separate act to include additional counties. Although the General Assembly might have acted, at some point in the future, the court dismissed that possibility as hypothetical. Farris established an inquiry in which potential application is grounded in common sense and reasonableness. See Farris, 528 S.W.2d at 554.

The parties agree that Farris requires the application of reasonable, rational, and pragmatic rules of statutory construction. They disagree about the scope of a statute's potential applicability. The Commissioners argue that Farris requires all statutes to apply "throughout the state" or provide for local approval. To the Commissioners, "throughout the State" is tantamount to everywhere in the state.

In considering whether a statute applies "throughout the State," courts must decide whether the legislation was designed to apply in "any other county in Tennessee, for if it is potentially applicable throughout the state," it is general legislation. Id. at 552 (emphasis added). If legislation was not designed to apply to "any other county in Tennessee," it is

local legislation that is void without provision for local approval.

There is tension between "any other county" and "throughout the state." "Throughout" means from "the whole of (a space, region, etc.); in or to every party of; everywhere in." XVIII Oxford English Dictionary, at 14. Throughout may also be conceptualized as "in or to every part, everywhere." Id. "Any" signifies an "indeterminate derivative of one." I Oxford English Dictionary, at 538. Thus, "any county" could plausibly refer to a number greater than one. "Throughout the state" could plausibly refer to "every part of" or "everywhere" in the state.

Section 9 does not require that legislation apply to "every part of" or "everywhere" in Tennessee. In Burson, the Tennessee Supreme Court upheld a statute that applied "generally to municipalities in all counties with a minimum population of 300,000 that do not have a mayor-aldermanic form of government." Burson, 816 S.W.2d at 730. In upholding that statute, the Tennessee Supreme Court did not state or otherwise suggest that a statute must potentially apply to every Tennessee county; it was sufficient that the statute could potentially apply within the class created by the General Assembly. The statute was constitutional because it applied to the "three most populous" counties in Tennessee and because "urban areas in additional

counties will eventually become subject to [the statute] as county population increases." Id. at 730.

Burson and Farris are not in conflict. "Throughout the state" is more appropriately understood as throughout the class created by the Tennessee General Assembly. If the class created by a statute is so narrowly designed that only one county can reasonably, rationally, and pragmatically be expected to fall within that class, the statute is void unless there is a provision for local approval. This conclusion is consistent with the General Assembly's "power to draw classifications among certain groups." City of Chattanooga v. Davis, 54 S.W.3d 248, 276 (Tenn. 2001); see also Op. Tenn. Att'y Gen. 86-195, 1986 Tenn. AG LEXIS 16, at *4 (Dec. 1, 1986) ("The fact that a law does not apply statewide does not make it a special or local law.").

The general law in Tennessee is that "[a]n existing municipality that does not operate a school system or a municipality incorporated after May 19, 1998, may not establish a school system." Tenn. Code Ann. § 6-58-112(b)(1). Chapter 905 suspends the general law if a municipality is: 1) located in a county in which a transition planning commission has been created; 2) authorized by its charter to operate a city school system; and 3) the proposed city school system satisfies Tenn. Comp. R. & Regs. 0520-01-08.01, which provides that a

municipality must "have a scholastic population within its boundaries that will assure an enrollment of at least 1,500 pupils in its public schools."

Public Chapter 1, now codified at Tennessee Code Annotated § 49-2-502, provides for the transition planning commission that is a requirement before the general law is suspended and a municipality can create a new school system. A transition planning commission can only be created if the transfer of administration of the schools in a special school district to the county board of education would result in an "increase in student enrollment within the county school system of 100% or more." Tenn. Code Ann. § 49-2-502(b)(1).

The class created by the Tennessee General Assembly necessarily limits Chapter 905 to eight counties: Shelby, Gibson, Carroll, Henry, Wilson, Williamson, Scott, and Marion. Of those eight counties, Shelby is the only one that has a transition planning commission and in which municipalities have taken steps to create municipal school districts under Chapter 905. Chapter 905 does not include a provision for local approval. To pass constitutional muster under Section 9, Chapter 905 must be potentially applicable to one or more of the remaining seven counties using reasonable, rational, and pragmatic rules of construction. See Farris, 528 S.W.2d at 552.

The parties characterize Chapter 905 differently.  The Municipalities argue that the 1,500-student requirement is a population threshold that has been, or will be attained by cities in the remaining counties with special school districts.  The Municipalities rely on a distinction between population thresholds and population brackets, a distinction that the Commissioners contend is artificial and would emasculate Section 9.  The Commissioners argue that Chapter 905 is not applicable to any county but Shelby under any reasonable, rational, and pragmatic construction.

Tennessee case law has addressed population thresholds, which are targets to be attained, and population brackets, which are drawn to target specific counties.  See, e.g., Leech v. Wayne Cnty., 588 S.W.2d 270, 274-277 (Tenn. 1979).  That distinction does not apply in this case.  Chapter 905 does not contain a population bracket.  See id. at 277 (a statute that applied to counties "having a population of not less than 12,350 nor more than 12,375 or not less than 38,800 nor more than 38,900 by the federal census of 1970 or any subsequent federal census" violated Section 9).  Chapter 905 also does not contain a population threshold in the manner addressed by the Tennessee Supreme Court.  See Burson, 816 S.W.2d at 730 (a statute that applied "in all counties with a minimum population of 300,000 that do not have a mayor-aldermanic form of government" was

56

constitutional); <u>see also</u> <u>Cnty. of Shelby v. McWherter</u>, 936 S.W.2d 923, 935 (Tenn. Ct. App. 1996) ("Only persons who are residents of the area served by a local education agency are eligible to serve on the school board in counties with populations of seven hundred thousand (700,000) or more, according to the 1990 Federal Census or any subsequent Federal Census.").

Chapter 905 establishes three separate but necessary criteria for the creation of municipal school districts. Population is only one criterion; it is not the focus of the classification created by the Tennessee General Assembly. <u>See</u> <u>Burson</u>, 816 S.W.2d at 730 (population threshold indicated that the statute could "become applicable to many other counties depending on subsequent population growth").

The Court must address Chapter 905 in its entirety, applying reasonable, rational, and pragmatic rules of construction to determine its potential application to counties other than Shelby. <u>See</u> <u>Farris</u>, 528 S.W.2d at 552.

The Commissioners argue that Chapter 905 does not apply to Gibson County because it: 1) does not have a county school board; 2) has existing bond debt; and 3) has special school districts that are subject to federal consent decrees. The Municipalities argue that: 1) Gibson County satisfies Chapter 905's population requirement; 2) Gibson County would be required

to create a county board of education if one of its special school districts availed itself of Chapter 1; and 3) the existence of bonded debt is not an impediment to the implementation of Chapter 905.

Gibson County does not operate a county school system. Its students are currently served in municipal or special school districts. Under Tennessee Code Annotated § 49-2-501(b)(2)(C), "in those counties in which all students in grades kindergarten through twelve (K-12) are eligible to be served by city and special school systems, the county shall not be required to operate a separate county school system, nor shall it be necessary that a county school board be elected or otherwise constituted." Milan is the only municipality in Gibson County that currently satisfies the 1,500-student requirement in Chapter 905. Data from the 2010 federal census shows that the school-age population of Milan is 1,753. (Tr. Ex. 48.) The Municipalities argue that, if Milan SSD transferred its administration to the county, Tennessee Code Annotated § 49-2-501(b)(2)(C) would require Gibson County to establish a county school system and the necessary administration.

In the absence of a county school system, the application of Chapter 905 to Gibson County is especially problematic. Chapter 905 applies only to counties in which a transition planning commission has been created. Such a commission can

only be created when a transfer of administration would result in a specified increase in student enrollment within the county school system.   Gibson County does not have a county school system.

Whether a special school district in Gibson County will surrender its charter, thus requiring Gibson County to organize a county school system, exists in theory, not in reality. Gibson County "operates no schools, has no elected school board, and levies no countywide property tax to fund education." See McKnight, 2005 Tenn. App. LEXIS 540, at *3.   Gibson County has vigorously defended its "unique method of operating and funding education."   See id.   The impetus for Gibson County implementing its "unique method" was the difficulty in obtaining adequate funding for rural schools.   Id. at *6.

Dr. Mary Sneed Reel ("Dr. Reel"), the Superintendent of the Milan SSD, is unaware of any efforts by Milan SSD to abolish itself.   (Dep. Of Mary Sneed Reel 7:13-21.)   Indeed, Dr. Reel testified that the Milan SSD receives benefits, including a greater tax base, from its current configuration.   (Id. 6:16-21.)   The Honorable Chris Crider, the Mayor of Milan, is unaware of any efforts to abolish the Milan SSD and testified that any efforts at abolition would be "unlikely."   (Dep. Of Chris Crider 7:16-18, 8:16-24.)

Given Gibson County's "unique method of operating and funding education," the absence of a county school system, Milan SSD's bond indebtedness, and the unlikelihood that Milan SSD will abolish its school system, the application of Chapter 905 to Gibson County exists only in theory. <u>Farris</u> instructs courts to refrain from entertaining theories. <u>See Farris</u>, 528 S.W.2d at 552. The "group of conditions" in Chapter 905 is "so unusual and particular" that "only by a most singular coincidence could [it] be fitted to [Gibson County]." <u>See In re Elm St.</u>, 158 N.E. 24, 26 (1927). Applying reasonable, rational, and pragmatic rules, Chapter 905 does not and will not apply to Gibson County.

The parties dispute the application of Chapter 905 to Carroll County. The Commissioners argue that no municipality in Carroll County can reasonably be expected to have a 1,500-student population by 2030. The Commissioners rely on Dr. Swanson's testimony and report. The Municipalities argue that municipalities in Carroll County, particularly McKenzie, will fall under Chapter 905 through modest population growth. The Municipalities rely on Dr. Hicks' testimony and report.

The Court finds Dr. Swanson's testimony credible. Unlike Dr. Hicks, Dr. Swanson forecast student-age populations in Carroll County municipalities through 2030. Dr. Hicks forecast Carroll County's total population growth, not the population growth by age ranges. Based on Dr. Swanson's forecast, the

possibility of any municipality in Carroll County having a student-age population of 1,500 is virtually nonexistent. (Trial Tr. 131:7-11.) As an additional complicating factor, Chapter 905 would apply only if a qualifying school system elected to transfer its administration to a county school system that serves two students, all in remedial programs. (Tr. Ex. 4.)

The Municipalities and the State contend that municipalities in Carroll County will fall under Chapter 905 as they grow. This is not a population threshold case. The appropriate inquiry is not simply whether Chapter 905 can "become applicable to many other counties depending on subsequent population growth." Burson, 816 S.W.2d at 730. The application of all of Chapter 905's conditions must be reasonable, rational, and pragmatic. See Farris, 528 S.W.2d at 552. Even considering population growth alone, Dr. Swanson's testimony establishes that the possibility of municipalities in Carroll County falling under Chapter 905 is so unlikely as to be nonexistent.

In addressing the constitutionality of a statute, the Court must presume that the statute is constitutional and resolve all doubts in favor of constitutionality. See Vogel, 937 S.W.2d at 858 (court begins "with the presumption which the law attaches and which we cannot ignore that the acts of the General Assembly

are constitutional"). The presumption of constitutionality rests on the availability of reasonable statutory constructions. See Davis-Kidd, 866 S.W.2d at 529 (courts have a "duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution"). Under no reasonable construction could Chapter 905 apply to Carroll County.

The parties do not seriously dispute that Chapter 905 does not apply and will not apply to Scott, Williamson, Wilson, Henry, and Marion Counties. Dr. Swanson's analysis demonstrates that no special school district in any of those counties has or will have sufficient student population to increase the student population in the county school system by 100% or more. Dr. Swanson testified that the necessary enrollment increases are so unlikely as to be virtually impossible. That testimony has not been contradicted.

The Commissioners and the Memphis City Plaintiffs contend that the legislative history demonstrates that Chapter 905 targeted Shelby County. Section 9 claims directly implicate legislative intent. See Farris, 528 S.W.2d at 552 (under Section 9, courts "must determine whether . . . legislation was designed to apply to any other county in Tennessee") (emphasis added). In Farris, the Tennessee Supreme Court appended

excerpts from the legislative history "in an effort to ascertain the legislative intent."  See 528 S.W.2d at 555-56.

The legislative history of Public Chapter 905, taken as a whole and fairly considered, firmly establishes that Chapter 905 was designed to apply only to Shelby County.  That design is not dispositive, but it supports the conclusion, derived from an examination of potentially comparable counties, that Chapter 905 applies to a particular county.

One example among many occurred on April 27, 2012.  When discussing House Bill 1105 ("HB 1105"), which became Chapter 905, two legislators explained why the bill that came from the Conference Committee differed from the bill in its original form:

> Rep. Hardaway: [T]his is different from the original Bill in that it only, this is different from the original Bill in that it only pertains to Shelby County?
>
> Rep. Montgomery: That is what it does.  What they did here is by stating what I read there, if a municipality is located within a county in which a transition planning commission has been developed, and that is the only county in the State of Tennessee that has that, so it limits it to Shelby.  You are right.

(HB 1105 46, ECF No. 306-6.)  This and similar exchanges reinforce Chapter 905's limited application to Shelby County.

The Municipalities cite portions of the legislative history in which references are made to "counties" or in which the possible application to a few other counties is mentioned.

There is in the history a sense of a wink and a nod, a candid discussion of the bill's purpose occasionally blurred by a third-party correction.  The history is clear, however, that the bill never would have passed had it not been intended to apply only to Shelby County.

For purposes of its Chapter 905 analysis, the Court presumes the good faith of the Tennessee General Assembly.  The Court presumes that the General Assembly did not intend to violate Article 11, Section 9, but the General Assembly did intend the bill to apply only to Shelby County.

"We close our eyes to realities if we do not see in [Chapter 905] the marks of legislation that is special and local in terms and in effect."  In re Elm Street, 158 N.E. at 26. Chapter 905 was tailored to address unique circumstances that had arisen in Shelby County.  The conditions to which it applies are "so unusual and particular [and] precisely fitted" to Shelby County, that "only by a most singular coincidence could [it] be fitted to any other [county]."  Id.

Only Shelby County has undertaken the process set forth in Chapter 1.  Chapter 905 establishes a series of conditions that have no reasonable application, present or potential, to any other county.

**VI.  Conclusion**

Although general in form, Public Chapter 905 is local in effect. Because it does not include a provision for local approval, Chapter 905 is VOID under Article 11, Section 9 of the Tennessee Constitution. All actions taken under the authority of Chapter 905 are VOID. The Municipalities are enjoined from proceeding under Chapter 905 to establish municipal school districts.

The Third-Party Plaintiffs are invited to submit additional arguments, both factual and legal, addressing only the constitutionality of Chapters 970 and Section 3 of Chapter 1 under Article 11, Sections 8 and 9 of the Tennessee Constitution. Those arguments should be submitted not later than December 11, 2012, and should not include further references to legislative history. The Third-Party Defendants may respond no later than December 27, 2012.

All other deadlines in this case are suspended, and the trial scheduled on January 3, 2012, is continued.

So ordered this 27th day of November, 2012.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE


65